UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| IN RE:<br><br>DURAMAX DIESEL LITIGATION | No. 1:17-cv-11661-TLL-PTM<br><br>Hon. Thomas L. Ludington<br>Magistrate Judge Patricia T. Morris |

**PLAINTIFFS' OPPOSITION TO DEFENDANT GENERAL MOTORS LLC'S MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED AND CONSOLIDATED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

**Page**

STATEMENT OF ISSUES PRESENTED .......... ix

STATEMENT OF CONTROLLING OR MOST APPROPRIATE AUTHORITY .......... xi

I. INTRODUCTION .......... 1

II. ALLEGATIONS .......... 4

A. GM and Bosch developed defeat devices for the Affected Vehicles. .......... 4

B. In furtherance of the scheme devised by GM and Bosch, GM promoted the Affected Vehicles as low-emitting .......... 5

C. The scheme devised by Bosch and GM was deceptive. .......... 5

D. Plaintiffs suffered damage to business and property as a result of the deceptive scheme. .......... 7

III. THE MOTION TO DISMISS SHOULD BE DENIED .......... 7

A. The Complaint satisfies Rule 8(a). .......... 8

B. Plaintiffs do not assert any claim that requires proof of affirmative misrepresentations. .......... 9

C. The Clean Air Act does not preempt Plaintiffs' claims. .......... 12

1. Plaintiffs' state law claims are not expressly preempted. .......... 13

a. Plaintiffs' state law claims do not seek to enforce emissions standards. .......... 15

b. GM's Section 209(a) cases are inapposite. .......... 16

2. There is no implied preemption of Plaintiffs' claims. .......... 18

3. Plaintiffs' fraudulent omission claims are plausibly pled. .......... 20

D. The primary jurisdiction doctrine does not apply. .......... 20

E. Plaintiffs allege a valid RICO claim. ....................21

1. RICO background and legal standard ....................21

2. Plaintiffs have RICO standing because they suffered cognizable economic injury by overpaying for the Affected Vehicles....................23

3. Plaintiffs properly allege a prima facie RICO violation. ..........28

a. Plaintiffs properly allege an association-in-fact enterprise....................28

b. Plaintiffs properly allege the racketeering predicates of mail and wire fraud. ....................35

(1) Plaintiffs allege GM's participation in a scheme to defraud....................35

(2) Plaintiffs allege the enterprise's use, or causing the use, of the mails and wires. ...............39

(3) Plaintiffs properly allege GM's intent to defraud. ....................44

4. Plaintiffs do not seek to remedy CAA violations through their RICO claims. ....................45

F. Plaintiffs have standing to bring claims for violations of the laws of states in which they neither live nor were injured. ................46

IV. CONCLUSION....................48

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*859 Boutique Fitness, LLC v. CycleBar Franchising, LLC*,
699 F. App'x 457 (6th Cir. 2017) ....................7

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009)....................8

*Ass'n of Taxicab Operators USA v. City of Dallas*,
720 F.3d 534 (5th Cir. 2013) ....................15

*Ass'n of Taxicab Operators, USA v. City of Dallas*,
866 F. Supp. 2d 595 (N.D. Tex. 2012), *aff'd*, 720 F.3d 534 (5th Cir. 2013) ....................18

*In re Avandia Mktg., Sales Practices & Prod. Liab. Litig.*,
804 F.3d 633 (3d Cir. 2015) ....................24

*Ayres v. Gen. Motors Corp.*,
234 F.3d 514 (11th Cir. 2000) ....................45

*Bailey v. Atl. Auto. Corp.*,
992 F. Supp. 2d 560 (D. Md. 2014)....................25, 26

*Bailey v. City of Ann Arbor*,
860 F.3d 382 (6th Cir. 2017) ....................3

*Bates v. Dow Agrosciences LLC*,
544 U.S. 431 (2005)....................14, 17

*Beck v. FCA US LLC*,
2017 WL 3448016 (E.D. Mich. Aug. 11, 2017)....................41

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)....................7

*Bledsoe v. FCA US LLC*,
No. 16-cv-14024-TGB-RSW (E.D. Mich.) ....................13

*Boyle v. United States*,
556 U.S. 938 (2009)....................29, 31

*In re Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig.*,
155 F. Supp. 2d 1069 (S.D. Ind. 2001)........................................................25, 26

*Brown v. Earthboard Sports USA, Inc.*,
481 F.3d 901 (6th Cir. 2007) ..........................................................................13

*C & L Ward Bros., Co. v. Outsource Sols., Inc.*,
2012 WL 3157005 (E.D. Mich. Aug. 3, 2012)..................................................33

*In re Caterpillar, Inc., C13 & C15 Engine Prods. Liab. Litig.*,
2015 WL 4591236 (D.N.J. July 29, 2015) ..................................................18, 19

*In re ClassicStar Mare Lease Litig.*,
2011 WL 3608456 (E.D. Ky. Aug. 15, 2011) ..................................................22

*In re ClassicStar Mare Lease Litig.*,
727 F.3d 473 (6th Cir. 2013) ..............................................................21, 29, 44

*In re ClassicStar Mare Lease Litig.*,
823 F. Supp. 2d 599 (E.D. Ky. 2011)...............................................................35

*Cobbs v. Katona*,
8 F. App'x 437 (6th Cir. 2001).........................................................................47

*Counts v. Gen. Motors LLC*,
2017 WL 1406938 (N.D. Cal. Apr. 20, 2017)...................................................12

*Counts v. Gen. Motors LLC*,
237 F. Supp. 3d 572 (E.D. Mich. 2017) ....................................................*passim*

*Counts v. Gen. Motors LLC*,
No. 16-12541 (E.D. Mich.)................................................................................3

*In re Detroit Diesel Corp. v. AG of N.Y.*,
269 A.D.2d 1 (N.Y. App. Div. 2000) ...............................................................16

*Easter v. Am. W. Fin.*,
381 F.3d 948 (9th Cir. 2004) ..........................................................................47

*Ellis v. J.P. Morgan Chase & Co.*,
950 F. Supp. 2d 1062 (N.D. Cal. 2013)............................................................25

*Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*,
541 U.S. 246 (2004)....................15, 17

*Fed. Express Corp. v. U.S. Postal Serv.*,
40 F. Supp. 2d 943 (W.D. Tenn. 1999)....................43

*In re Ford Fusion & C-Max Fuel Econ. Litig.*,
2015 WL 7018369 (S.D.N.Y. Nov. 12, 2015)....................14, 21, 43

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n*,
505 U.S. 88 (1992)....................18

*In re Gen. Motors LLC Ignition Switch Litig.*,
2016 WL 3920353 (S.D.N.Y. July 15, 2016)....................33

*Gifford v. Meda*,
2010 WL 1875096 (E.D. Mich. May 10, 2010)....................46

*Jackson v. Gen. Motors Corp.*,
770 F. Supp. 2d 570 (S.D.N.Y. 2011)....................16

*Javitch v. Capwill*,
284 F. Supp. 2d 848 (N.D. Ohio 2003)....................33

*Jensen Family Farms, Inc. v. Monterey Bay Unified Air Pollution Control Dist.*,
644 F.3d 934 (9th Cir. 2011)....................15, 18

*Kaatz v. Hyland's Inc.*,
2016 WL 3676697 (S.D.N.Y. July 6, 2016)....................47

*Lease v. Fishel*,
2009 WL 922486 (M.D. Pa. Apr. 3, 2009)....................9

*Levine v. First Am. Title Ins. Co.*,
682 F. Supp. 2d 442 (E.D. Pa. 2010)....................32

*Lewis v. Casey*,
518 U.S. 343 (1996)....................48

*Line v. Astro Mfg. Co.*,
993 F. Supp. 1033 (E.D. Ky. 1998)....................26

*Marsh v. Genentech, Inc.*,
693 F.3d 546 (6th Cir. 2012) ....................................................................13

*McCabe v. Daimler AG*,
948 F. Supp. 2d 1347 (N.D. Ga. 2013)........................................................42

*McLaughlin v. Am. Tobacco Co.*,
522 F.3d 215 (2d Cir. 2008), *abrogated on other grounds by*
*Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008) ......................27, 28

*Merrick v. Diageo Ams. Supply, Inc.*,
805 F.3d 685 (6th Cir. 2015) ....................................................................14

*In re Merrill Lynch Ltd. P'ships Litig.*,
154 F.3d 56 (2d Cir. 1998) ........................................................................25

*Mitchell Tracey v. First Am. Title Ins. Co.*,
935 F. Supp. 2d 826 (D. Md. 2013)............................................................32

*Morales v. Trans World Airlines, Inc.*,
504 U.S. 374 (1992)....................................................................................13

*Neder v. United States*,
527 U.S. 1 (1999)........................................................................................12

*Norman v. Niagara Mohawk Power Corp.*,
873 F.2d 634 (2d Cir. 1989) ...................................................................45, 46

*Reiter v. Sonotone Corp.*,
442 U.S. 330 (1979)....................................................................................23

*Rivera v. Wyeth-Ayerst Labs.*,
283 F.3d 315 (5th Cir. 2002) ....................................................................47

*Schmuck v. United States*,
489 U.S. 705 (1989)....................................................................................39

*Sedima, S.P.R.L. v. Imrex Co.*,
473 U.S. 479 (1985)...............................................................................21, 22

*Shaw v. Nissan N. Am., Inc.*,
220 F. Supp. 3d 1046 (C.D. Cal. 2016) .......................................................34

*Slorp v. Lerner, Sampson & Rothfuss*,
587 F. App'x 249 (6th Cir. 2014) ....................................................30

*Stewart v. City of Memphis*,
2017 WL 627467 (W.D. Tenn. Feb. 15, 2017) ....................................9

*Stitt v. Citibank, N.A.*,
942 F. Supp. 2d 944 (N.D. Cal. 2013)...............................................25

*Storey v. Attends Healthcare Prods., Inc.*,
2016 WL 3125210 (E.D. Mich. June 3, 2016) ...............................46, 47

*In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prods. Liab. Litig.*,
826 F. Supp. 2d 1180 (C.D. Cal. 2011) ..............................................34

*Tri-State Express, Inc. v. Cummins Engine Co.*,
2000 U.S. Dist. LEXIS 23564 (D.D.C. Sept. 11, 2000).......................27

*United States v. Daniel*,
329 F.3d 480 (6th Cir. 2003) ........................................................35, 44

*United States v. Garlick*,
240 F.3d 789 (9th Cir. 2001) ..............................................................35

*United States v. Oh*,
200 F. App'x 545 (6th Cir. 2006) .......................................................10

*United States v. Warshak*,
631 F.3d 266 (6th Cir. 2010) ..............................................................39

*Universal Health Grp. v. Allstate Ins. Co.*,
2010 WL 2278618 (E.D. Mich. May 12, 2010) ....................................9

*In re Volkswagen "Clean Diesel" Litig.*,
2016 WL 5347198 (Va. Cir. Ct. Aug. 30, 2016)..............................12, 14, 16, 19

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*,
2017 WL 3816738 (N.D. Cal. Aug. 31, 2017) ..............................16, 17

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*,
2017 WL 4890594 (N.D. Cal. Oct. 30, 2017) ....................................2, 24, 31, 44

*Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc.*,
648 F.3d 452 (6th Cir. 2011) .........................................................................32

*Woodard v. Labrada*,
2017 WL 3309765 (C.D. Cal. July 31, 2017).....................................................10

## STATUTES

18 U.S.C. § 1961 ...........................................................................................28

18 U.S.C. § 1962 ...........................................................................................22

18 U.S.C. § 1964 ...........................................................................................22

42 U.S.C. § 7401 ...........................................................................................14

42 U.S.C. § 7543 ......................................................................................14, 18

## OTHER AUTHORITIES

Fed. R. Evid. 404(b)(2) ....................................................................................9

## STATEMENT OF ISSUES PRESENTED

1. The Complaint alleges wrongful conduct by Defendants Bosch LLC and Bosch GmbH in devising and implementing "defeat devices" not only for Defendant General Motors LLC but also for all other car manufactures, including Volkswagen, which has pleaded guilty to criminal violations for using such a defeat device. Those allegations are relevant to the plausibility of the RICO claims involving the Bosch Defendants' knowledge and intent with respect to Plaintiffs' allegations in this case. Do the allegations of such other violations comport with Fed. R. Civ. P. 8(a)?

2. Plaintiffs do not assert a claim for common law fraud or any claim that requires proof of affirmative misrepresentations or individual reliance on affirmative misrepresentations. Rather, affirmative statements by GM cited in the complaint establish that GM understood that a vehicle's emissions performance and fuel economy was material to a reasonable consumer, thus triggering GM's duty to tell the whole truth. Is GM's argument that Plaintiffs fail to state a claim for affirmative misrepresentations irrelevant?

3. Plaintiffs' claims under consumer protection statutes and for fraudulent concealment seek recovery for the economic loss they incurred from Defendants' unfair, unlawful, and deceptive failure to reveal material facts about the vehicles' emission of pollutants and the vehicles' fuel economy and performance that were achieved only by manipulating emissions controls. These claims do not rely on, and are independent of, EPA emissions standards. Should this Court rule that Plaintiffs' state law claims are not preempted under the Clean Air Act, which regulates EPA emissions standards?

4. Plaintiffs allege with specificity that Defendants fraudulently failed to disclose material information concerning the emission of pollutants and performance, which induced customers to pay too much for those vehicles. And state consumer protection laws are broadly worded to provide a remedy for unfair, unlawful, or deceptive conduct. Have Plaintiffs adequately pled claims for fraudulent concealment and violation of state consumer laws?

5. Plaintiffs are not asking this Court to affirmatively determine that the GM vehicles are in noncompliance with emissions regulations. Rather, this case involves the question of whether GM omitted material information about

compliance. Should this Court decline to stay this action under the primary jurisdiction doctrine, when there is no danger of regulatory inconsistency?

6. Plaintiffs allege that Defendants knowingly entered into and implemented a scheme to sell and promote certain GM vehicles through fraudulent omissions regarding the vehicles' emissions of pollutants and economic value. The Bosch Defendants provided defeat devices that turn on emissions controls during testing but turn off the emissions controls when a testing environment is not detected. And GM marketed the vehicles without revealing the use of such defeat devices. As a result of this scheme, Plaintiffs paid too much for the vehicles. Have Plaintiffs adequately alleged a RICO claim?

7. Whether named Plaintiffs who have standing to assert their own claims can assert claims on behalf of absent class members under the laws of other states presents a question of typicality to be determined under Rule 23. Plaintiffs here have standing to assert their own claims, and they assert those same claims on behalf of absent class members under the substantially similar laws of other states. Should ruling on typicality be deferred until Plaintiffs file a motion for class certification?

# STATEMENT OF CONTROLLING OR MOST APPROPRIATE AUTHORITY

## A. The Complaint satisfies Rule 8(a).

1. Fed. R. Civ. P. 8(a)
2. Fed. R. Evid. 404(b)(2)

## B. General Motors LLC's argument that Plaintiffs fail to allege a claim for affirmative misrepresentations is irrelevant.

3. *Counts v. Gen. Motors LLC*, 237 F. Supp. 3d 572 (E.D. Mich. 2017)
4. *United States v. Oh*, 200 F. App'x 545 (6th Cir. 2006)
5. *Woodard v. Labrada*, 2017 WL 3309765 (C.D. Cal. July 31, 2017)

## C. Section 209 of the Clean Air Act does not preempt Plaintiffs' claims.

6. 42 U.S.C. § 7543(a)
7. *Bates v. Dow Agrosciences L.L.C.*, 544 U.S. 431 (2005)
8. *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246 (2004)
9. *Merrick v. Diageo Ams. Supply, Inc.*, 805 F.3d 685 (6th Cir. 2015)
10. *In re Caterpillar, Inc.*, 2015 WL 4591236 (D.N.J. July 29, 2015)
11. *In re Volkswagen "Clean Diesel" Litig.* (Va. Cir. Ct. Aug. 30, 2016).

## D. This action should not be stayed under primary jurisdiction doctrine.

12. *Counts v. Gen. Motors LLC*, 237 F. Supp. 3d 572 (E.D. Mich. 2017)
13. *In re Ford Fusion & C-Max Fuel Econ. Litig.*, 2015 WL 7018369 (S.D.N.Y. Nov. 12, 2015)

## E. Plaintiffs sufficiently plead a RICO claim.

14. *Boyle v. United States*, 556 U.S. 938 (2009)
15. *Reiter v. Sonotone Corp.*, 442 U.S. 330 (1979)
16. *Schmuck v. United States*, 489 U.S. 705 (1989)
17. *Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc.*, 648 F.3d 452 (6th Cir. 2011)
18. *In re ClassicStar Mare Lease Litig.*, 727 F.3d 473 (6th Cir. 2013)
19. *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, 2017 WL 4890594 (N.D. Cal. Oct. 30, 2017)

**F. Plaintiffs have standing to bring claims for violations of the laws of states in which they neither live nor were injured.**

20. *Counts v. Gen. Motors LLC*, 237 F. Supp. 3d 572 (E.D. Mich. 2017)
21. *In re Auto. Parts Antitrust Litig.*, 2013 WL 2456612 (E.D. Mich. June 6, 2013)

# I. INTRODUCTION

The motion to dismiss[1] of Defendant General Motors ("GM") contradicts the weight of recent, well-reasoned authority holding that the use of "defeat devices" by automotive manufacturers contravenes various state laws and the federal RICO statute. It is one more attempt by the auto industry to avoid compensating its customers, who were the victims of GM's deceptive scheme to defraud. The motion to dismiss should be denied.

In their Complaint,[2] Plaintiffs allege that GM and Defendants Robert Bosch GmbH and Robert Bosch LLC (sometimes, collectively, Bosch[3]) knowingly devised and implemented a scheme to sell vehicles that were rigged with "defeat devices" that allowed GM vehicles to pass tests for federal and state emissions standards that protect health and air quality. As other courts have recognized and as discussed below, all of Defendants' arguments are contrary to law.

Notably with respect to RICO, Judge Breyer explained in similar litigation against Bosch and Volkswagen that there is no justification for defeat devices that

---

[1] *See* Def. General Motors LLC's Mot. to Dismiss Pls.' First Am. and Consol. Class Action Compl. and Mem. in Supp., ECF No. 45 ("GM Mem.").

[2] *See* Pls.' First Am. and Consol. Class Action Compl., ECF No. 18 ("Complaint"). Citations to "¶" refer to the Complaint unless otherwise noted.

[3] In this Opposition, "Bosch" refers to both Robert Bosch GmbH and Robert Bosch LLC; "Bosch GmbH" refers to Robert Bosch GmbH; and "Bosch LLC" refers to Robert Bosch LLC.

turn off the emissions-reduction systems (in part or in whole) when software designed by Bosch detects that the vehicle is not being tested for emissions:

> No one to date in this multidistrict litigation has sought to justify, or explain a lawful purpose for, software that effectively turns a vehicle's emission systems on or off depending on whether the vehicle is undergoing emissions testing or being operated under normal driving conditions.

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, 2017 WL 4890594, at *15 (N.D. Cal. Oct. 30, 2017).[4] Similarly here, Plaintiffs allege that "the vehicles' promised power, fuel economy, and efficiency is obtained only by turning off or turning down emissions controls when the software in these vehicles senses they are not in an emissions testing environment." ¶ 2.

The one novel argument in GM's motion is its misguided effort to muddy the waters by asserting that "[v]irtually every manufacturer discloses AECDs [auxiliary emissions control devices] for every vehicle on the road, and the EPA reviews these disclosures before certifying a vehicle for sale." GM Mem. at 1. But GM neither asserts nor provides evidence that Duramax vehicles in fact contain authorized AECDs. And GM neither asserts nor provides evidence that the EPA was aware of or approved the software that Plaintiffs allege turns on emissions systems only during emissions testing. Instead, GM incorrectly asserts that "without an EPA finding that the Duramax vehicles contain a 'defeat device,' any

[4] *See* Exhibit A, attached hereto, which includes all unpublished cases.

actionable claims 'collapse.'" *Id*. at 2. In making that assertion, GM cites to an order in *Counts*, in which this Court stated, "If the Cruze does not contain a 'defeat device,' the underlying premise of Plaintiffs' suit will collapse." *Counts v. Gen. Motors LLC*, No. 16-12541 (E.D. Mich.), ECF No. 38 at 2. This Court did *not* rule that the plaintiffs had to obtain an EPA finding to that effect, as GM now erroneously contends. In short, GM does not provide *any* evidence that *anyone*, whether the EPA or the public, knew that Duramax vehicles contain an AECD, let alone that the EPA approved such a device.

Based on the allegations in the Complaint, and GM's failure to provide any evidence by means of a request for judicial notice to the contrary, there is no chance EPA or CARB would approve the cheating devices discovered by Plaintiffs' experts that allow excessive pollution during 65-70% of the time that the vehicles are driven and thus could not possibly receive EPA or CARB approval. GM has refused to produce any such documentation to Plaintiffs, and failed to produce it for the Court's review. As a result, GM's unsubstantiated contentions about AECDs are inadmissible and irrelevant at this stage of the litigation. *See Bailey v. City of Ann Arbor*, 860 F.3d 382, 386 (6th Cir. 2017) ("a court ruling on a motion to dismiss 'may consider materials in addition to the complaint if such materials are public records or are otherwise appropriate for the taking of judicial notice'") (citation omitted).

## II. ALLEGATIONS

### A. GM and Bosch developed defeat devices for the Affected Vehicles.

This lawsuit concerns a massive fraud that GM and Bosch perpetrated on state and federal regulators and on the American public. Bosch designed and developed EDC Unit 17, which GM installed in the Affected Vehicles[5] for the purpose of evading emission testing requirements by shifting into a test mode that emitted less pollutants. *See, e.g.*, ¶¶ 15, 113. When EDC Unit 17 was not in test mode, however, the Affected Vehicles emitted dangerous levels of pollutants that were far in excess of what EPA or CARB regulations allowed. *See, e.g.*, ¶ 121. As part of the scheme, EPA and CARB were deceived into issuing Certificates of Conformity ("COC") and Executive Orders ("EOs"), respectively, that the Affected Vehicles met emissions standards. *See, e.g.*, ¶ 164.

Bosch and GM "worked together to develop and implement a specific set of software algorithms for implementation in the [Affected] Vehicles, including algorithms to adjust fuel levels, exhaust gas recirculation, air pressure levels, and urea injection rates in vehicles equipped with SCR systems." ¶ 161. These adjustments allowed Bosch and GM to program cars to evade emissions testing.

[5] ¶ 62 ("To meet the EPA emissions requirements applicable to 2011 vehicles GM introduced a new Duramax V8 diesel engine in both the Silverado and Sierra.").

¶ 162. Customizing an ECU is an intensive 3- to 5-year endeavor involving a full-time Bosch presence at an automaker's facility, including GM. ¶ 172.

### B. In furtherance of the scheme devised by GM and Bosch, GM promoted the Affected Vehicles as low-emitting.

Bosch and GM understood that a vehicle's pollution footprint is a factor in a reasonable consumer's decision to buy a vehicle. In furtherance of the scheme devised by GM and Bosch, GM promoted the Duramax engine as delivering "low emissions" or having "reduced NOx emissions" in press releases, owner's manuals, and brochures that it intended to reach the eyes of consumers. GM was acutely aware of this due to the public perception that diesels are "dirty." ¶ 85. Thus, GM continuously emphasized that its vehicles delivered "low emissions, "reduced emissions," and "low emissions and great power," had the latest control systems that reduced Nox by a "whopping 63% when compared to the 2010 model," run "cleaner," delivered a fine mist that results in lower emissions, and had "advanced emissions equipment." ¶¶ 85, 86, 89, 90, 91, 92, 93. And GM emphasized "greater fuel efficiency, improved performance, and reduced emissions." ¶ 95.

### C. The scheme devised by Bosch and GM was deceptive.

Plaintiffs have extensively tested a 2013 Silverado 2500 diesel using a Portable Emissions Measurement System (PEMS), which is representative of the class of Duramax diesel engines present in both the Chevrolet Silverado and GMC

Sierra model years 2011 to 2016. ¶¶ 107-112. Testing confirmed that the vehicle complies with emissions standards at the temperature windows where the emissions test is performed for certification. ¶ 113. Plaintiffs' experts created a program that is specific to each vehicle to allow communication with the vehicle's computer (ECM) in order to extract important operational information like exhaust temperatures, EGR rates, NOx concentrations upstream of the SCR catalysts, and other information the vehicle's computer might collect. ¶ 114. The thorough testing showed that "two defeat devices are active [for] 65-70% of [vehicle miles traveled] with emissions that are 2.1 to 5.8 times the standard." ¶ 123.

Further testing demonstrates that GM—enabled by Bosch's EDC 17—employs three defeat devices. ¶¶ 125-139. Those devices cause the vehicles to (1) produce emissions above the certification tests at temperatures above the certification range (86ºF); (2) produce higher emissions when temperatures are below the certification test range (68ºF); and (3) produce higher emissions by an average factor of 4.5 in all temperature windows after the vehicle has been run for 200-500 seconds of steady speed operation. ¶ 126. Plaintiffs allege that the Affected Vehicles are the following GM models, which were affected by the unlawful, unfair, deceptive, and defective emission controls: 2011-2016 Silverado 2500HD & 3500HD trucks and Sierra 2500HD & 3500HD trucks. ¶ 149.

### D. Plaintiffs suffered damage to business and property as a result of the deceptive scheme.

Plaintiffs and class members paid a premium of nearly $9,000, as GM charged more for its Duramax engine than a comparable gas car. ¶ 205. For example, paragraph 205 of the Complaint sets forth an advertisement for a 2016 Sierra 2500 indicating that the Duramax costs an additional $8,595.

Had Plaintiffs and class members known of the higher emissions at the time they purchased or leased their Affected Vehicles, they would not have purchased or leased those vehicles, or would have paid substantially less for the vehicles than they did. Affected Vehicles will necessarily be worth less in the marketplace because of their decrease in performance and efficiency and increased wear on their cars' engines. ¶ 206.

## III. THE MOTION TO DISMISS SHOULD BE DENIED

A court "faced with a motion to dismiss must view the complaint in the light most favorable to the nonmoving party, accept all the allegations in the complaint as true, and draw all reasonable inferences in favor of the nonmoving party." *859 Boutique Fitness, LLC v. CycleBar Franchising, LLC*, 699 F. App'x 457, 459 (6th Cir. 2017) (citation omitted). Dismissal is appropriate only if the complaint fails to state a claim to relief that is "plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). And a "claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The "plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at 556). There must be enough to "nudge" the claims "across the line from conceivable to plausible." *Id.* at 683 (citation omitted).

**A. The Complaint satisfies Rule 8(a).**

GM erroneously argues that the Complaint violates Rule 8(a) by including allegations about "scandals in ***other lawsuits*** involving ***other manufacturers*** and ***other vehicles***." GM Mem. at 12. GM ignores the obvious—those other lawsuits involved GM's co-Defendants, Bosch GmbH and Bosch LLC. As Plaintiffs allege, "Almost all of the vehicles found or alleged to have been manipulating emissions in the United States (Mercedes, FCA, Volkswagen, Audi, Porsche, Chevy Cruze) use a Bosch EDC17 device." ¶ 20. Similarly here, "Bosch GmbH and Bosch LLC developed, manufactured, and tested the electronic diesel control (EDC) that allowed GM to implement the defeat device." *Id.* And Plaintiffs allege that Bosch played a critical role in the defeat device scheme in many diesel vehicles in the U.S., giving rise to a strong inference that it played a key role in implementing the GM emission strategy. ¶¶ 168-200. Based on those allegations, Plaintiffs allege that "the same level of coordination between Bosch and Volkswagen also occurred between Bosch and GM." ¶ 168. Proof of such other wrongful acts by Bosch is

relevant, for example, to the plausibility of the alleged scheme in this action, and to Bosch's knowledge and intent in devising and implementing the scheme. *See* Fed. R. Evid. 404(b)(2) ("Evidence of a crime, wrong, or other act . . . may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.").

The two cases cited by GM are inapposite. In *Universal Health Group v. Allstate Insurance Co.*, 2010 WL 2278618, at *3 (E.D. Mich. May 12, 2010), the complaint contained arguments rather than factual allegations. And in *Lease v. Fishel*, 2009 WL 922486, at *2 (M.D. Pa. Apr. 3, 2009), the court stated that "[t]he mash of allegations in this introductory statement read more like a novel than a legal pleading and frequently digress into improper argumentative detail." No such improper allegation is contained in the Complaint in this action. And in *Universal Health Group*, the defendant filed a motion to strike voluminous irrelevant allegations under Rule 12(f). GM has not filed such a motion here. Indeed, "[t]he Sixth Circuit has stated that [such] motions . . . 'are viewed with disfavor and are not frequently granted.'" *Stewart v. City of Memphis*, 2017 WL 627467, at *4 (W.D. Tenn. Feb. 15, 2017).

### B. Plaintiffs do not assert any claim that requires proof of affirmative misrepresentations.

GM argues that Plaintiffs fail to state an affirmative misrepresentations claim based on the "puffery" doctrine. GM Mem. at 13-18. But Plaintiffs do not

sue for common law fraud under state law for affirmative misrepresentations. Instead, Plaintiffs sue for omissions of material fact, fraudulent concealment, violation of state law consumer protection statutes, and violation of RICO. The consumer protection statutes bar not only fraud but also deceptive, unfair, and unlawful conduct. And to the extent those statutes preclude fraud, they do not incorporate the standards of common law fraud. *See, e.g.*, *Woodard v. Labrada*, 2017 WL 3309765, at *11 (C.D. Cal. July 31, 2017) ("Unlike common law fraud, a UCL violation can be shown even without allegations of actual deception, reasonable reliance and damage.") (citation omitted). And Plaintiffs' RICO claim does not require any proof of affirmative misrepresentations because the omission of material facts suffices to prove the predicate acts of mail or wire fraud. As the Sixth Circuit has explained, "in the fraud context an affirmative misstatement is not required. Rather, a scheme or artifice to defraud may simply involve a knowing omission of a material fact." *United States v. Oh*, 200 F. App'x 545, 553 (6th Cir. 2006). So GM's arguments about the standards for alleging common law fraud are irrelevant, as is the line of "puffery" cases, which focus on claims for affirmative misrepresentations.

GM also makes the irrelevant argument that Plaintiffs do not allege statements upon which they relied. GM Mem. at 16. GM does not point to a single state law claim made by Plaintiffs that requires such specificity since Plaintiffs are

not suing for common law fraud but rather on omissions claims. Plaintiffs each allege that before they purchased their vehicles, they reviewed advertisements on GM's website and representations from GM's authorized dealer touting the efficiency, fuel economy, and power and performance of the engine.[6] And Plaintiffs all allege that they bought their vehicles on the reasonable but mistaken belief, due to Defendants' omission of material facts, that the vehicle was a "clean diesel" and/or a "low emission diesel," complied with U.S. emissions standards, was properly EPA-certified, and would retain all of its promised fuel economy and performance throughout its useful life. *Id.* Since Plaintiffs are not suing for common law fraud, those allegations suffice.[7]

Finally, evidence of affirmative statements made by GM are relevant not to prove common law fraud (which is not alleged by Plaintiffs) or claims based on affirmative misrepresentations but rather to show that Defendants' omissions were material for purposes of claims under consumer protection statutes and RICO. *See*

---

[6] *See* ¶ 26 (George Stanley); ¶ 27 (Michael Reichert); ¶ 28 (Andrei Fenner); ¶ 29 (Gregory Williams); ¶ 30 (Joshua Herman); ¶ 31 (Phillip Burns); ¶ 32 (Kurt Roberts); ¶ 33 (Anthony Gadecki); ¶ 34 (Cody McAvoy); ¶ 35 (Keith Ash); ¶ 36 (Matt Henderson); ¶ 37 (James T. Crunkleton III); ¶ 38 (Carrie Mizell).

[7] *See Counts v. Gen. Motors LLC*, 237 F. Supp. 3d 572, 597 (E.D. Mich. 2017) ("[I]t appears that—in at least California, New Jersey, North Dakota, and Kansas—individualized reliance does not necessarily need to be pleaded. Perhaps other states are not so permissive, but because GM has not specifically raised that argument, the Court will not *sua sponte* analyze the elements of fraudulent concealment from each state's law that Plaintiffs purport to sue under.").

*Neder v. United States*, 527 U.S. 1, 25 (1999) ("[W]e hold that materiality of falsehood is an element of the federal mail fraud, wire fraud, and bank fraud statutes."). Plaintiffs do cite to GM advertisements that contain statements about low emissions, "whopping" emissions reductions, and use of the latest emissions control technology. The relevance of those promises is GM's acknowledgment that low emissions are material, so GM's puffery argument misses the point. Far from generalized boasting, such plain statements about the merits of reduced emissions provide clear evidence that omitted information about the defeat devices and the pollutants spewed by the Affected Vehicles are material to a reasonable consumer. *See Counts v. Gen. Motors LLC*, 2017 WL 1406938, at *4 n.3 (E.D. Mich. Apr. 20, 2017) ("Indeed, even though GM's advertising campaign does not constitute actionable misrepresentations, it does provide context for the question of whether GM made material omissions that would have misled a reasonable consumer.").

**C. The Clean Air Act does not preempt Plaintiffs' claims.**

In moving to dismiss on preemption grounds, *see* GM Mem. at 18-27, GM seeks immunity for *voluntary* false promises to consumers and concealment of material facts. *See In re Volkswagen "Clean Diesel" Litig.*, 2016 WL 5347198, at *5 (Va. Cir. Ct. Aug. 30, 2016). Under GM's interpretation of the Clean Air Act ("CAA"), a manufacturer could promise consumers that its vehicles are clean, low emitting, and EPA-compliant and collect a premium for these so-called features.

Then when these promises—which no regulator forced GM to make—are alleged to be false and misleading, the manufacturer can hide behind CAA preemption by speculating that, in order to prove deception, the fact-finder may need to make a finding that the vehicles violated EPA regulations.

As Judge Berg said in a hearing on motions to dismiss in another defeat device case, "[t]hat seems like fraud to me, it seems like it's a pretty bad misrepresentation if somebody is selling me something with a device in it that hides what it's really doing. That sounds crooked." Transcript of Oct. 11, 2017 Hearing on Motions to Dismiss, ECF No. 46 at 24, *Bledsoe v. FCA US LLC*, No. 16-cv-14024-TGB-RSW (E.D. Mich.).

**1. Plaintiffs' state law claims are not expressly preempted.**

Federal preemption is an affirmative defense for which the defendants bear the burden of proof. *Brown v. Earthboard Sports USA, Inc.*, 481 F.3d 901, 912 (6th Cir. 2007). At the pleadings stage, it is the plaintiffs' own allegations that must show the defense exists and defeats the claim for relief. *Marsh v. Genentech, Inc.*, 693 F.3d 546, 554-55 (6th Cir. 2012). A preemption analysis under the Clean Air Act therefore begins by considering whether the Plaintiffs' allegations run afoul of the plain language of the CAA. *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383 (1992). When analyzing the plain language of the CAA's preemption clause, the Sixth Circuit requires "due regard for the presuppositions of our

embracing federal system." *Merrick v. Diageo Ams. Supply, Inc.*, 805 F.3d 685, 694 (6th Cir. 2015). Ambiguity in the text of a preemption clause is interpreted against preemption. *Bates v. Dow Agrosciences LLC*, 544 U.S. 431, 449 (2005).

There is thus a well-established presumption against preemption in this context. When Congress acts to preempt state law—especially in areas of longstanding state concern—it treads on the states' customary prerogatives in ways that risk upsetting the traditional federal-state balance of authority. *Merrick*, 805 F.3d at 694. Environmental regulation is such a field. *Id. See also* 42 U.S.C. § 7401(a)(3) (air pollution is the "primary responsibility of States and local governments"). And so is false advertising. *In re Ford Fusion & C-Max Fuel Econ. Litig.*, 2015 WL 7018369, at *28 (S.D.N.Y. Nov. 12, 2015).

GM cannot overcome this presumption. CAA's preemption clause provides that "[n]o State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to this part." 42 U.S.C. § 7543(a). Rather than seeking to enforce emissions standards, Plaintiffs "seek remediation of injuries arising from misrepresentations and concealment of material facts . . . about the compliance, efficiency, and technology of their vehicles." *In re Volkswagen*, 2016 WL 5347198, at *5.

**a. Plaintiffs' state law claims do not seek to enforce emissions standards.**

The interpretation of "standard" under the CAA is "narrow"—that term contemplates numerical limits on emissions or equipment and design requirements related to emissions control. *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246 (2004).[8] Plaintiffs do not seek to impose numerical limits on emissions or equipment and design requirements related to emissions control. Plaintiffs assert state law causes of action for violations of consumer fraud, consumer protection, or deceptive trade practices statutes (Counts 2-5, 8, 10-11, 13-54) and fraudulent concealment (Counts 7, 9, 12). These claims are not "dependent on a 'finding that GM violated federal emissions requirements.'" *Counts*, 237 F. Supp. 3d at 590. Instead, the "gravamen of Plaintiffs' claims . . . focus on 'the deceit about compliance, rather than the need to enforce compliance." *Id*. at 591.

The weight of authority in this context holds that section 209(a) does not expressly preempt Plaintiffs' claims. In addition to *Counts*, the court in

[8] *See Ass'n of Taxicab Operators USA v. City of Dallas*, 720 F.3d 534, 539 (5th Cir. 2013) (discussing "standard" in terms of "numerical emission levels with which vehicles or engines must comply . . . or emission-control technology with which they must be equipped") (quoting *Engine Mfrs. Ass'n*, 541 U.S. at 253); *Jensen Family Farms, Inc. v. Monterey Bay Unified Air Pollution Control Dist.*, 644 F.3d 934, 940 (9th Cir. 2011) (holding that a requirement that farmers register and pay a fee for diesel engines is not a "standard" because it does not set emission levels or impose design requirements).

*Volkswagen* explains that consumer fraud claims are not preempted where they "ultimately rest on and seek remediation of injuries arising from misrepresentations and concealment of material facts . . . about the compliance, efficiency, and technology of their vehicles." *In re Volkswagen*, 2016 WL 5347198, at *5.

**b. GM's Section 209(a) cases are inapposite.**

GM relies on factually inapposite decisions that do not analyze preemption in the context of voluntary false statements and material omissions made to consumers. In *In re Detroit Diesel Corp. v. AG of N.Y.*, 269 A.D.2d 1 (N.Y. App. Div. 2000), the New York Attorney General was investigating defendants' efforts to circumvent federal emissions standards. The AG was therefore "attempt[ing] to enforce [a] standard relating to the control of emissions from new motor vehicles" as prohibited by 42 U.S.C. § 7543(a). *Id*. at 7. In *Jackson v. Gen. Motors Corp.*, 770 F. Supp. 2d 570 (S.D.N.Y. 2011), city transit workers (not consumers) sued for negligence and strict liability alleging harm from the ingestion of diesel exhaust fumes. And in *Volkswagen*, Judge Breyer rejected the State of Wyoming's investigation, similar to the investigation attempted in *Detroit Diesel*, because Wyoming was "attempting to hold Volkswagen liable for using a defeat device in its vehicles" as opposed to the false statements that it made to consumers. *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, 2017

WL 3816738, at *13 (N.D. Cal. Aug. 31, 2017). Judge Breyer distinguished that claims from those made in *Counts*, "where the court held that Section 209(a) did not preempt certain contract, fraudulent concealment, and deceptive advertising claims brought against GM by consumers who alleged that they purchased GM vehicles that contained a defeat device." *Id.*

With no apposite case law on its side, GM conjures an argument based on a revised version of its losing argument in *Counts*. GM argues that Plaintiffs' state law claims rest on the concealment or presence of a "defeat device," as defined by EPA regulations. GM Mem. at 18-21. GM goes further, arguing that by alleging that GM made misrepresentations to the EPA, Plaintiffs' state law claims are challenging an EPA compliance determination under the CAA and EPA's regulations. GM Mem. at 21-24. But this misguided analysis selectively relies upon background and RICO allegations in the Complaint, and avoids addressing the elements of Plaintiffs' state law causes of action. *See* GM Mem. at 18-27.[9] Indeed, GM invents claims that Plaintiffs do not assert. *See id.* at 22 (Plaintiffs raise "fraud on the EPA claim"); *id*. at 25 (Plaintiffs "seek to . . . impose a disclosure requirement").

[9] The relevant preemption inquiry, which GM does not perform, includes examining the elements of the state laws at issue. *See Bates*, 544 U.S. at 443-46, 453; *Engine Mfrs. Ass'n*, 541 U.S. at 249-51, 258-59.

**2. There is no implied preemption of Plaintiffs' claims.**

Implied preemption occurs either when Congress expresses a clear intent to occupy the field (field preemption), or when compliance with both federal and state regulations is impossible (conflict preemption). *See Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992). Neither form of implied preemption applies here.

The CAA savings clause demonstrates that Congress did not intend to occupy the field of emissions regulation: "Nothing in this part shall preclude or deny to any State or political subdivision thereof the right otherwise to control, regulate, or restrict the use, operation, or movement of registered or licensed motor vehicles." 42 U.S.C. § 7543(d). This savings clause negates field preemption and no court has found field preemption under the CAA. *See In re Caterpillar, Inc., C13 & C15 Engine Prods. Liab. Litig.*, 2015 WL 4591236, at *14 (D.N.J. July 29, 2015) (explaining that no court has held that the CAA preempts the field and that "the savings clause suggests that Congress did not intend to occupy the entire field of motor vehicle regulation"); *Ass'n of Taxicab Operators, USA v. City of Dallas*, 866 F. Supp. 2d 595, 603 (N.D. Tex. 2012) (rejecting field preemption under the CAA), *aff'd*, 720 F.3d 534 (5th Cir. 2013); *Jensen Family Farms*, 644 F.3d at 941 (rejecting broad "relating to" preemption under the CAA given the EMA court's narrowing of the word "standard").

Here again, courts analyzing implied preemption under the CAA in exactly these circumstances hold that there is "no argument, nor . . . any basis to conclude, that a significant federal regulatory goal of the CAA is consumer protection from false advertising claims regarding emissions compliance, vehicle efficiency, or implementation of new emissions technology." *In re Volkswagen*, 2016 WL 5347198, at *6. Similarly, the *Caterpillar* court also rejected the defendant's contention that federal regulation in this area is so extensive that Plaintiffs' consumer protection and fraud claims are impliedly preempted. *Caterpillar*, 2015 WL 4591236, at *14. Thus, Plaintiffs' fraud and consumer protection claims are also not impliedly preempted because they do not interfere with any significant federal regulatory goal within the CAA.

Conflict preemption also does not apply. Plaintiffs' claims of deception do not make it impossible for GM to comply with both state and federal law when prevailing on those claims will not require the Court to find a violation of the CAA. *Id.* at *15. Moreover, Plaintiffs' claims are not an obstacle to Congressional objectives and will not interfere with the EPA's certification or recall process under the CAA. *See id.* ("[S]peculation regarding duplicative costs from this action and a potential EPA recall of the engines at issue is not a basis for preemption.").

GM's speculation that allowing the state law claims to proceed would "result in the 'anarchic patchwork' of requirements Congress specifically thought to

avoid" is unavailing. GM Mem. at 26, 31 (citations omitted). There is no such risk where, as here, "Plaintiffs are not attempting to tighten emissions regulations or introduce separate state emissions regulations." *Counts*, 237 F. Supp. 3d at 592.

**3. Plaintiffs' fraudulent omission claims are plausibly pled.**

GM posits, without support, that "it is implausible that a reasonable consumer might care about a hypothetical 'defeat device' that is divorced from EPA regulations." *Id*. at 29. But Plaintiffs' omissions claims are not based on EPA regulations. As it was in *Counts*, "GM's representation of Plaintiffs' burden is inaccurate. Plaintiffs' claims do not depend on and thus Plaintiffs need not allege facts indicating that the Cruze violates EPA emissions standards." *Counts*, 237 F. Supp. 3d at 595. Instead, Plaintiffs must show "that GM fraudulently concealed or misrepresented that the functionality and effectiveness of the [] 'clean diesel' system was substantially lower than a reasonable customer would expect, given the representations made in GM's advertising campaign." *Id.* Therefore, the premise of GM's preemption argument is erroneous, such that preemption does not apply.

**D. The primary jurisdiction doctrine does not apply.**

In asking this Court to invoke the primary jurisdiction doctrine, GM Mem. at 29-31, GM does not attempt to distinguish this case from *Counts*, where the Court described GM's primary jurisdiction argument as having "no merit." *Counts*, 237 F. Supp. 3d at 593. Indeed, as this Court did in *Counts*, courts routinely reject this

argument in similar factual circumstances. *See, e.g.*, *In re Ford Fusion*, 2015 WL 7018369, at *29-30 (rejecting primary jurisdiction argument and noting that "the Court properly may determine whether Defendant's alleged guarantees of real-world fuel economy were misleading to consumers without treading on the calculation methods devised by the EPA, or their disclosure as mandated by the FTC.") The same analysis applies here.

And the EPA does not have the power to address Plaintiffs' claims or remedy their alleged damages. Even if it found that GM has violated regulatory standards, "the EPA could not compensate Plaintiffs for their overpayment." *Counts*, 237 F. Supp. 3d at 593. For these reasons, as well as the significant delay a stay would produce, the primary jurisdiction doctrine should not be applied. *Id*.

## E. Plaintiffs allege a valid RICO claim.

### 1. RICO background and legal standard

Congress intended for the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* ("RICO") to be read "broadly" and has admonished that the statute "be liberally construed to effectuate its remedial purposes." *In re ClassicStar Mare Lease Litig.*, 727 F.3d 473, 487, 492 (6th Cir. 2013) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 498 (1985)). The "remedial purposes" of the statute "are nowhere more evident than in the provision of a private action for those injured by racketeering activity." *Sedima*, 473 U.S. at 498.

Plaintiffs bring this action under 18 U.S.C. § 1964(c), alleging violations of 18 U.S.C. § 1962(c) and (d). Section 1962(d) makes it "unlawful for any person to conspire to violate" RICO's criminal prohibitions, including section 1962(c). Because Plaintiffs have adequately alleged a claim pursuant to section 1962(c), GM's motion to dismiss the section 1962(d) conspiracy claim should be denied as well. *See In re ClassicStar Mare Lease Litig.*, 2011 WL 3608456, at *11 (E.D. Ky. Aug. 15, 2011) ("Since Defendants argue that the claim of conspiracy under subsection (d) must fail in the absence of a viable claim for a violation of either subsection (a) or (c), and the Court has concluded that Plaintiffs have adequately averred those claims, this portion of the motion shall be denied, as well."). To state a claim under section 1962(c), Plaintiffs must allege that GM participated in the (1) conduct (2) of an enterprise through a (3) pattern of (4) racketeering activity, and that its participation was the proximate cause of an injury to Plaintiffs' business or property. *Sedima*, 473 U.S. at 496-97. In its motion to dismiss, GM first argues that Plaintiffs have not alleged an injury to business or property. Next, GM contends that Plaintiffs have not alleged the second and fourth RICO elements of an "enterprise" and "racketeering activity."[10] But because Plaintiffs plausibly plead each element of their RICO claim, GM's motion should be denied.

[10] GM does not challenge the "conduct" or "pattern" elements of Plaintiffs' RICO claims, nor does it dispute that its conduct was the "proximate cause" of the alleged injury to Plaintiffs.

### 2. Plaintiffs have RICO standing because they suffered cognizable economic injury by overpaying for the Affected Vehicles.

Under RICO, plaintiffs must allege that they were "injured in [their] business or property" by the defendant's violation of the statute. 18 U.S.C. § 1964(c). "Money, of course, is a form of property." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 338 (1979). As such, a "person," such as each plaintiff, "whose property is diminished by a payment of money wrongfully induced is injured in his property." *Id.* at 340 (citation omitted) (interpreting analogous "business or property" injury requirement in Clayton Act, 15 U.S.C. § 15). GM nevertheless erroneously argues that Plaintiffs' alleged injuries are "speculative" and "have not yet been realized." GM Mem. at 33, 35. But GM misconstrues and overlooks well-pled factual allegations in the Complaint.

There is nothing speculative about the financial losses that Plaintiffs sustained as a result of Defendants' RICO violations. Plaintiffs were "wrongfully deprived of their property"—i.e., their money—at the moment they overpaid for Affected Vehicles that were "worth significantly less than the invoice price." ¶¶ 276, 279(c). GM's advertising, websites, and YouTube videos represented that the Affected Vehicles were "clean" and "environmentally friendly" (¶¶ 265, 238, 205), and Plaintiffs paid a premium of "nearly $9,000" over the price of a comparable gas car based at least in part on these representations (¶¶ 13, 205). As a

result of the scheme to conceal the "defeat devices"[11] from regulators and consumers, Plaintiffs did not get what they paid for. ¶¶ 28-36. These supposedly "clean" vehicles were emitting, and continue to emit, illegal levels of pollutants such as NOx. *Id*. So Plaintiffs unknowingly spent their money on a product worth "far less than was paid." ¶ 274. Plaintiffs each allege that had they known of the concealed defeat devices, they "would have paid substantially less . . . than they did" for the Affected Vehicles or would not have purchased or leased them at all. ¶¶ 26-38, 206.

Courts routinely find that overpayment due to a defendant's fraud is a cognizable RICO injury. Recently, in a another case involving RICO allegations in a defeat-device case, Judge Charles Breyer concluded that "a consumer who has been overcharged can claim an injury to her property, based on a wrongful deprivation of her money" or "out of pocket loss." *In re Volkswagen*, 2017 WL 4890594, at *5 (quoting *Canyon Cty. v. Syngenta Seeds, Inc*., 519 F.3d 969, 976 (9th Cir. 2008)). Other courts have reached similar conclusions. *See, e.g.*, *In re Avandia Mktg., Sales Practices & Prod. Liab. Litig.*, 804 F.3d 633, 639 (3d Cir. 2015) ("overpayment due to illegal or deceptive marketing practices" constitutes

[11] "Defeat devices"—defined as an "auxiliary emission control device 'that reduces the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal vehicle operation and use'"—are prohibited under the CAA. ¶ 163 (citing 40 C.F.R. § 86.1803-01).

RICO concrete injury); *Ellis v. J.P. Morgan Chase & Co.*, 950 F. Supp. 2d 1062, 1087 (N.D. Cal. 2013) ("A consumer who has been overcharged can claim injury to property under RICO based on a wrongful deprivation of money, which is a form of property."); *Bailey v. Atl. Auto. Corp.*, 992 F. Supp. 2d 560, 580-81 (D. Md. 2014) (a monetary loss at the time of purchase constituted a cognizable RICO injury where plaintiff alleged she purchased a vehicle represented to be a pre-owned consumer vehicle but which had in fact been used as a commercial short-term rental); *Stitt v. Citibank, N.A.*, 942 F. Supp. 2d 944, 953-54 (N.D. Cal. 2013) (finding "direct financial injury" under RICO where plaintiffs alleged they "paid marked-up fees" that they "would have disputed and would not have paid . . . but for Defendants' deception"); *In re Merrill Lynch Ltd. P'ships Litig.*, 154 F.3d 56, 59 (2d Cir. 1998) (plaintiff investors sustained a RICO injury in their out-of-pocket losses the moment they invested in partnerships that were fraudulent and would never achieve the promised objectives). So unlike the cases GM cites involving injuries that were "speculative," "too remote" or "not yet . . . realized" (*see* GM Mem. at 32-33), Plaintiffs suffered RICO injuries through the out-of-pocket premiums they paid for their vehicles as a result of Defendants' fraudulent scheme. ¶¶ 28-36.

GM's authority does not provide otherwise. One inapposite line of cases, exemplified by *In re Bridgestone/Firestone, Inc. Tires Prods. Liab. Litig.*, 155 F.

Supp. 2d 1069, 1088 (S.D. Ind. 2001), addresses defects that have not yet manifested. GM Mem. at 33-34. In *Bridgestone*, the plaintiffs alleged that the allegedly defective tires *may* suffer from a tread separation. *Id.* at 1088. The *Bridgestone* court concluded that the plaintiffs had not yet "realized the diminished value or experienced product failure" and therefore could show no RICO injury. *Id.* at 1091. But the court acknowledged that "diminished value as a commercial concept" constitutes a RICO injury when "a plaintiff actually realizes a loss occasioned by it." *Id.* at 1093 n.26. That is what Plaintiffs allege here. Unlike *Bridgestone*, Plaintiffs do not allege that the Affected Vehicles have a *potential* defect or that their value *may* drop due to a possibility that a defect will manifest *in the future*. Plaintiffs suffered a loss at the point of sale because they bought vehicles with concealed defeat devices that defeated the benefits that were a material feature of the vehicles as advertised. *See, e.g.*, *Bailey*, 992 F. Supp. 2d at 580-81 (distinguishing *Bridgestone* and finding injury where defendant misrepresented a rental car as a consumer vehicle).

Similarly unavailing is GM's argument that Plaintiffs' "diminution in value" and "benefit of the bargain" damages are not cognizable under RICO. GM Mem. at 33. For this argument to have even facial plausibility, Plaintiffs would have had to pay the fair market value for their vehicles, which they did not. Unlike the plaintiff in *Line v. Astro Mfg. Co.*, 993 F. Supp. 1033, 1037 (E.D. Ky. 1998), who "paid no

more than fair market value" for the house he purchased and purportedly "[did] not lose money" as a result of the alleged RICO violation, Plaintiffs allege that they overpaid for their vehicles based on Defendants' fraudulent scheme. ¶¶ 28-36. Likewise, in *Tri-State Express, Inc. v. Cummins Engine Co.*, 2000 U.S. Dist. LEXIS 23564, at *10 (D.D.C. Sept. 11, 2000), the court concluded that the plaintiff's injury was premised on a future decline in value that would occur only after the plaintiffs' trucks were retrofitted. Because that injury had not occurred, the court deemed it "speculative and insufficient to demonstrate injury under RICO." *Id.* at *17. In contrast, Plaintiffs here identify the dollars they overpaid on the date they bought or leased an Affected Vehicle.

GM's reliance on *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 220 (2d Cir. 2008), *abrogated on other grounds by Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008), is also misplaced. There, plaintiff cigarette smokers alleged that they had been deceived into believing that "light" cigarettes were healthier than their "full-flavored" counterparts. Plaintiffs argued that this misrepresentation of the health risks "led to an increased market demand for light cigarettes," which, in turn, "drove up the price," resulting in plaintiffs overpaying for the product. *Id.* at 226. But the court ruled that the plaintiffs' injury was based on the "expectation of a safer cigarette," which was not an injury to "business or property." *Id.* at 229. The court noted that "Defendants' misrepresentation could in no way have reduced

the value of the cigarettes that plaintiffs actually purchased; they simply could have induced plaintiffs to buy Lights instead of full-flavored cigarettes." *Id.* So the plaintiffs' theory of injury was "pure speculation" and awarding damages would require "conceptualiz[ing] the impossible—a healthy cigarette" and then imagining "what a consumer might have paid for such a thing." *Id.*

Calculating Plaintiffs' injuries in this case will not require imagination of the "impossible" or consideration of the subjective possibilities of what Plaintiffs might have paid for the Affected Vehicles had they known the truth. Nor do Plaintiffs' arguments rely on the premise that increased demand due to Defendants' misrepresentations led to price inflation and, thus, overpayment. Plaintiffs here allege that the item they received was of a lesser value than the item they paid for, and they seek to recover the calculable difference between the money they paid and the value of the product they received, as did the plaintiffs in *Bailey*, *Stitt*, *Merrill Lynch*, and *Volkswagen*. The out-of-pocket loss Plaintiffs suffered—i.e., a loss of property at the moment of sale—due to Defendants' fraudulent scheme is a cognizable RICO injury.

**3. Plaintiffs properly allege a prima facie RICO violation.**

**a. Plaintiffs properly allege an association-in-fact enterprise.**

An association-in-fact enterprise can include "any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). The

term "any" ensures that the definition has a "wide reach," as the "very concept of an association in fact is expansive." *Boyle v. United States*, 556 U.S. 938, 944 (2009); *see also In re ClassicStar Mare Lease Litig.*, 727 F.3d at 492 (noting "the Supreme Court's repeated admonitions that the term 'enterprise,' like the RICO statute itself, should be interpreted broadly"). Three elements are necessary to prove an association-in-fact enterprise: (1) a common purpose; (2) relationships among those associated with the enterprise; and (3) longevity necessary to accomplish the purpose. *Boyle*, 556 U.S. at 946. Plaintiffs have properly alleged each of these elements.

First, with respect to "common purpose," Plaintiffs allege that GM and the Bosch defendants worked together to deceive "regulators and the public into believing the [Affected] Vehicles were 'clean' and 'environmentally friendly.'" ¶ 238. Defendants operated with the common purpose of "designing, manufacturing, distributing, testing, and selling the [Affected] Vehicles through fraudulent COCs and EOs, false emissions tests, deceptive and misleading marketing and materials." ¶ 249. The motivation for this common purpose was simple: the enterprise members sought to increase their revenues and market share by selling more vehicles. ¶¶ 253, 259. As to the fruits of their common purpose, "[e]ach member . . . shared the bounty generated by the enterprise—i.e., by sharing the benefit derived from increased sales revenue generated by the scheme to

defraud." ¶ 259. Plaintiffs have amply alleged a "common purpose of engaging in a course of conduct." *Slorp v. Lerner, Sampson & Rothfuss*, 587 F. App'x 249, 265 (6th Cir. 2014).

Second, the Complaint details the relationships of the enterprise members. The enterprise is a "close partnership" between GM and the Bosch defendants, formed on the basis of "corporate ties, contractual relationships, financial ties, and continuing coordination of activities" between them. ¶¶ 166, 253. GM and Bosch coordinated extensively on the development of the EDC 17 (¶ 25), and customizing the EDC 17 for the Affected Vehicles was "an intensive three- to five-year endeavor involving a full-time Bosch presence" at GM (¶¶ 172, 256). Plaintiffs also allege the particulars of GM's role within the organization. GM exerted substantial control and participated in the affairs of the enterprise by, among other activities: (1) designing the defeat devices in conjunction with Bosch; (2) failing to correct or disable the defeat devices; (3) manufacturing, distributing, and selling the Affected Vehicles; (4) misrepresenting and omitting vehicle specifications, including the presence of the defeat devices on regulatory applications; (5) introducing the Affected Vehicles into the stream of commerce; (6) concealing the defeat devices from the public; and (7) ensuring that other RICO defendants and co-conspirators complied with the fraudulent scheme. ¶ 255.

These allegations amply describe the relationships between the enterprise members as well as GM's specific role within the organization. Indeed, in a recent decision in the *Volkswagen "Clean Diesel"* emissions litigation, Judge Breyer refused to dismiss a RICO claim based on an almost identically pleaded enterprise consisting of Bosch (the parts supplier) and Volkswagen (the auto manufacturer), which was allegedly undertaken to develop, install, and conceal defeat devices in diesel vehicles and deceive the consuming public regarding "clean diesel" technology. Among other things, the court concluded that a sufficient relationship between the parties was established by the "contracts" between Bosch and Volkswagen, and the allegations that Bosch worked with Volkswagen on the emissions systems in the diesel vehicles. The same result should follow here. *In re Volkswagen*, 2017 WL 4890594, at *16.

Finally, Plaintiffs allege that the enterprise operated with the longevity necessary to accomplish its purpose. *See Boyle*, 556 U.S. at 946. Plaintiffs allege that the scheme endured for "many years" and resulted in the sale of Affected Vehicles with illegal defeat devices for more than six years. ¶¶ 16, 276. This establishes that the enterprise acted with sufficient longevity to accomplish its purpose.

GM nonetheless argues that Defendants came together for "legitimate purposes" in the "ordinary course of their business affairs." GM Mem. at 37-38.

This argument fails for several reasons. GM cannot escape liability for its fraudulent activity by also engaging in legitimate activity. Moreover, even if the "legitimate activity" excuse were plausible, the purpose of an alleged enterprise's activity is a question for the jury, not a question to be resolved on a motion to dismiss. Finally, all of GM's arguments are based on non-binding and distinguishable precedent.

The fact that Defendants may have engaged in some lawful activity does not immunize them from their otherwise illegitimate activities. GM contends that it worked with Bosch in the "ordinary course of business," but business activities are not "ordinary . . . if they are used to advance the alleged fraudulent scheme." *Levine v. First Am. Title Ins. Co.*, 682 F. Supp. 2d 442, 461 (E.D. Pa. 2010) ("The fact that the organization between Defendant and its title agents engages in legitimate functions . . . does not overcome the claim of illicit overcharging which is not part of the normal affairs of the business relationship."); *Mitchell Tracey v. First Am. Title Ins. Co.*, 935 F. Supp. 2d 826, 844 (D. Md. 2013) (allegations of deliberate overcharge and misappropriation of funds were "unlawful acts" and, as such, were "not conducted in the ordinary course of business"). Defendants' collusion to design and conceal the defeat devices was separate and apart from whatever "ordinary" business activities they conducted.

And GM's claim that it was merely engaged in its ordinary business functions, rather than defrauding consumers, is, at best, an argument for the jury. *See Watson Carpet & Floor Covering, Inc. v. Mohawk Indus., Inc.*, 648 F.3d 452, 458 (6th Cir. 2011) ("Ferreting out the most likely reason for the defendants' actions is not appropriate at the pleadings stage."). The Complaint includes more than enough detail about the enterprise and its allegedly fraudulent purpose to survive a motion to dismiss. How can the use of at least three defeat devices that result in excessive pollution for 60-75% of the vehicles' operation be ordinary business activity, given the strict regulation of NOx? It cannot.

The cases GM relies on (mostly in string cites) are inapposite. For example, *C & L Ward Bros., Co. v. Outsource Sols., Inc.*, 2012 WL 3157005, at *6 (E.D. Mich. Aug. 3, 2012), involved a claim against defendants that included a business and its successors and officers. Because the entities were already "associated as a business" long before the alleged predicate acts, the court found that their association was not formed for the purpose of engaging in a course of racketeering conduct. *Id.* Here, in contrast, the defendants are distinct entities and companies that came together for the purpose of designing, installing, and concealing engine control units with illegal defeat devices.

Likewise, in both *In re General Motors LLC Ignition Switch Litigation*, 2016 WL 3920353 (S.D.N.Y. July 15, 2016), and *Javitch v. Capwill*, 284 F. Supp.

2d 848 (N.D. Ohio 2003), one or more of the alleged enterprise members acted only in the scope of their normal business relationships and were not aware of, or active participants in, any illegal activity. Similarly, in *Shaw v. Nissan North America, Inc.*, 220 F. Supp. 3d 1046, 1057 (C.D. Cal. 2016), one of the alleged enterprise members took measures to remediate the alleged harm, engaging in conduct that was more "consistent with the behavior of a responsive supplier" than with that of a "participant in some fraudulent enterprise." Here in contrast, Plaintiffs allege that Bosch and GM worked in close coordination to design, develop, and install *illegal* defeat devices in the Affected Vehicles. These illegal and fraudulent activities could not have been undertaken in the ordinary course of any legitimate business.

Finally, in *In re Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices, and Products Liability Litigation*, 826 F. Supp. 2d 1180, 1202-03 (C.D. Cal. 2011), the court concluded that the alleged defect at issue was an unintended consequence of the legal "design, manufacture, and sale or lease of Toyota vehicles." Here, Plaintiffs allege not that Bosch and GM were simply conducting ordinary business that inadvertently had negative consequences, but rather that they deliberately and intentionally engaged in illegal and fraudulent activity.

### b. Plaintiffs properly allege the racketeering predicates of mail and wire fraud.

The elements of mail and wire fraud are (1) a scheme to defraud; (2) the use, or causing the use, of the mails or wires in furtherance of that scheme; and (3) specific intent to defraud. *United States v. Daniel*, 329 F.3d 480, 485 (6th Cir. 2003). Plaintiffs have properly pled these elements for both mail and wire fraud.

#### (1) Plaintiffs allege GM's participation in a scheme to defraud.

A scheme to defraud "includes any plan or course of action by which someone intends to deprive another by . . . deception of money or property by means of false or fraudulent pretenses, representations, or promises." *Daniel*, 329 F.3d at 485 (citation omitted). False material representations include affirmative misrepresentations and "communications of half-truths and concealment of material facts." *In re ClassicStar Mare Lease Litig.*, 823 F. Supp. 2d 599, 627 (E.D. Ky. 2011). The misrepresentation need not be made through the mails or wires or to the RICO plaintiff but may instead be made to a third party. *United States v. Garlick*, 240 F.3d 789, 792 (9th Cir. 2001); *Bridge*, 553 U.S. at 653. Here, Plaintiffs allege that Defendants used, or caused the use of, the mails and wires to further their scheme to defraud consumers and to misrepresent the true nature of the Affected Vehicles in pursuit of their own financial gain.

Plaintiffs allege that GM, along with others, hatched a plan to deceive both regulators and consumers into believing that the Affected Vehicles complied with U.S. emission standards and were "environmentally friendly." *See, e.g.*, ¶¶ 238, 250, 259, 267, 276-277. GM and Bosch worked hand-in-glove to design, develop, and install illegal defeat devices in the Affected Vehicles, which produced emissions levels that far exceeded "the permissible limit for deadly NOx pollutants during real-world driving." ¶¶ 82, 160. These defeat devices are complex systems with a "unique set of specifications and software code" tailored to the Affected Vehicles. ¶¶ 82, 158-162. The design and implementation of the defeat devices required an "interactive process" necessitating "close collaboration" between Bosch and GM "from beginning to end." ¶ 160. This back-and-forth collaboration shows that GM knowingly participated in the scheme. Further, even if GM did not know about the defeat devices from the outset—as implausible as that would be—it was put on notice following the public disclosure of similar Bosch systems in Volkswagen diesel vehicles in September 2015. Notably, GM continued to manufacture and sell the Affected Vehicles with Bosch components even after the Volkswagen revelations. ¶ 260.

GM omitted material information about the Affected Vehicles in its interactions with government regulators. Before selling any Affected Vehicles, GM was obligated to "apply for, and obtain, an EPA-administered COC certifying that

the vehicle comported" with "emission standards for pollutants." ¶ 61. The COC applications required GM to accurately describe the Affected Vehicles "in all material respects," including "all auxiliary emission control devices . . . and an explanation of why the control device is not a defeat device." ¶¶ 61, 163. The Affected Vehicles were granted COCs despite the defeat devices, demonstrating that GM "affirmatively concealed from government regulators, the presence of the test-detecting and performance altering software code that it developed with Bosch." ¶ 164. "In other words, GM . . . lied to the government" to obtain approval for the Affected Vehicles. *Id*. Lying by omission to regulators was essential to the scheme's success. With the fraudulently obtained COCs, GM was able to market and sell Affected Vehicles "with power and efficiency characteristics that made them very appealing," while also producing "illegal levels of deadly NOx pollution." ¶ 84. Had it not concealed the defeat devices, the "trucks would have been less efficient and less powerful, meaning that GM would not have sold as many and would not have been able to charge a premium for them." *Id*.

In addition to concealing the defeat devices from regulators, GM misled consumers, including Plaintiffs, by "designing and distributing marketing materials that misrepresented and concealed the defects in the vehicles." ¶ 255(j). GM's strategy was designed to dupe consumers, because "GM understood that a vehicle's pollution footprint is a factor in a reasonable consumer's decision to

purchase a vehicle." ¶ 85. So in its "press releases, owner's manuals, and brochures" it "promoted the Duramax engine as delivering 'low emissions' or having 'reduced NOx emissions,'" disregarding that they actually emitted "illegal amounts of pollution." ¶¶ 85, 267. Plaintiffs submit numerous examples of these misleading statements, including:

a. A GM brochure for the Sierra Duramax engine stating that it "turn[s] heavy diesel fuel into a fine mist, delivering low emissions and great power." ¶ 88.

b. A GM publication for the 2011 Silverado claiming that its Duramax engine was "friendlier to the environment" and reduced NOx "emissions by a whopping 63%" for a "remarkable reduction of diesel emissions." ¶ 89.

c. A GM press release for the 2013 Silverado claiming that the Duramax engine provides "greater fuel efficiency, improved performance and reduced emissions." ¶ 95.

d. A GM brochure for the 2014 Silverado promising "lower emissions" and "improve[d] fuel economy." ¶ 96.

e. A GM advertisement for the 2016 Sierra touting "low emissions and great power." ¶ 98.

f. A 2011 Duramax owner's manual promising a "whopping" and "remarkable" reduction in NOx and diesel emissions. ¶ 99.

g. A GM advertisement for the 2014 Sierra claiming that the Duramax engine "turn[s] heavy diesel fuel into a fine mist, burning clean and fast with lower emissions." ¶ 102.

h. A GM advertisement for the 2013 Sierra 2500HD alleging the Duramax engine will "reduce carbon dioxide emissions and stretch your fuel budget." ¶ 103.

*See* ¶¶ 85-106. None of these misleading statements addressed the Affected Vehicles' substandard performance during every day driving, and each

misrepresents the Affected Vehicles' actual emissions levels. Encouraged by these and similar misrepresentations, Plaintiffs and class members purchased vehicles worth far less than the price they paid. ¶ 274, 279. GM's misrepresentations to the regulators and consumers were material.

**(2) Plaintiffs allege the enterprise's use, or causing the use, of the mails and wires.**

The use, or causing the use, of the mails and wires need not be fraudulent or misleading but must only be made "in furtherance" of the scheme. *Schmuck v. United States*, 489 U.S. 705, 715 (1989) ("innocent" mailings may supply the mailing element in mail fraud case). The requirement that a mailing be made "in furtherance" of the scheme is "fairly expansive" and includes mailings and transmissions that are "a step in the plot" of the larger scheme. *United States v. Warshak*, 631 F.3d 266, 311 (6th Cir. 2010) (citation and internal quotation marks omitted).

Plaintiffs allege numerous instances of GM's use, or causing the use, of the mail and wires in furtherance of its scheme, including the advertisements, brochures, and manuals cited above, for which Plaintiffs provide internet links and exhibits. *See* ¶¶ 85-106. These examples illustrate that GM utilized its own website and other internet forums to publish misleading materials about the fuel efficiency, emissions standards, and other performance metrics of the Affected Vehicles. ¶ 265.

In addition to these direct examples, Plaintiffs allege that GM and other members of the enterprise made use, or caused the use, of U.S. mail, interstate facsimile, and interstate electronic mail in furtherance of the scheme. ¶ 266. The fraudulent COC applications transmitted to the EPA, for example, were an essential component of the scheme. ¶ 263. Additional uses of the mails and wires included sending, receiving, or causing to be mailed or electronically communicated: (1) the Affected Vehicles themselves; (2) component parts for the defeat devices; (3) essential hardware for the Affected Vehicles; (4) falsified emissions tests; (5) fraudulently obtained COCs and EOs; (6) vehicle registrations and plates as a result of the fraudulently obtained COCs and EOs; (7) documents and communications that facilitated the falsified emission tests; (8) documents intended to facilitate the manufacture and sale of the Affected Vehicles, including bills of lading, invoices, shipping records, reports, and correspondence; (9) documents to process and receive payment for the Affected Vehicles by unsuspecting franchise dealers, including invoices and receipts; (10) payments to Bosch; (11) deposits of proceeds; and (12) SEC filings in which GM has failed to disclose the scheme. ¶ 263. Each of these actions furthered the fraudulent scheme and is sufficient to establish GM's use, or causing the use, of the mails or wires.

There is no merit to GM's contention that it cannot "ascertain whether the purported predicate acts are within or outside its normal operations" and does not

know "what those acts *are*." GM Mem. at 42. Plaintiffs allege that GM relied on at least three categories of fraudulent misrepresentations to actualize its scheme and have pled each with sufficient specificity.

First, Plaintiffs allege that GM fraudulently omitted and concealed material information from government regulators in its applications for COCs. Plaintiffs identify GM as the speaker/omitter and explain that the material information was omitted from the COC applications for the Affected Vehicles submitted to the government. Plaintiffs explain that these material omissions were fraudulent because GM knew about the defeat devices but concealed them to ensure government approval and to facilitate the sale of the Affected Vehicles. *See* ¶¶ 61, 163-164, 274. This satisfies Rule 9(b), which establishes "a slightly more relaxed pleading burden [for claims of fraud by omission]; the claim can succeed without the same level of specificity required by a normal fraud claim." *Beck v. FCA US LLC*, 2017 WL 3448016, at *9 (E.D. Mich. Aug. 11, 2017). "This is because a plaintiff alleging an omission-based fraud 'will not be able to specify the time, place, and specific content of an omission as precisely as would a plaintiff in a false representation claim.'" *Id.* (citation omitted).

Second, Plaintiffs allege that GM concealed the defeat devices from consumers, including Plaintiffs and class members, resulting in overpayment for the Affected Vehicles at the time of purchase or lease. This is sufficient to notify

GM of the details of the fraud. Again, GM is the speaker/omitter of the material information and the failure to disclose this information occurred at the locations each plaintiff purchased or leased an Affected Vehicle[12] on the dates each purchase or lease occurred,[13] among other times and places. The omissions were fraudulent because they concealed material information from Plaintiffs, which caused them to overpay for a product. So the Complaint enables GM to respond to Plaintiffs' allegations. *See McCabe v. Daimler AG*, 948 F. Supp. 2d 1347, 1367 (N.D. Ga. 2013) (plaintiffs adequately alleged time and place of material omission where they submitted the dates on which each plaintiff purchased a defective vehicle manufactured by defendant and contended that the defect should have been disclosed at the time of purchase).

Third, Plaintiffs allege that GM affirmatively misrepresented the emissions capacity of the Affected Vehicles in its advertising materials. ¶¶ 85-106. Again, Plaintiffs identify GM as the speaker. And Plaintiffs allege that the statements were

---

[12] The locations include: Earnhardt GMC, Mesa, Arizona, ¶ 26; Everett Buick/GMC, Brant, Arkansas, ¶ 27; Cardinale GMC, Monterey, California, ¶ 28; Chase Chevrolet, Stockton, California, ¶ 29; Billy Navarre Chevrolet, Sulphur, Louisiana, ¶ 30; Williams Chevrolet, Traverse City, Michigan, ¶ 31; Dralle Chevrolet, Peotone, Illinois, ¶ 32; Star Buick & GMC, Easton, Pennsylvania, ¶ 33; Mountain View Chevrolet, Claremont, California, ¶ 34; McLoughlin Chevrolet, Milwaukie, Oregon, ¶ 35; Bayer Motor Company, Comanche, Texas, ¶ 36.

[13] These dates include on or about: February 2012, ¶ 26; January 4, 2014, ¶ 27; August 1, 2013, ¶ 28; September 2016, ¶ 29; June 4, 2016, ¶ 30; September 29, 2014, ¶ 31; May 2015, ¶ 32; May 14, 2013, ¶ 33; April 9, 2015, ¶ 34; March 25, 2017, ¶ 35; February 2016, ¶ 36.

made in advertisements set forth in the Complaint. Finally, Plaintiffs allege that the statements were fraudulent because GM knew that the Affected Vehicles emitted pollutants at illegally high levels during every day driving conditions. ¶¶ 26-38, 85-106.

At this early stage, Plaintiffs do not need to pinpoint the precise dates of publication for each misleading advertisement, but the Complaint includes the actual advertisements in question. This leaves no room for GM to suggest that it cannot discern the "nature or intent of the statements" that Plaintiffs complain of. And the need to identify specific dates of publication is less relevant where, as here, "Defendant is aware of the advertising campaigns . . . disseminated by Defendant." *Fed. Express Corp. v. U.S. Postal Serv.*, 40 F. Supp. 2d 943, 952 (W.D. Tenn. 1999); *see also In re Ford Fusion,* 2015 WL 7018369, at *33 ("[T]o the extent that Plaintiffs have referenced specific ads . . . they have sufficiently alleged the who, what, when, where, and why of the fraud at issue under Rule 9(b)."). Further, "where the allegedly misleading advertising has occurred over a long period of time, it would be unreasonable . . . to require Plaintiff to identify the exact day, hour or place of every advertisement which made the allegedly misleading statements." *Fed. Express Corp.*, 40 F. Supp. 2d at 951. If GM has any question as to which of its statements are alleged to be misleading, it need look only to the links and exhibits submitted with the Complaint.

**(3) Plaintiffs properly allege GM's intent to defraud.**

GM's intent to defraud can be reasonably inferred from the allegations as to the scheme itself. *See In re Volkswagen*, 2017 WL 4890594 (analyzing comparable allegations of illegal defeat devices and stating that the court may infer a specific intent to defraud on the basis of the scheme itself); *Daniel*, 329 F.3d at 488 (citing *Horman v. United States*, 116 F. 350, 352 (6th Cir. 1902) (noting that the intent required to commit mail fraud "must be to injure, which doubtless may be inferred when the scheme has such effect as a necessary result of carrying it out")). As alleged in the Complaint, GM and Bosch worked in close collaboration to develop and install illegal defeat devices designed to effectively turn the Affected Vehicles' emissions systems on or off depending on whether the vehicle is undergoing emissions testing. They undertook this scheme to deceive regulators and consumers. Not only did GM install an illegal emissions workaround, it then acted affirmatively to conceal it and advertise the purported "lower emissions" technology to maximize its profits at Plaintiffs' expense. GM's intent to defraud is apparent from the illegal purpose of the scheme and GM's integral role in its success. *See In re ClassicStar Mare Lease Litig.*, 727 F.3d at 484-85 (holding that the plaintiffs had proved intent to defraud because "the evidence clearly established that Defendants operated and marketed the Mare Lease Program with

the knowledge that ClassicStar never owned anywhere near the number of Thoroughbreds it purported to lease to investors").

### 4. Plaintiffs do not seek to remedy CAA violations through their RICO claims.

GM misapprehends Plaintiffs' Complaint when it erroneously claims that "RICO may not be used to pursue civil liability for violation of an administrative statute or rule that does not itself create a private right of action." GM Mem. at 43. As detailed above, Plaintiffs' RICO claim alleges that Defendants misrepresented or omitted material facts about the Affected Vehicles. To the extent Plaintiffs prove violations of statutes and rules, it is the deceit about compliance, rather than the need to enforce compliance, that is the gravamen of Plaintiffs' claims.

The cases cited by GM are inapposite. In *Ayres v. General Motors Corp.*, 234 F.3d 514, 521 (11th Cir. 2000), the court held that the plaintiffs could not sue under RICO based on their argument that "Defendants had a duty to disclose the ECM defect under the Safety Act" because the Safety Act provides exclusive remedies for such a violation. Here, in contrast, Plaintiffs do not base their RICO claim on any violation of the CAA. In another case cited by GM, the Energy Reorganization Act provided explicit remedies "for an employee who has been discriminated against or discharged for making safety complaints." *Norman v. Niagara Mohawk Power Corp.*, 873 F.2d 634, 637 (2d Cir. 1989). As a result, the plaintiff could not sue under RICO for such a violation because "the administrative

remedy provided in section 210 is exclusive." *Id*. And in the third case cited by GM, the court explained that the "conduct complained of in the instant case, i.e. the misclassification of Plaintiffs as independent contractors for purposes of federal income and employment tax reporting, is unlawful only by virtue of the federal income tax laws." *Gifford v. Meda*, 2010 WL 1875096, at *16 (E.D. Mich. May 10, 2010). So "the comprehensive administrative scheme embodied in the IRC and the SSA leaves no room for a private action based upon a violation of FICA masquerading as a RICO claim." *Id*. Here, in contrast, Plaintiffs' RICO claim does not rest *at all* on a violation of the CAA.

**F. Plaintiffs have standing to bring claims for violations of the laws of states in which they neither live nor were injured.**

Plaintiffs have adequately alleged facts plausibly showing an "injury in fact" and have Article III standing to bring their own claims and other state law claims on behalf of absent class members at this stage of the case. Plaintiffs address this issue more fully in their Opposition to Bosch's motion to dismiss and here address only particular arguments by GM.

GM tries to conflate the issues of standing as to named plaintiffs bringing their own claims and standing to bring claims on behalf of class members. For example, GM relies on *Storey v. Attends Healthcare Products, Inc.*, 2016 WL 3125210 (E.D. Mich. June 3, 2016), to support its position that a standing evaluation "should not await a decision on class certification." GM Mem. at 46

(citing *Storey*, 2016 WL 3125210, at *1). But this Court in *Storey* made clear that the standing issue differed from the issue here since "Defendant's standing arguments have nothing to do with the unnamed putative class members." *Storey*, 2016 WL 3125210, at *3. The defendant in *Storey* attacked the standing of the named plaintiffs to bring their own claims because it did not believe they had alleged injury in fact. *Id.* at *2. This is a clear distinction from GM's motion to dismiss. Plaintiffs have sufficiently alleged an injury-in-fact and have Article III standing to bring their own claims and, at this stage of the case, are able to bring claims on behalf of unnamed plaintiffs.

GM then cites inapposite cases that have no bearing on the issue raised here. *See Rivera v. Wyeth-Ayerst Labs.*, 283 F.3d 315, 319 n.6 (5th Cir. 2002) (court simply concluded that it could address the issue of standing on appeal from a class certification decision); *Cobbs v. Katona*, 8 F. App'x 437, 438 (6th Cir. 2001) (holding that a prior Rule12(b)(6) dismissal is regarded as an adjudication on the merits for issue and claim preclusion purposes in subsequent actions); *Easter v. Am. W. Fin.*, 381 F.3d 948, 962 (9th Cir. 2004) (factually inapposite because there was no named plaintiff with standing to assert *any* claims against certain defendants, unlike Plaintiffs here who allege injury from these very defendants).

There is now a "growing consensus" that "class certification should come first." *Kaatz v. Hyland's Inc.*, 2016 WL 3676697, at *4 (S.D.N.Y. July 6, 2016).

Plaintiffs "personally have been injured," as is required by *Lewis v. Casey*, 518 U.S. 343, 357 (1996), and have standing to pursue their own claims and state claims on behalf of absent class members until the class certification stage.

## IV. CONCLUSION

GM's motion to dismiss should be denied in its entirety.

Dated: November 29, 2017

Respectfully Submitted,

By: */s/ Steve W. Berman*
Steve W. Berman
Jessica Thompson
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
jessicat@hbsslaw.com

E. Powell Miller (P39487)
Sharon S. Almonrode (P33938)
Dennis A. Lienhardt (P8118)
MILLER LAW FIRM PC
950 W. University Dr., Ste. 300
Rochester, MI 48307
Telephone: (248) 841-2200
Facsimile: (248) 652-2852
epm@millerlawpc.com
ssa@millerlawpc.com
dal@millerlawpc.com

Christopher A. Seeger
SEEGER WEISS LLP
77 Water Street, New York,
New York, NY 10005
Telephone: (212) 584-0700
Facsimile: (212) 584-0799
cseeger@seegerweiss.com

Robert C. Hilliard
HILLIARD MUNOZ GONZALES LLP
719 S Shoreline Blvd., # 500
Corpus Christi, TX 78401
Telephone: (361) 882-1612
bobh@hmglawfirm.com

James E. Cecchi
Carella, Byrne, Cecchi, Olstein,
BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, NJ 07068
Telephone: (973) 994-1700
Facsimile: (973) 994-1744
JCecchi@carellabyrne.com

David S. Stellings
LIEFF CABRASER HEIMANN &
BERNSTEIN, LLP
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: (414) 956-1000
Email: dstellings@lchb.com

Roland Tellis
BARON & BUDD, P.C.
15910 Ventura Blvd #1600
Encino, CA 91436
Telephone: (818) 839-2333
Facsimile: (818) 986-9698
rtellis@baronbudd.com

Joseph Henry ("Hank") Bates
Randall K. Pulliam
CARNEY BATES & PULLIAM PLLC
519 West 7th Street
Little Rock, AR 72201
Telephone: (501) 312-8500
hbates@cbplaw.com
rpulliam@cbplaw.com

*Attorneys for Plaintiffs and the Proposed Class*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on November 29, 2017, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

By: *<u>/s/ Steve W. Berman</u>*
Steve W. Berman