UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

IN RE DURAMAX DIESEL LITIGATION,

ANDREI FENNER, et al,

          Plaintiffs,

v.

GENERAL MOTORS, LLC,
ROBERT BOSCH GMBH, and
ROBERT BOSCH LLC,

          Defendants.

_____/

Case No. 17-cv-11661

Honorable Thomas L. Ludington

## ORDER DENYING MOTIONS TO DISMISS AND DENYING MOTIONS FOR LEAVE TO FILE SURREPLIES AS MOOT

On May 25, 2017, the original Plaintiffs (including the first-named Plaintiff Andrei Fenner) filed a complaint against Defendant General Motors LLC ("GM"), Robert Bosch GmbH, and Robert Bosch LLC ("Bosch" and, collectively, the "Defendants"). ECF No. 1. The suit was assigned to United States District Judge George Caram Steeh. On July 25, 2017, Judge Steeh issued a stipulated proposed order which consolidated the *Fenner* class action with another class action (*Carrie Mizell* et al. v. *General Motors LLC,* et al., Case No. 17-11984) also pending before him at the time. ECF No. 16. Pursuant to that stipulated proposed order, the "caption for the Consolidated Action" was designated as "IN RE DURAMAX DIESEL LITIGATION." *Id.* at 3. Also pursuant to that stipulated order, the Plaintiffs filed a consolidated amended complaint on August 4, 2017. ECF No. 18. On August 30, 2017, the consolidated case was reassigned because it is a companion case to *Counts* et al. *v. General Motors*, Case No. 1-16-cv-12541, which is currently in discovery. ECF No. 33.

At the deadline for responsive pleadings, Defendants filed two motions to dismiss the consolidated amended complaint. ECF Nos. 44, 45.[1] Defendants advance many arguments, including that the Plaintiffs lack standing to sue, that Plaintiffs have failed to state a claim for affirmative misrepresentation, that any fraudulent concealment or omission claims should be dismissed or stayed, and that Plaintiffs have failed to state a Racketeering Influenced and Corrupt Organizations Act (RICO) claim, 18 U.S.C. § 1961 *et seq.* For the following reasons, the motions to dismiss will be denied.

## I.

All well-pleaded factual allegations are assumed to be true at the pleading stage. The consolidated amended complaint names thirteen Plaintiffs residing in ten states.[2] Each Plaintiff bought a Silverado or Sierra 2500 or 3500 diesel vehicle with a model year between 2011 and 2016. Con. Am. Compl. at 1, ECF No. 18. Some Plaintiffs bought new vehicles and others bought used vehicles, but each purchased their vehicle from an authorized GM dealer. *See, e.g.*, *id.* at 14. The vehicles which Plaintiffs identify all contain a "Duramax" diesel engine. *Id.* at 1. Plaintiffs' allegations center on the emissions reduction technology associated with that engine.

## A.

According to Plaintiffs, GM represented the Duramax engine as providing both low

---

[1] Prior to filing, GM and Bosch requested leave to submit briefs of 80 (and 60, respectively) pages in support of their motions to dismiss. ECF Nos. 35, 39. In response, the Court directed the Defendants to submit an outline of their anticipated briefs and suggested that judicial efficiency might be served by waiting to advance state-specific challenges to Plaintiffs' claims in a motion filed pursuant to Federal Rule of Civil Procedure 12(c). ECF No. 36. Defendants were amenable to the latter suggestion and, accordingly, the Court granted the parties leave to submit briefs of 50 pages (and reply briefs of 15 pages). ECF No. 42.

[2] Those states are Arizona, Arkansas, California, Louisiana, Michigan, Nevada, New Jersey, New Mexico, Oregon, and Texas.

emissions and high performance. *Id.*[3] Plaintiffs (in unsourced quotations) contend that GM boasted that the Duramax engine constituted a "'remarkable reduction of diesel emissions'" compared to the engine previously used in its Silverado and Sierra vehicles. *Id.* Those representations were false. Plaintiffs allege that

> scientifically valid emissions testing has revealed that the Silverado and Sierra 2500 and 3500 models emit levels of NOx many times higher than (i) their gasoline counterparts, (ii) what a reasonable consumer would expect, (iii) what GM had advertised, (iv) the Environmental Protection Agency's maximum standards, and (v) the levels set for the vehicles to obtain a certificate of compliance that allows them to be sold in the United States.

*Id.*[4]

In other words, the Duramax engine does not actually combine high power and low emissions as GM suggested: "[T]he vehicles' promised power, fuel economy, and efficiency is obtained only by turning off or turning down emissions controls when the software in these vehicles senses they are not in an emissions testing environment." *Id.* at 1–2.

The Duramax engine allegedly achieves this feat by employing "defeat devices." *Id.* at 2. As Plaintiffs define that term, "[a] defeat device means an auxiliary emissions control device that reduces the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal vehicle operation and use." *Id.* The Duramax engine allegedly contains three such devices. Defeat Device No. 1 "reduces or derates the emissions system when temperatures are above the emissions certification test range (86°F)." *Id.* at 3. Similarly, Defeat Device No. 2 "operates to reduce emissions control when temperatures are below

---

[3] This purported achievement would be particularly noteworthy because diesel engines "have an inherent trade-off between power, fuel efficiency, and emissions: the greater the power and fuel efficiency, the dirtier and more harmful the emissions." *Id.* at 46.

[4] In the consolidated amended complaint, Plaintiffs summarize, in detail, the testing they conducted on a 2013 Silverado 2500. *Id.* at 70–92.

the emissions certification low temperature range (68°F)." *Id.* The impact of these alleged devices is significant:

> Testing reveals that at temperatures below 68°F (the lower limit of the certification test temperature), stop and go emissions are 2.1 times the emissions standard at 428 mg/mile (the standard is 200 mg/mile). At temperatures above 86°F, stop and go emissions are an average of 2.4 times the standard with some emissions as high as 5.8 times the standard.

*Id.*

The third defeat device "reduces the level of emissions controls after 200-500 seconds of steady speed operation in all temperature windows, causing emissions to increase on average of a factor of 4.5." *Id.* Plaintiffs estimate that "due to just the temperature-triggered defeat devices, the vehicles operate at 65-70% of their miles driven with emissions that are 2.1 to 5.8 times the standard." *Id.*[5]

Plaintiffs provide a technical explanation for how GM was able to leverage these devices to "obtain and market higher power and fuel efficiency from its engines while still passing the cold-start emissions certification tests." *Id.* at 4. Essentially, GM placed the "Selective Analytic Reduction (SCR) in front of the Diesel Particulate Filter (DPF)."[6] *Id.* In doing so, GM increased the engine's power production and fuel efficiency. However, placing the SCR in front of the DPF also dramatically increased potential emissions, thus requiring the engine to "employ Active

---

[5] Plaintiffs analyze these alleged devices to those which Volkswagen has recently pleaded guilty to including in their diesel vehicles and which other vehicle manufacturers have been accused of utilizing. *See id.* at 2.

[6] The SCR converts oxides of nitrogen (a harmful pollutant produced by diesel engines) into nitrogen gas and water "by means of a reduction reaction." *Id.* at 50. The DPF traps and stores particulate matter (soot). *Id.* at 51. The DPF is "cleaned through a process known as regeneration." *Id.* "Passive regeneration" is a "continuously occurring process" which occurs whenever "the exhaust gas temperature is high enough to burn the particulate matter trapped by the filter." *Id.* "Active regeneration occurs only when the engine senses that the DPF needs to be cleaned as the DPF is approaching maximum capacity and generating too much exhaust backpressure." *Id.* In that scenario, "fuel is injected into the exhaust stream via the HCI to increase the exhaust gas temperature so that the particulate matter can be burned off at carbon's non-catalytic oxidation temperature." *Id.* Because fuel is being used for a purpose other than propulsion, "[a]ctive regeneration dramatically reduces fuel economy." *Id.*

Regeneration (burning off collected soot at a high temperature) and other power- and efficiency-sapping exhaust treatment measures." *Id.* Thus, the power and fuel-efficiency gains were lost because of the increased need for emissions reduction technology. GM's solution, according to the Plaintiffs, was the three defeat devices identified above.

## B.

## 1.

Plaintiffs allege that, in developing this solution, "GM did not act alone." *Id.* at 10. Rather, Robert Bosch GmbH and Robert Bosch LLC "were active and knowing participants in the scheme to evade U.S. emissions requirements" and to develop, manufacture, and test the "electronic diesel control (EDC) that allowed GM to implement the defeat device." *Id.* The EDC in question, Bosch's EDC17, "is a good enabler for manufacturers to employ 'defeat devices' as it enables the software to detect conditions when emissions controls can be derated——*i.e.*, conditions outside of the emissions test cycle." *Id.* Importantly, "[a]lmost all of the vehicles found or alleged to have been manipulating emissions in the United States (Mercedes, FCA, Volkswagen, Audi, Porsche, Chevy Cruze) use a Bosch EDC17 device." *Id.*

According to a Bosch press release quoted by Plaintiffs, the EDC17 device controls "'the precise timing and quantity of injection, exhaust gas recirculation, and manifold pressure regulation.'" *Id.* at 93. The device also "'offers a large number of options such as the control of particulate filters or systems for reducing nitrogen oxides.'" *Id.* EDC17 is "run on complex, highly proprietary engine management software over which Bosch exerts near-total control." *Id.* at 94. Because the software "is typically locked to prevent customers, like GM, from making significant changes on their own," vehicle manufacturers must work closely with Bosch to implement EDC17 in a vehicle. *Id.*

According to Plaintiffs, "Bosch participated not just in the development of the defeat device, but also in the scheme to prevent U.S. regulators from uncovering the device's true functionality." *Id.* at 39. Additionally, "Bosch GmbH and Bosch LLC marketed 'clean diesel' in the United States and lobbied U.S. regulators to approve 'clean diesel,' another highly unusual activity for a mere supplier." *Id.* In short, Plaintiffs believe that "Bosch was a knowing and active participant in a massive, decade-long conspiracy with Volkswagen, Audi, Mercedes, GM, and others to defraud U.S. consumers, regulators, and diesel car purchasers or lessees." *Id.* at 40.

**2.**

In their complaint, Plaintiffs repeatedly reference allegedly similar conduct by other automobile manufacturers. Plaintiffs explain that, in recent years, "almost all of the major automobile manufacturers rushed to develop 'clean diesel' and promoted new diesel vehicles as environmentally friendly and clean." *Id.* at 5. Due in part to that marketing, a significant market for "clean diesel" vehicles developed: "[O]ver a million diesel vehicles were purchased between 2007 and 2016 in the United States and over ten million in Europe." *Id.* at 6. A number of those diesel vehicle manufacturers, however, have now been accused of installing "defeat devices" in their diesel vehicles. *Id.* For example, Volkswagen has pleaded guilty to criminal charges (and has settled civil class action claims) arising out of allegations that it purposefully evaded emission standards. *Id.* Fiat Chrysler Automobiles has also been accused of similar conduct. On January 12, 2017, the EPA "issued a Notice of Violation to FCA because it had cheated on its emissions certificates with respect to its Dodge Ram and Jeep Grand Cherokee vehicles, and on May 23, 2017, the United States filed a civil suit in the Eastern District of Michigan alleging violations of the Clean Air Act." *Id.* at 6–7.

## C.

Unlike gasoline engines, diesel engines "compress a mist of liquid fuel and air to very high temperatures and pressures, which causes the diesel to spontaneously combust." *Id.* at 46. When compared to gasoline engines, diesel engines produce greater amounts of "oxides of nitrogen (NOx), which includes a variety of nitrogen and oxygen chemical compounds that only form at high temperatures." *Id. See also id.* at 47. According to Plaintiffs,

> NOx pollution contributes to nitrogen dioxide, particulate matter in the air, and reacts with sunlight in the atmosphere to form ozone. Exposure to these pollutants has been linked with serious health dangers, including asthma attacks and other respiratory illnesses serious enough to send people to the hospital. Ozone and particulate matter exposure have been associated with premature death due to respiratory-related or cardiovascular-related effects. Children, the elderly, and people with pre-existing respiratory illness are at acute risk of health effects from these pollutants. As a ground level pollutant, NO2, a common byproduct of NOx reduction systems using an oxidation catalyst, is highly toxic in comparison to nitric oxide (NO). If overall NOx levels are not sufficiently controlled, then concentrations of NO2 levels at ground level can be quite high, where they have adverse acute health effects.

*Id.*

Plaintiffs further allege that the EPA believes that NOx contributes to increases in the amount of acid rain, water quality deterioration, toxic chemicals, smog, nitric acid vapor, and global warming. *Id.* at 113–114.

## D.

In the consolidated amended complaint, Plaintiffs repeatedly reference the pollution standards promulgated by the EPA and other entities. They allege that GM and Bosch conspired to conceal the defeat devices in the Duramax engine from the EPA and allege that, because of the defeat devices, the vehicles in question do not comply with emission pollution standards, despite being certified as conforming to those requirements. *See, e.g., id.* at 97–99. But Plaintiffs also allege that "[t]his case is not based on these laws but on deception aimed at consumers." *Id.* at 5.

Plaintiffs contend that "a vehicle's pollution footprint is a factor in a reasonable consumer's decision to purchase a vehicle" and that GM's actions demonstrate their understanding of that fact. As Plaintiffs explain, GM crafted a marketing campaign, "intended to reach the eyes of consumers, [which] promoted the Duramax engine as delivering 'low emissions' or having 'reduced NOx emissions.' GM was acutely aware of this due to the public perception that diesels are 'dirty.'" *Id.* at 60.

In the consolidated amended complaint, Plaintiffs quote, summarize, or reproduce approximately ten pages of GM advertising, press releases, and publications related to the emissions production and fuel economy of its diesel engines. *See id.* at 61–70. These advertisements and publications repeatedly emphasize that the Duramax engine "'run[s] clean,'" delivers "'low emissions,'" and is "'friendlier to the environment.'" Notably, not one of the advertisements or publications which Plaintiffs reproduce in this section of the consolidated amended complaint references EPA standards or represents that the vehicle in question has been certified by the EPA.

Plaintiffs allege that the disparity between the way the Duramax engine was characterized as operating and the way in which its emissions reductions systems were actually configured has resulted in financial harm to them and other consumers. *See id.* at 116 ("As a result of GM's unfair, deceptive, and/or fraudulent business practices, and its failure to disclose that under normal operating conditions the Polluting Vehicles are not "clean" diesels, emit more pollutants than do gasoline-powered vehicles, and emit more pollutants than permitted under federal and state laws, owners and/or lessees of the Polluting Vehicles have suffered losses.").

First, Plaintiffs allege that they "paid a premium of nearly $9,000 [because] GM charged more for its Duramax engine than a comparable gas car." *Id.* at 115. Because the Duramax engine

did not reduce emissions to the level a reasonable consumer would have expected, Plaintiffs allege

that they overpaid for the vehicle at the time of purchase. *Id.* at 117. Plaintiffs also identify other

damages they have suffered:

> Had Plaintiffs and Class members known of the higher emissions at the time they purchased or leased their Polluting Vehicles, they would not have purchased or leased those vehicles, or would have paid substantially less for the vehicles than they did. Moreover, when and if GM recalls the Polluting Vehicles and degrades the GM Clean Diesel engine performance and fuel efficiency in order to make the Polluting Vehicles compliant with EPA standards, Plaintiffs and Class members will be required to spend additional sums on fuel and will not obtain the performance characteristics of their vehicles when purchased. Moreover, Polluting Vehicles will necessarily be worth less in the marketplace because of their decrease in performance and efficiency and increased wear on their cars' engines.

*Id.* at 117.

### E.

The consolidated amended complaint includes fifty-four counts. The first count alleges that

the Defendants violated the RICO statute. The remaining fifty-three counts are state law claims

predicated on the fraudulent concealment and consumer protection laws of forty-three different

states. Thirty-three of the state law claims originate from states where no named Plaintiff resides.

### II.

Defendants have moved for dismissal pursuant to Federal Rules of Civil Procedure 8(a),

9(b), 12(b)(1) and 12(b)(6). Rule 8(a)(2) mandates that pleadings, including complaints, must

contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *Id.*

Rule 9(b) requires a party allege fraud or mistake to "state with particularity the circumstances

constituting fraud or mistake." *Id.* Rule 9(b) also provides, however, that "[m]alice, intent,

knowledge, and other conditions of a person's mind may be alleged generally." *Id.*

Rule 12(b)(1) provides the means by which a party may assert lack of subject-matter

jurisdiction as a defense. "A Rule 12(b)(1) motion for lack of subject matter jurisdiction can

challenge the sufficiency of the pleading itself (facial attack) or the factual existence of subject matter jurisdiction (factual attack)." *Cartwright v. Garner*, 751 F.3d 752, 759 (6th Cir. 2014) (citing *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir.1994)). "A facial attack goes to the question of whether the plaintiff has alleged a basis for subject matter jurisdiction, and the court takes the allegations of the complaint as true for purposes of Rule 12(b)(1) analysis." *Id.* However, a "factual attack challenges the factual existence of subject matter jurisdiction." *Id.* In that case, "the district court has broad discretion over what evidence to consider and may look outside the pleadings to determine whether subject-matter jurisdiction exists." *Adkisson v. Jacobs Eng'g Grp., Inc.*, 790 F.3d 641, 647 (6th Cir. 2015). Regardless, "the plaintiff bears the burden of proving that jurisdiction exists." *DLX, Inc. v. Kentucky*, 381 F.3d 511, 516 (6th Cir. 2004).

A pleading fails to state a claim under Rule 12(b)(6) if it does not contain allegations that support recovery under any recognizable legal theory. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). In considering a Rule 12(b)(6) motion, the Court construes the pleading in the non-movant's favor and accepts the allegations of facts therein as true. *See Lambert v. Hartman*, 517 F.3d 433, 439 (6th Cir. 2008). The pleader need not provide "detailed factual allegations" to survive dismissal, but the "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In essence, the pleading "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face" and "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678–79 (quotations and citation omitted).

## III.

In the present motions to dismiss, Defendants argue that Plaintiffs lack standing to bring suit, that the consolidated amended complaint is impermissibly vague, that all of Plaintiffs' claims are preempted, that any surviving claims should be stayed, and that Plaintiffs have failed to state a cognizable RICO claim. Those arguments will be addressed in roughly that order. Before proceeding further, the Court must confirm its jurisdiction. After analyzing jurisdictional issues, the next question is whether the complaint is sufficiently clear and specific to comply with federal pleading requirements. The cognizability of Plaintiffs' claims involving the alleged misrepresentation, concealment, or omission of material facts is inextricably intertwined with the question of whether those claims are preempted and the related question of whether this suit should be stayed in favor of an EPA investigation. Accordingly, those questions will be considered together. Next, Defendants' arguments for dismissal of the RICO claim will be considered. Finally, the dispute over whether Plaintiffs lack standing to assert claims premised on the laws of states where no named Plaintiff resides will be addressed.

Both GM and Bosch have filed separate motions to dismiss. While the two motions travel similar ground (and refer to and rely upon each other), they also contain distinct arguments. An effort will be made to specifically identify which Defendant's arguments are being addressed and the impact of each conclusion on each Defendant. However, one of the disputes is whether the complaint is adequately specific in its allegations about which Defendant took what action. For that reason, some generalization will be inevitable.

## A.

Federal courts have a duty to confirm subject matter jurisdiction in every case pending before them. *Valinski v. Detroit Edison*, 197 F. App'x 403, 405 (6th Cir. 2006). Article III, § 2 of

the U.S. Constitution limits federal court jurisdiction to "Cases" and "Controversies." The doctrine derived from Art. III, § 2 imposes the requirement of standing: federal jurisdiction exists only if the dispute is one "which [is] appropriately resolved through the judicial process." *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990). For standing to exist, three elements must be satisfied: injury in fact, causation, and redressability. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). Injury in fact exists when the plaintiff has suffered "an invasion of a legally protected interest" that is both "concrete and particularized" and "actual or imminent," not "conjectural or hypothetical." *Id.* at 560 (citations omitted). Causation exists if the injury is one "that fairly can be traced to the challenged action of the defendant." *Simon v. E. Kentucky Welfare Rights Org.*, 426 U.S. 26, 41 (1976). The redressability requirement is satisfied if the plaintiff's injury is "likely to be redressed by a favorable decision." *Id.* at 38. Standing can exist even if the alleged injury "may be difficult to prove or measure." *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1549 (2016).

Bosch argues that the Plaintiffs lack Article III standing because they have not identified an injury in fact which is traceable to the actions of Bosch. GM has not briefed the question of Article III standing, but has incorporated by reference Bosch's brief on the issue. *See* GM Mot. Dismiss at 16–17 n.18, ECF No. 45.[7] Bosch identifies "two types of injuries (1) alleged overpayment for their vehicles . . . and (2) potential future injuries arising from potential diminished performance." Bosh Mot. Dismiss at 11. As regards the overpayment theory, Bosch argues that the injury cannot be fairly traced to Bosch's actions because Bosch did not advertise

---

[7] This decision is puzzling because Bosch appears to admit in their briefing that Plaintiffs' "overpayment" theory is sufficient to establish standing to sue GM. Bosch focuses its argument on the assertion that any such overpayment is not attributable to Bosch's actions. *See* Bosch. Mot. Dismiss at 12, ECF No. 44 ("But Plaintiffs do not have standing to sue Bosch LLC – rather than GM – unless their injury "fairly can be traced" to the actions of Bosch LLC. . . . Any overpayment based on artificially inflated market price cannot fairly be traced to the actions of Bosch LLC, which is not alleged to have advertised directly to consumers or have had any control over the price of the Subject Vehicles."). Nevertheless, because the Court has an independent obligation to confirm its own jurisdiction, Plaintiffs' standing to sue GM will be briefly addressed.

the vehicles to consumers, did not establish the price for the vehicles, and was not a party to any vehicle-purchase contracts. As regards the potential for diminished future performance, Bosch argues that this theory is unduly hypothetical and speculative.

## 1.

Plaintiffs' overpayment theory suffices to provide standing to sue GM, which manufactured the vehicles and authorized their sale. Accepting Plaintiffs' allegations as true, they paid a premium for a "clean diesel" vehicle which actually polluted at levels dramatically higher than a reasonable consumer would expect. In other words, they paid for a product which did not operate in the way they believed it did. Claims of overpayment, wherein a plaintiff paid a premium but did not receive the anticipated consideration, are cognizable injuries in fact. *See Wuliger v. Manufacturers Life Ins. Co.*, 567 F.3d 787, 794 (6th Cir. 2009). *See also Danvers Motor Co. v. Ford Motor Co.*, 432 F.3d 286, 293 (3d Cir. 2005) ("Monetary harm is a classic form of injury-in-fact."). That injury is traceable to GM's actions: GM developed the Duramax engine (including the alleged defeat devices), marketed its diesel vehicles as environmentally friendly, and set the MSRP for its diesel vehicles. There is, accordingly, a "'traceable connection between the plaintiff's injury and the complained-of conduct of the defendant.'" *Id.* at 796 (quoting *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103 (1998)). And financial damages are, of course, fully redressable by a favorable decision. Plaintiffs have standing to sue GM.

Bosch's connection to the alleged overpayment, however, is more attenuated. Bosch did not manufacture the Duramax engine, advertise vehicles containing that engine, or establish the MSRP. Accordingly, Bosch argues that any overpayment by Plaintiffs is attributable solely to GM's actions. That assertion mischaracterizes the allegations in the consolidated amended complaint. Plaintiffs allege that

> Bosch participated not just in the development of the defeat device, but also in the scheme to prevent U.S. regulators from uncovering the device's true functionality. Moreover, Bosch's participation was not limited to engineering the defeat device (in a collaboration described as unusually close). Rather, Bosch GmbH and Bosch LLC marketed "clean diesel" in the United States and lobbied U.S. regulators to approve "clean diesel," another highly unusual activity for a mere supplier.

Con. Am. Compl. at 39.

In other words, "Bosch GmbH and Bosch LLC have enabled over 1.3 million vehicles to be on the road in the United States polluting at levels that exceed emissions standards and which use software that manipulate emissions controls in a manner not expected by a reasonable consumer." *Id.* at 40.

Bosch admits that it supplied components to the diesel vehicles in question, but argues that it did not market those vehicles or enter into any contractual relationships with any of the Plaintiffs. As stated, however, that is not entirely true. Plaintiffs allege that Bosch "marketed 'clean diesel' in the United States." *Id.* at 39. While the exact nature of that marketing is unclear, it is plausible that Bosch's efforts contributed to the market demand for "clean diesel" vehicles, generally, in the United States. *See id.* at 5–6. The premiums which Plaintiffs paid for vehicles with Duramax engines were a natural consequence of that market demand. Similarly, Plaintiffs allege that Bosch enabled GM to deceive consumers and thus contributed to the overpayment. Plaintiffs emphasize the close relationship between GM and Bosch, including the joint efforts to calibrate EDC17 for the Duramax engine. The allegations in the consolidated amended complaint, if true, clearly establish that Bosch developed the vehicle component which has caused Plaintiffs' injury, that Bosch was aware of the deception that component would inevitably contribute to, and that Bosch was aware that consumers would pay a premium for vehicle capabilities that the component would not deliver. In other words, Plaintiffs overpaid for their vehicles *because* Bosch worked closely with GM to install working defeat devices in the Duramax vehicles.

There can be no dispute that, compared to GM, Bosch has a more indirect relationship with United States consumers. But "[p]roximate causation is not a requirement of Article III standing." *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1391 n.6 (2014). Indeed, "the causation requirement in standing is not focused on whether the defendant 'caused' the plaintiff's injury in the liability sense; the plaintiff need only allege 'injury that fairly can be traced to the challenged action of the defendant, and not injury that results from the independent action of some third party not before the court.'" *Wuliger*, 567 F.3d at 796 (quoting *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41–42 (1976)). Bosch may ultimately prevail in its argument that it should not be held liable for Plaintiffs' overpayment, but Plaintiffs' allegation that Bosch was intimately involved in the creation of the component which caused the overpayment suffices to establish Article III standing.

None of the (noncontrolling) cases which Bosch cites in support of its argument compel a different result because each is legally or factually distinguishable. Bosch cites *In re Schering Plough Corp. Intron/Temodar Consumer Class Action* for the proposition that overpayment damages provide standing only if traceable to the actions of the defendant. 678 F.3d 235, 245 (3d Cir. 2012). In holding that the plaintiffs had not identified a causal relationship between the alleged misconduct (unlawful marketing practices) and the alleged injury (payment for ineffective drugs), the Third Circuit noted that the plaintiffs did not actually allege that they "ever paid for a Temodar or Intron-A prescription." *Id.* at 247. The plaintiffs did allege that they paid for Rebetol, but the Third Circuit explained that "[i]t is pure conjecture to conclude that because Schering's misconduct caused other doctors to write prescriptions for ineffective off-label uses for other products, Local 331 ended up paying for two prescriptions for Rebetol due to the same kind of misconduct." *Id.* at 248. Here, the causal connection is much clearer: Bosch worked with GM to

develop the vehicle component which was the source of the overpayment by Plaintiffs. *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prod. Liab. Litig.* is similarly inapplicable. 826 F. Supp. 2d 1180, 1191 (C.D. Cal. 2011) (dismissing claims against North American divisions of Toyota Motor Corporation because the complaint did not allege that the American advertisements were aired in other countries and thus did not identify a link between the defendants responsible for U.S. marketing and "the buying decisions of Toyota customers worldwide"). Bosch's involvement in the creation of a vehicle component which has caused financial harm to Plaintiffs has been clearly alleged.[8] Between that involvement and Bosch's alleged marketing for "clean diesel," Plaintiffs have adequately alleged that their overpayment can be fairly traced to Bosch.

**2.**

Plaintiffs' allegations of overpayment are sufficient to enable them to advance their state law consumer protection and fraudulent concealment claims. Plaintiffs' other alleged damages (essentially that, if the existence of a defeat device is proven, the value of their vehicles will decrease) need not be considered for standing purposes. Defendants separately challenge Plaintiffs' standing to bring a RICO claim. That argument is based upon a statutory standing requirement, not Article III standards, and thus will be considered below.

**B.**

Defendants next challenge the form of the consolidated amended complaint. GM argues, first, that the entire complaint should be dismissed because it does not contain a "short and plain

---

[8] Bosch also argues that Plaintiffs' overpayment theory should be interpreted as essentially a "benefit-of-the-bargain" argument and suggests that such a theory is insufficient to establish standing because Bosch was not a party to any vehicle-purchase contracts with consumers. But a consumer can establish a concrete injury by alleging that he or she "received a product that failed to work for its intended purpose or was worth objectively less than what one could reasonably expect," regardless of whether the purchase was made pursuant to a contract. *Koronthaly v. L'Oreal USA, Inc.*, 374 F. App'x 257, 259 (3d Cir. 2010).

statement of the claim showing that the pleader is entitled to relief," as required by Federal Rule of Civil Procedure 8(a). Second, GM (joined by Bosch) argues that all of Plaintiffs' state law claims which sound in fraud do not meet Federal Rule of Civil Procedure 9(b) specificity standards. Third, Bosch argues that Plaintiffs have engaged in impermissible group pleading. Each argument will be addressed in turn.

## 1.

Rule 8(a)(2) mandates that pleadings, including complaints, must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." *Id.* However, federal pleading rules "do not countenance dismissal of a complaint for imperfect statement of the legal theory supporting the claim asserted." *Johnson v. City of Shelby, Miss.*, 135 S. Ct. 346, 346 (2014). The consolidated amended complaint spans 229 pages and contains 900 pages of exhibits. Defendants are correct that this complaint is lengthy, but this is not one of the extraordinarily rare scenarios where a complaint should be dismissed because of its length. Defendants fault the consolidated amended complaint for including "scores of paragraphs [related] to alleged misconduct involving Volkswagen, Audi, Porsche, Mercedes, and Fiat Chrysler." GM Mot. Dismiss at 12. These allegations are of limited relevance, but do provide context for Plaintiffs' remaining allegations. The undergirding purpose of Rule 8(a) is to ensure that the complaint provides notice. If the length and unnecessary complexity of the complaint obscures the true nature of the allegations and claims, dismissal may be appropriate. This is not such a case.

## 2.

Defendants also argue that Plaintiffs have failed to meet the heightened pleading standards of Rule 9(b) with respect to their allegations of fraud. The adequacy of Plaintiffs' fraud allegations

are best resolved in conjunction with the analysis of whether Plaintiffs have stated a claim. However, one general point will be taken up separately.

The specificity required for allegations of affirmative misrepresentations is necessarily different than the specificity required for allegations of fraudulent omissions.[9] The purpose of Rule 9(b) is to put defendants on notice of the nature of the claim. *See Williams v. Duke Energy Int'l, Inc.*, 681 F.3d 788, 803 (6th Cir. 2012) ("[I]t is a principle of basic fairness that a plaintiff should have an opportunity to flesh out her claim through evidence unturned in discovery. Rule 9(b) does not require omniscience; rather the Rule requires that the circumstances of the fraud be pled with enough specificity to put defendants on notice as to the nature of the claim." (internal citations omitted)). "When it comes to claims of fraud by omission or fraudulent concealment, the plaintiff faces a slightly more relaxed pleading burden; the claim 'can succeed without the same level of specificity required by a normal fraud claim.'" *Beck v. FCA US LLC*, No. 17-CV-10267, 2017 WL 3448016, at *9 (E.D. Mich. Aug. 11, 2017) (quoting *Baggett v. Hewlett–Packard Co.*, 582 F.Supp.2d 1261, 1267 (C.D. Cal. 2007)). The reasons for the disparate burden are straightforward. Fraudulent acts occur at a specific time, fraudulent omissions occur over a period of time. Fraudulent acts can be specifically described, but omissions are, by very definition, more amorphous.

As this Court explained in *Counts*, the Sixth Circuit has rejected the argument that it has the authority to "relax" the Rule 9(b) particularity requirement. *See Counts v. General Motors, LLC*, 237 F. Supp. 3d (E.D. Mich. 2017) (citing *United States v. Walgreen Co.*, 846 F.3d 879, 880–81 (6th Cir. 2017)). That said, the Sixth Circuit has recognized that "'particular' allegations of fraud may demand different things in different contexts." *Walgreen*, 846 F.3d at 881. Plaintiffs

---

[9] Plaintiffs have expressly disclaimed any claims premised on affirmative misrepresentation (discussed below).

must allege their theory of fraudulent omissions with enough specificity to provide Defendants with fair notice of the claims. At the same time, in reviewing the consolidated amended complaint, "the difficulty of obtaining proprietary . . . information or pinpointing the point in time when a fraudulent omission occurred will be taken into account." *Counts*, 237 F. Supp. 3d at 595.

**3.**

Bosch further argues that the Plaintiffs have engaged in impermissible group pleading. This argument is primarily focused on Plaintiffs' RICO claim. As discussed below, Plaintiffs have adequately alleged the prima facie elements of a RICO claim with sufficient specificity to put Defendants on notice of their alleged involvement in the enterprise. Bosch further objects to Plaintiffs' decision to define "Bosch" as including both Bosch LLC and Bosch Gmbh. Bosch contends that Plaintiffs' failure to distinguish between these two entities precludes Bosch from understanding exactly what its constituent entities are accused of.

When asserting claims of fraud, plaintiffs are not permitted to "generally assert all claims against all defendants." *State Farm Mut. Auto. Ins. Co. v. Universal Health Grp., Inc.*, No. 14-CV-10266, 2014 WL 5427170, at *3 (E.D. Mich. Oct. 24, 2014) (citing *Hoover v. Langston Equip. Assocs., Inc.*, 958 F.2d 742, 745 (6th Cir. 1992)). But, at the same time, the Federal Rules of Civil Procedure are premised on the idea that pleadings should be simple and focused on providing notice. *See Llewellyn-Jones v. Metro Prop. Grp., LLC*, 22 F. Supp. 3d 760, 780 (E.D. Mich. 2014). As discussed above, allegations of fraudulent concealment will inevitably be less specific than allegations of affirmative misrepresentation.

Plaintiffs allege that "[b]oth Bosch GmbH and Bosch LLC . . . operate under the umbrella of the Bosch Group." Con. Am. Compl. at 41. Members of both Bosch GmbH and Bosch LLC were involved in the alleged conspiracy here. Plaintiffs indicate that the "acts of individuals

described in this Complaint have been associated with Bosch GmbH and Bosch LLC whenever possible." *Id.* But Plaintiffs further contend that those employees "often hold themselves out as working for 'Bosch.'" *Id.* at 42. In other words, identifying "which Bosch defendant" was involved in which particular actions cannot always be "ascertained with certainty." *Id.* Plaintiffs believe that discovery will alleviate this confusion. *Id.*

Given Plaintiffs' allegation that Bosch employees and constituent entities often blur the legal boundaries between Bosch subsidiaries, the allegations against the Bosch Defendants are sufficiently specific. Plaintiffs are proceeding primarily on a theory of fraudulent omissions, and Bosch's alleged role within that fraudulent scheme is clear. "Rule 9(b) is not to be read in isolation, but is to be interpreted in conjunction with Federal Rule of Civil Procedure 8." *U.S. ex rel. Bledsoe v. Cmty. Health Sys., Inc.*, 501 F.3d 493, 503 (6th Cir. 2007). "In a complex case, involving multiple actors and spanning a significant period of time, where there has been no opportunity for discovery, 'the specificity requirements of Rule 9(b) [should] be applied less stringently. . . . It is a principle of basic fairness that a plaintiff should have an opportunity to flesh out her claim through evidence unturned in discovery.'" *State Farm Mut. Auto. Ins. Co. v. Pointe Physical Therapy, LLC*, 107 F. Supp. 3d 772, 788 (E.D. Mich. 2015) (quoting *JAC Holding Enterprises, Inc. v. Atrium Capital Partners, LLC*, 997 F.Supp.2d 710, 727 (E.D. Mich. 2014)). This is one such case.

In other words, the Rule 9(b) requirements are not meant to be an insurmountable barrier. Although the precise identity of the subsidiary and/or employee which may have taken certain actions is unclear, that level of detail is unnecessary to put the Bosch Defendants on notice of the claims made against them. The consolidated amended complaint will not be dismissed without prejudice for engaging in group pleading.

**IV.**

Defendants seek dismissal of the state law claims. First, they argue that Plaintiffs have failed to state claims for affirmative misrepresentation. Second, Defendants argue that Plaintiffs' fraudulent omission claims should be dismissed or stayed. Specifically, Defendants assert that Plaintiffs' concealment or omission claims are preempted, have not been plausibly pled, and should be stayed under the primary jurisdiction doctrine. In response, Plaintiffs deny that they are advancing any fraud claims premised on affirmative misrepresentations. *See* Pl. Resp. GM Mot. Dismiss at 9–10 ("But Plaintiffs do not sue for common law fraud under state law for affirmative misrepresentations."). Rather, "Plaintiffs sue for omissions of material fact, fraudulent concealment, violation of state law consumer protection statutes, and violation of RICO." *Id.* at 10. Plaintiffs further challenge the assertion that the state consumer protection laws on which it relies incorporate only claims of "common law fraud": "The consumer protection statutes bar not only fraud but also deceptive, unfair, and unlawful conduct." *Id.* For similar reasons, Plaintiffs contend that GM's argument that Plaintiffs have failed to plead reliance on affirmative misrepresentations is irrelevant.

Plaintiffs acknowledge that the consolidated amended complaint includes an extended discussion of various advertisements and press releases which GM issued regarding vehicles equipped with the Duramax engine. Those allegations, Plaintiffs explain, are not meant to buttress affirmative misrepresentation claims. They are meant "to show that Defendants' omissions were material for purposes of claims under consumer protection statutes and RICO." *Id.* at 11. To repeat: "The relevance of those promises is GM's acknowledgement that low emissions are material . . . to a reasonable consumer." *Id.* at 12.

Given Plaintiffs' decision to disavow any affirmative misrepresentation claims, the remaining issues are whether Plaintiffs' state law claims are preempted by the Clean Air Act (CAA), whether Plaintiffs have plausibly pleaded fraudulent omission claims, and whether any plausibly pleaded fraudulent omission claims should be stayed pursuant to the primary jurisdiction doctrine. Each question will be addressed in turn.

## A.

"Pre-emption may be either expressed or implied, and 'is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose.'" *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 98 (1992) (quoting *Jones v. Rath Packing Co.*, 430 U.S. 519, 525 (1977)). In all preemption cases, and especially where "Congress has 'legislated . . . in a field in which the States have traditionally occupied,' . . . [courts] 'start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)). "Environmental regulation is a field that the states have traditionally occupied." *Merrick v. Diageo Americas Supply, Inc.*, 805 F.3d 685, 694 (6th Cir. 2015). The same is true of consumer protection and advertising regulations. *See In re Ford Fusion & C-Max Fuel Econ. Litig.*, No. 13-MD-2450 KMK, 2015 WL 7018369, at *28 (S.D.N.Y. Nov. 12, 2015); *Gilles v. Ford Motor Co.*, 24 F. Supp. 3d 1039, 1047 (D. Colo. 2014). Where the statute does not expressly preempt state law, preemption may be implied. The Supreme Court has recognized

> two types of implied pre-emption: field pre-emption, where the scheme of federal regulation is so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it, and conflict pre-emption, where compliance with both federal and state regulations is a physical impossibility, or where state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.

*Gade*, 112 S.Ct. at 98 (internal citations omitted).

Defendants' preemption arguments arise out of Section 209 of the CAA. That section, codified at 42 U.S.C. § 7543, reads as follows:

> No State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines subject to this part. No State shall require certification, inspection, or any other approval relating to the control of emissions from any new motor vehicle or new motor vehicle engine as condition precedent to the initial retail sale, titling (if any), or registration of such motor vehicle, motor vehicle engine, or equipment.

*Id.* at § 7543(a).

Section 7543 also specifies, however, that "[n]othing in this part shall preclude or deny to any State or political subdivision thereof the right otherwise to control, regulate, or restrict the use, operation, or movement of registered or licensed motor vehicles." *Id.* at § 7543(d).

**1.**

The initial question is whether Plaintiffs' suit (and the state law claims it is premised upon) represents an attempt to establish a "standard" relating to the control of emissions or involves "certification, inspection, or any other approval relating to the control of emissions." The Supreme Court has interpreted "standard" in § 7543(a) to mean "requirements such as numerical emission levels with which vehicles or engines must comply . . . or emission-control technology with which they must be equipped." *Engine Mfrs. Ass'n v. S. Coast Air Quality Mgmt. Dist.*, 541 U.S. 246, 253 (2004). Plaintiffs are, of course, private citizens suing on their own behalf, not state governmental entities. But there is some authority to support the proposition that § 7543(a)'s language can reach even private causes of action for damages. *See Cipollone v. Liggett Grp., Inc.*, 505 U.S. 504, 521 (1992) (finding that the federal cigarette statute, which forbade states from imposing additional "requirements" or "prohibitions" governing cigarette advertising, had broad

preemptive effect and applied to both "positive enactments and common law" actions for damages) (internal citations omitted). *See also Jackson v. Gen. Motors Corp.*, 770 F. Supp. 2d 570, 575 (S.D.N.Y. 2011) ("The operative phrase in § 209(a) is 'adopt or attempt to enforce.' As a result, if state common law tort actions are examples of 'enforcement,' then such actions (assuming that they are 'related to' the control of emissions) are clearly preempted by § 209(a)."). Indeed, as the *Cipollone* Court recognized, "common-law damages actions . . . are premised on the existence of a legal duty, and it is difficult to say that such actions do not impose 'requirements or prohibitions.'" 505 U.S. at 522.

Accordingly, if Plaintiffs' state law claims represent veiled attempts to establish a "standard relating to the control of emissions," they are expressly preempted. But Plaintiffs' suit is not a disguised attempt to impose a standard on GM by mandating maximum "numerical emission levels" for its diesel vehicles or requiring certain emission-control technology. Rather than imposing requirements regarding the type of emissions technology which GM must include in its vehicles, Plaintiffs' suit seeks compensation for GM's fraudulent *concealment* of the actual operation of the emissions technology in its diesel vehicles from consumers.

GM further argues that Plaintiffs' suit represents an attempt to require "disclosure" of "information regarding AECDs—a technology for the 'control of emissions'—before a car can be sold." GM Mot. Dismiss at 25. According to GM, the suit is thus preempted because this disclosure requirement constitutes a "straightforward effort to 'require certification, inspection, or any other approval relating to the control of emissions . . . as a condition precedent to the initial retail sale' of a new motor vehicle." *Id.* (quoting § 7543(a)). Defendants have provided no authority for the proposition that private claims alleging violations of consumer protection laws are equivalent to a "certification, inspection, or . . . other approval" requirement. Such an interpretation

would be incompatible with the plain meaning of the section. The ability to certify, inspect, or approve presupposes that the acting party has some authority to prevent the sale of a car if the vehicle fails to pass the certification test. Consumers cannot prevent a manufacturer from selling a particular vehicle, and so it appears impossible that consumers could impose *any* "condition precedent to the initial retail sale" of a vehicle.[10] § 7543(a).

## 2.

GM nevertheless argues that the suit is preempted because Plaintiffs' claims "relate to" the enforcement of EPA emission standards. GM's rationale can be summarized as follows. First, "Plaintiffs' non-disclosure claims rest exclusively on the presence of an 'illegal' 'defeat device.'" GM Mot. Dismiss at 19. Second, the alleged purpose of that "defeat device" is "to defeat EPA certification testing and evade federal emissions standards." *Id.* at 20. Third, "[a]ll of Plaintiffs' claims thus depend on and are based 'solely on' a showing that GM employed a 'defeat device' as defined by the EPA." *Id.* For that reason, all of Plaintiffs' claims are expressly preempted. *Id.*

This line of reasoning can be sustained only by selectively characterizing Plaintiffs' allegations and claims. But notwithstanding Defendants' understandable desire to reframe Plaintiffs' allegations in a light favorable to their preferred defenses, the Court cannot do the same.

---

[10] In further support of the contention that GM has publically disclosed the existence of AECDs which are present in the subject vehicles, GM points to a publically available document which purports to show that GM provided "AECD Descriptions" to the EPA. *See* GM Reply Br. at 5 & Ex. 5, ECF No. 57. Information from outside the pleadings cannot be considered at the pleading stage, with several limited exceptions. *Tackett v. M & G Polymers, USA, L.L.C.*, 561 F.3d 478, 487 (6th Cir. 2009). To the extent the identified document is a public record, courts may typically only take judicial notice of such records to recognize "the fact of the documents' existence, and not for the truth of the matters asserted therein." *Passa v. City of Columbus*, 123 F. App'x 694, 697 (6th Cir. 2005). And even if this exhibit was considered now, it would not change the Court's analysis. The document suggests that AECD descriptions were provided to the EPA, but does not include those descriptions. In other words, the document does not appear to provide any evidence that the AECDs were themselves publically disclosed. Plaintiffs' claims are focused on allegedly inadequate disclosures to the *public*; confidential disclosures to the EPA are irrelevant.

The relevance of the document purportedly submitted to the EPA is the primary subject of the parties' motions for leave to file surreplies. *See* ECF No. 58, 60. Because the document cannot be considered for the purpose it was submitted and would not change the Court's analysis even if reviewed, those motions will be denied as moot.

When considering "well-pleaded factual allegations," the Court must "assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679. In considering a motion to dismiss, the Court must "construe the complaint in a light most favorable" to the plaintiff. *Lambert*, 527 F.3d at 439.

GM customers could conceivably attempt to bring suit against GM and Bosch for noncompliance with EPA emission standards. And there can be no doubt that such a suit would be preempted. *See Engine Mfrs. Ass'n*, 541 U.S. at 255.[11] But construing *this* complaint in a light most favorable to Plaintiffs, Plaintiffs claims can be interpreted differently. A careful parsing of Defendants' syllogism reveals several mistaken premises.

## i.

First, Defendants emphasize that Plaintiffs' claims "rest exclusively on the presence of an 'illegal' 'defeat device.'" GM Mot. Dismiss at 19. By that assertion, Defendants mean that the complaint "alleges only one type of defeat device, *i.e.* one whose purpose is to defeat EPA certification testing and evade federal emissions standards." *Id.* at 20. Thus, Defendants believe Plaintiffs' claims will require proof that the Duramax engine includes a "'defeat device' *as defined by the EPA*." *Id.* (emphasis added). That is not the definition given by Plaintiffs in the consolidated amended complaint. According to Plaintiffs, "[a] defeat device means an auxiliary emissions control device that reduces the effectiveness of the emission control system under conditions which

---

[11] There are a number of potential theories which Plaintiffs could have conceivably advanced and which would have been squarely preempted. For example, if Plaintiffs were seeking damages based solely on Defendants' alleged violations of the CAA, their suit would be preempted. Likewise, if Plaintiffs' claims were "predicated on deceit against the EPA during new-vehicle certification," their claims would be preempted. *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, 264 F. Supp. 3d 1040, 1054 (N.D. Cal. 2017).

may reasonably be expected to be encountered in normal vehicle operation and use." Con. Am. Compl. at 2.[12]

It is undoubtedly true that the consolidated amended complaint includes references to EPA standards, emissions testing, and Plaintiffs' belief that the vehicles at issue violate EPA regulations. *See, e.g., id.* at 2, 3, 6. But Plaintiffs can prevail on their claims without proving the existence of a "defeat device" as that term is defined by the EPA. Plaintiffs' fraudulent concealment and consumer protection claims are premised on the following assertions:

> A reasonable consumer would not expect their Silverado or Sierra vehicle to spew unmitigated NOx in this fashion while driving in the city or on the highway, nor would a reasonable consumer expect that fuel economy was achieved in part by turning off or derating the emission systems, nor would a reasonable consumer expect that if the emissions were as promised the advertised fuel economy and performance could not be achieved. . . . GM never disclosed to consumers that the Polluting Vehicles may be "clean" diesels in very limited circumstances but are "dirty" diesels under most driving conditions. GM never disclosed to consumers that it programs its emissions systems to work only under certain conditions. GM never disclosed that it prioritizes engine power and profits over the environment. GM never disclosed that the Polluting Vehicles' emissions materially exceed the emissions from gasoline-powered vehicles, that the emissions exceed what a reasonable consumer would expect from a "low emissions" vehicle, and that the emissions materially exceed applicable emissions limits in real-world driving conditions.

*Id.* at 8, 9–10.

None of these allegations, with the exception of the very last phrase,[13] will require proof that the Duramax engine contains a "defeat device" which violates EPA standards. To the contrary,

---

[12] The consolidated amended complaint also discusses the EPA's definition of a defeat device, but that definition is alleged in connection with allegations regarding the EPA's conclusion that Volkswagen's diesel vehicles violated the CAA. *Id.* at 6. In their briefing, Defendants repeatedly contend that allegations regarding the conduct of other diesel vehicle manufacturers is irrelevant, and so Defendants cannot reasonably point to these allegations when arguing that Plaintiffs' claims should be preempted.

[13] And even this allegation is focused on consumer expectations about compliance, not the compliance itself. *See In re Volkswagen "Clean Diesel" Litigation*, 2016 WL 5347198 at *6 (Va.Cir.Ct. 2016) ("[A]lthough emissions compliance or lack thereof may be further proof of deceit, it is the deceit about compliance, rather than the need to enforce compliance, that is the gravamen of Plaintiffs' claims."). Admittedly, proving this allegation appears to require proof that EPA regulations have been violated. To the extent that it is true, a claim premised on solely that allegation

Plaintiffs' fraudulent concealment and consumer protection claims are focused on whether Defendants fraudulently concealed information regarding the operation of the Duramax engine's emissions technology which would have been material to a reasonable consumer. Thus, Plaintiffs will be required to prove that the Duramax engine contains a component which "derates" emissions reduction technology and thus increases emissions to a level that a reasonable consumer would not anticipate and would consider material to his or her purchase decision. But Plaintiffs will not be required to prove that the engine component which is the source of the harm meets the EPA's definition of an illegal defeat device.[14]

### ii.

Second, Defendants assert that Plaintiffs are asking the Court to "declare the EPA's existing compliance determination invalid—and *any* such effort is an affront to the EPA's exclusive jurisdiction." GM Mot. Dismiss at 22 (emphasis in original). Just like Plaintiffs can prevail without demonstrating the existence of a "defeat device" that is illegal under EPA regulations, Plaintiffs can prevail without showing that the subject vehicles violate EPA regulations. The gravamen of their state law claims is that they purchased a vehicle which polluted at levels far greater than a reasonable consumer would expect. In other words, the vehicle operated differently than they expected. And, importantly, Plaintiffs allege that this disparity results from a nondisclosed vehicle component which is inherently deceptive: its alleged purpose is to surreptitiously permit dramatically higher emissions under certain conditions.

---

would likely be preempted. But Plaintiffs advance numerous other theories of consumer harm which are not preempted.

[14] Notwithstanding this fact, Plaintiffs (and the Court) frequently use the term "defeat device" as a short hand for the manner in which EDC17 allegedly uses several features to bypass or derate emissions reduction technologies in certain circumstances. That term has entered the common parlance, and so the fact that the EPA has also provided a legal definition for the term "defeat device" does not mean that every use of the term "defeat device" necessarily involves a reference to that regulatory definition.

On their face, these allegations do not require proof of noncompliance with EPA regulations. In fact, it is conceivably possible that Defendants could simultaneously comply with EPA regulations while still concealing material information from consumers. Defendants' arguments to the contrary are premised on the assumption that consumers only care about compliance with emission standards, not the total level of emissions by a certain vehicle or the different levels of pollution emitted by competing vehicles. But that assumption cannot be true: the significant market for environmentally friendly vehicles—which are designed to emit pollution far below the regulatory maximums—directly contradicts that assertion. As noted above, the advertisements and press releases which GM issued regarding the Duramax engine and subject vehicles repeatedly emphasized the engine's low emissions, but never expressly referenced EPA regulations. In other words, GM's own conduct reveals an understanding that consumers believe emission levels are material to their purchasing decisions separate and apart from the regulatory maximum emission standards. Thus, the allegation that the subject vehicles do not comply with EPA regulations is consistent with Plaintiffs' theory of harm, but proof of noncompliance is not required.[15]

If Plaintiffs' claims were predicated on proving noncompliance with EPA regulations or with demonstrating that Defendants had defrauded the EPA, they would be preempted. *See Jackson*, 770 F. Supp. 2d at 572 (finding state tort claims advanced by government employees to be preempted because the plaintiffs had abandoned all claims except those expressly based on proving violation of the CAA). Plaintiffs expressly deny that they assert those claims. *See* Con. Am. Compl. at 5; Pl. Resp. GM Mot. Dismiss at 17. Plaintiffs, not Defendants, are the masters of their complaint. *See Caterpillar Inc. v. Williams*, 482 U.S. 386, 392 (1987).

---

[15] In other words, proof that Defendants concealed material information from the EPA will almost certainly provide the factual predicate to sustain Plaintiffs' state law claims, but the inverse is not necessarily true.

**iii.**

Defendants rely upon a number of cases to support their express preemption argument, but each are distinguishable. For example, Defendants cite a several cases where state governmental entities brought claims against vehicle manufacturers alleging unlawful levels of emissions. *See In re Office of Attorney Gen. of State of New York*, 269 A.D.2d 1, 11, 709 N.Y.S.2d 1 (2000) (finding the New York attorney general's suit to be preempted by the CAA because "the Attorney General [was] attempting to enforce [federal emission] standards"); *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, 264 F. Supp. 3d 1040, 1052 (N.D. Cal. 2017) (finding Wyoming's suit to be preempted because Wyoming was attempting to enforce a state regulation which prohibited "installing a defeat device in a vehicle prior to registration"). Such suits involved transparent attempts by state governmental entities to establish supplementary emission regulations or enforce existing regulations. Here, Plaintiffs are suing for consumer fraud premised on the allegation that Defendants did not disclose certain aspects of how the subject vehicles operated. The allegations involve the level of emissions, but do not require proof that federal emission regulations were violated.

Defendants also cite *Jackson v. General Motors Corp.*, 770 F. Supp. 2d 570. *Jackson* involved government employees bringing suit alleging common law tort claims. Thus, *Jackson* did not involve an attempt by a state to create and enforce emission standards. But the *Jackson* plaintiffs were alleging "direct violations of EPA standards as a predicate for claims of personal injuries" *Felix v. Volkswagen Grp. of Am., Inc.*, No. A-0585-16T3, 2017 WL 3013080, at *5 (N.J. Super. Ct. App. Div. July 17, 2017) (distinguishing *Jackson*). *See also Jackson*, 770 F. Supp. 2d at 577 ("Plaintiffs' negligence claims regarding Defendants' compliance with CAA emissions standards" are "squarely" preempted).

In other words, Defendants rely upon cases where the claims depended upon direct proof of noncompliance with federal emission regulations. Plaintiffs, on the other hand, are bringing consumer protection and fraudulent concealment claims which do not require direct proof of noncompliance. None of the courts which have considered such claims have concluded that they are preempted. *See Felix v. Volkswagen Grp. of Am., Inc.*, No. A-0585-16T3, 2017 WL 3013080, at *6 (N.J. Super. Ct. App. Div. July 17, 2017) ("[T]he gravamen of plaintiffs' complaint centers on VW's alleged deceitful, fraudulent practices, and its alleged breach of a duty not to mislead consumers."); *Counts v. Gen. Motors*, LLC, 237 F. Supp. 3d 572, 592 (E.D. Mich. 2017) (holding that "a suit by private consumers who allege that a vehicle manufacturer misrepresented the functionality and effectiveness of certain technology" is not preempted by the CAA); *In re Volkswagen "Clean Diesel" Litigation*, 2016 WL 5347198 at *6 (Va.Cir.Ct. 2016) ("Because Plaintiffs' fraud and VCPA claims are based on alleged misrepresentations that do not rely on or seek to enforce any emissions standards, and because they will not interfere with any significant CAA regulatory objective," they are not preempted.). *See also In re Caterpillar, Inc., C13 & C15 Engine Prod. Liab. Litig.*, No. 1:14-CV-3722 JBS-JS, 2015 WL 4591236, at *11 (D.N.J. July 29, 2015) ("Plaintiffs' claims which seek enforcement of express and implied warranties for defects in the Engines' emissions systems, as well as those based on consumer fraud and negligent design, are hardly comparable to efforts by state and local governments to adopt or enforce emissions standards or to require additional certifications or inspections prior to sale.").

### 3.

Because Plaintiffs' claims are not expressly preempted, the next question is whether they are implicitly preempted. As explained above, there are two types of implied preemption. The first, field preemption, occurs where federal regulations are so expansive that Congress has left no room

for supplemental state regulation. Defendants do not advance a field preemption argument. And because the CAA includes a "savings clause" wherein Congress expressly confirms that states retain the ability to regulate "the use, operation, or movement" of motor vehicles, that decision was reasonable. § 7543(d). *See also Geier v. Am. Honda Motor Co.*, 529 U.S. 861, 868 (2000).

The second kind of implied preemption—conflict preemption—comes in two varieties. First, conflict preemption exists when compliance with both federal and state requirements is physically impossible. *Gade*, 505 U.S. at 98. GM does not advance that argument. Second, conflict preemption exists when state law would operate as an obstacle to "the accomplishment and execution of the full purposes and objectives of Congress." *Id.* (internal citations omitted). GM argues that Plaintiffs' claims represent an obstacle to Congress's purpose and objectives in enacting the CAA.

Specifically, GM argues that "[t]o the extent that Plaintiffs' claims are based on GM's failure to publically disclose (or only partially disclose) specific aspects of its AECDs, these claims are preempted" because "the EPA has already decided what should and should not be disclosed to the public with respect to emissions controls" and thus "the EPA has decided that [this information] may remain confidential." GM Mot. Dismiss at 24–27.

The question raised by GM's argument is whether Congress intended the CAA (or EPA) to regulate the scope of vehicle manufacturer's disclosure obligations to consumers. GM has provided no legal authority to support the proposition that the CAA and/or the EPA is responsible for determining the extent to which vehicle manufacturers must disclose information about the emissions produced by their cars to consumers. The EPA is tasked with *environmental* protection, not *consumer* protection. Defendants have not provided "any basis to conclude, that a significant federal regulatory goal of the CAA is consumer protection from false advertising claims regarding

emissions compliance, vehicle efficiency, or implementation of new emissions technology." *In re Volkswagen "Clean Diesel" Litigation*, 2016 WL 5347198 at *6. *See also In re Caterpillar, Inc., C13 & C15 Engine Prod. Liab. Litig.*, No. 1:14-CV-3722 JBS-JS, 2015 WL 4591236, at *11, *14 (D.N.J. July 29, 2015) (finding that consumer fraud and negligent design claims were not implicitly preempted by the CAA because the claims were not premised on proof that the engines were noncompliant with EPA standards).

It is undoubtedly true, as Defendants argue, that the EPA requires vehicle manufacturers to provide extensive disclosures *to the EPA* so that it may determine emissions compliance. And the EPA has further concluded that some of those disclosures will not be made public record by the agency. *See, e.g.*, EPA Class Determination 1–13, ECF No. 45, Ex. 2. Defendants reference a document produced by the EPA which explains that the EPA will not produce information under the Freedom of Information Act if the requested information involves confidential trade secrets. *Id.* at 2. GM appears to argue that because the EPA does not have a legal duty to disclose certain information to the public, GM does not have a duty to disclose that information to the public. Simply put, the EPA's duty to disclose information to the public is entirely untethered from GM's duty to disclose information to the public. The idea that the EPA's interpretation of its obligations under the Freedom of Information Act has any bearing on Defendants' obligations to disclose material information to consumers simply has no merit.[16] There is no risk that Plaintiffs' claims will interfere or undermine the purposes and objectives of Congress in passing the CAA, and so Plaintiffs' claims are not implicitly preempted.

---

[16] GM's argument regarding implied preemption might have merit if "Plaintiffs' claims could be construed as alleging that AEDC disclosures to the government should have been made public," but as explained above Plaintiffs' claims are premised on Defendants' nondisclosures to consumers, not the EPA. GM. Mot. Dismiss at 27.

**B.**

Defendants argue that, even if Plaintiffs' claims are not preempted, "Plaintiffs have not plausibly pled that there is *any* kind of 'defeat device' other than the kind used to defeat EPA regulations that would be material to a reasonable consumers." GM Mot. Dismiss at 28 (emphasis in original). In other words, "[w]hile it might plausibly be material to a reasonable consumer that [the level of emissions allegedly revealed by Plaintiffs' testing] does not comply with EPA regulations, it is *not* plausible that a reasonable consumer would care about those numbers outside the context of EPA regulations." *Id.*

This is an argument for a jury. In essence, GM is arguing that consumers care only about compliance with EPA regulations, as opposed to the true level of emissions. That assertion might be true for some consumers, but it cannot possibly be generally accepted as true as a matter of law. Plaintiffs allege that there is a significant consumer demand for environmentally friendly vehicles. *See* Con. Am. Compl. at 5. And that fact is common knowledge. Many of these vehicles, like the Toyota Prius, emit pollution far below the regulatory maximums. If consumers only cared about regulatory compliance and not the quantitative level of emissions, then vehicle manufacturers would focus their advertising on regulatory compliance, not environmental friendliness. But as already noted twice, Plaintiffs have summarized or reproduced over ten pages of GM advertisements and press releases where the company repeatedly touts the low emissions and environmentally friendly nature of the Duramax engine, but never expressly states that the engine complies with emission regulations. That fact goes without saying: all consumers naturally expect their vehicles to be compliant. Consumers who purposefully buy a "green" vehicle, then, must be (at least partially) basing their purchase decision on the technology in the vehicle which reduces emissions far *below* that maximum level. Plaintiffs allege that the subject vehicles operate with

significant portions of its emissions reduction technology inactive for 65 to 70% of the miles driven. *Id.* at 3. It is very plausible that a consumer who bought a vehicle because it purportedly contained advanced emissions reduction technology would consider that fact to be material. *Id.* at 3.[17]

## C.

Finally, Defendants argue that this case should be stayed pursuant to the primary jurisdiction doctrine in favor of an EPA investigation. "The doctrine of primary jurisdiction arises when a claim is properly cognizable in court but contains some issue within the special competence of an administrative agency." *United States v. Haun*, 124 F.3d 745, 749 (6th Cir. 1997). When the doctrine is invoked, the court proceedings are stayed so that the parties may refer the matter to the administrative agency. *Id.* However, the doctrine is not subject to a "ready formula" for application. *Id.* Relevant factors include "'the desirable uniformity which would obtain if initially a specialized agency passed on certain types of administrative questions'" and "'the expert and specialized knowledge of the agencies involved.'" *In re Long Distance Telecommunications Litig.*, 831 F.2d 627, 630 (6th Cir. 1987) (quoting *United States v. Western Pacific Railroad Co.*, 352 U.S. 59, 63–65, 77 S.Ct. 161, 164 (1956)).

Neither factor supports a stay here. The Court has already explained why Plaintiffs' claims are not premised on proof that the Duramax engine involves an "illegal" defect device or is noncompliant with EPA regulations. Accordingly, the factual questions raised by Plaintiffs' suit are only tangentially within the EPA's specialty. *See In re Ford Fusion & C-Max Fuel Econ. Litig.*,

---

[17] Bosch also argues that the state law claims brought against it should be dismissed because they are preempted. In so arguing, Bosch also attempts to argue that all of Plaintiffs' claims against them are expressly premised on Bosch's alleged efforts to evade United States emission requirements. But Plaintiffs are not advancing state law claims of that nature. To the extent Bosch argues that Plaintiffs have not stated any state law claims against them because they have not plausibly pleaded a connection between Bosch's conduct and the fraudulent concealment, that argument is best left for the (presumptive) motions by Defendants for judgment on the pleadings.

No. 13-MD-2450 KMK, 2015 WL 7018369, at *30 (S.D.N.Y. Nov. 12, 2015) ("While Defendant is correct that Plaintiffs' claims relate to the accuracy of EPA-estimated fuel economy (and perhaps suggest deficiencies in the current estimation formula), the question of whether the advertisements related to such information were misleading is a question conventionally left to the courts to answer."). Because the EPA has no regulatory responsibility regarding Defendants' disclosures to consumers, there is no risk of regulatory inconsistency. The EPA undoubtedly possesses specialized expertise regarding emissions testing and the operation of defeat devices. But, as this Court explained in *Counts*, "federal courts must frequently adjudicate disputes involving complicated technical claims, particularly in the field of products liability. Simply put, mere technical complexity is not a 'compelling and legitimate' reason for a federal court to decline jurisdiction." 237 F. Supp. 3d at 593 (internal citations omitted).

Additionally, the primary jurisdiction doctrine should not be invoked if "no administrative forum is available." *Haun*, 124 F.3d at 750. The EPA has no authority to redress consumer grievances regarding the operation of emissions technology in vehicles it certifies, and thus Plaintiffs have no administrative forum for their claims. Similarly, the EPA has no authority to remedy Plaintiffs' alleged financial damages. *See id.* (noting that the "exclusive means" by which the government could "collect a monetary penalty" against the defendants was through a civil action in the district court). *See also Counts*, 237 F. Supp. 3d at 593. The primary jurisdiction doctrine is inapplicable here.

## V.

Defendants also seek dismissal of Plaintiffs' RICO claim, which is contained in the first count in the consolidated amended complaint. In Plaintiffs' words,

> For many years now, the RICO Defendants have aggressively sought to increase the sales of Polluting Vehicles in an effort to bolster revenue, augment profits, and

increase GM's share of the diesel truck market. Finding it impossible to achieve their goals lawfully, however, the RICO Defendants resorted instead to orchestrating a fraudulent scheme and conspiracy. In particular, the RICO Defendants, along with other entities and individuals, created and/or participated in the affairs of an illegal enterprise ("Clean Diesel Fraud Enterprise") whose direct purpose was to deceive the regulators and the public into believing the Polluting Vehicles were "clean" and "environmentally friendly."

Con. Am. Compl. at 128–29.

The Racketeer Influenced and Corrupt Organizations Act establishes bases for both criminal and civil suits. A RICO civil suit may be brought by "[a]ny person injured in his business or property by reason of a violation of section 1962 of this chapter." 18 U.S.C. § 1964(c). Section 1962 provides that: "It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." *Id.* at § 1962(c). In other words, a party advancing a civil RICO claim must establish their right to sue and then further allege the following elements: "'(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'" *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 404 (6th Cir. 2012) (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)).

Defendants argue both that Plaintiffs have not established their standing to bring a civil RICO suit and also that Plaintiffs have not adequately alleged the prima facie elements of a RICO claim. GM additionally argues that the RICO claim is an improper attempt to enforce the provisions of the Clean Air Act ("CAA"), violations of which may be prosecuted exclusively pursuant the CAA.

**A.**

Plaintiffs may assert a RICO claim only if they can identify an injury to their "business or property by reason of a violation of section 1962." 18 U.S.C. § 1964(c). In so limiting the scope of RICO standing, Congress exhibited an intention to exclude "personal injury—that is, an injury 'to a person, such as a broken bone, a cut, or a bruise' or a 'bodily injury.'" *Jackson v. Sedgwick Claims Mgmt. Servs., Inc.*, 731 F.3d 556, 564 (6th Cir. 2013) (quoting *Black's Law Dictionary* 857 (9th ed. 2009)). Similarly, a RICO injury must be concrete, not intangible or speculative. *See Saro v. Brown,* 11 F. App'x 387, 389 (6th Cir. 2001). *See also Fleischhauer v. Feltner*, 879 F.2d 1290, 1299 (6th Cir. 1989) (explaining that RICO plaintiffs must identify a "reasonable and principled basis of recovery" which is "not based upon mere speculation and surmise"); *Short v. Janssen Pharm., Inc.*, No. 1:14-CV-1025, 2015 WL 2201713, at *3 (W.D. Mich. May 11, 2015) ("Short must, at a minimum, show some direct, pecuniary injury to his own pocket that is unrelated to the claimed personal injury.").

In *Reiter v. Sonotone Corp.*, the Supreme Court interpreted § 4 of the Clayton Act, which authorizes "[a]ny person who shall be injured in his business or property" by reason of an antitrust law violation to bring suit. 442 U.S. 330, 337 (1979). The Supreme Court held that "where petitioner alleges a wrongful deprivation of her money because the price of the hearing aid she bought was artificially inflated by reason of respondents' anticompetitive conduct, she has alleged an injury in her 'property' under § 4." *Id.* at 342. That holding did not involve the RICO statute, but the Sixth Circuit has held that "*Reiter*'s common-sense observation about §4 applies with equal logical force to § 1964(c)." *Jackson*, 731 F.3d at 564.[18]

---

[18] The Clayton Act included a civil-action provision which permitted private parties to sue for injuries arising out of antitrust law violations. The Supreme Court has "repeatedly observed . . . that Congress modeled § 1964(c) on the civil-action provision of the federal antitrust law." *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 267 (1992).

**1.**

Plaintiffs' alleged injury appears to be analogous: the price of the vehicles they bought was "artificially inflated by reason of [Defendants' fraudulent scheme]." *Reiter*, 442 U.S. at 342. Defendants argue, however, that "this supposed 'injury' is purely speculative" and that other Courts have refused to recognize RICO injuries involving similar "overpayment" theories. GM Mot. Dismiss at 35.

Defendants argue that *In re Bridgestone/Firestone, Inc. Tires Prod. Liab. Litig.* supports their interpretation of the RICO injury requirement. 155 F. Supp. 2d 1069, 1089 (S.D. Ind.), *rev'd on other grounds In re Bridgestone/Firestone, Inc.*, 288 F.3d 1012 (7th Cir. 2002). In *Bridgestone*, the plaintiffs asserted a RICO claim against Bridgestone/Firestone Inc. arising out of an alleged defect in a particular brand of radial tires that caused "the Tires to have 'an unreasonably dangerous propensity to suffer complete or substantial tread separation.'" *Id.* at 1077 (quoting Complaint, ¶ 4). The plaintiffs alleged they sustained RICO injuries because they would be forced to "bear the financial loss associated with the cost of the replacing the Tires," their vehicles were less valuable because the safety risks of the tires was now known, and because consumers would have paid less for the Tires if the safety risks were known. *Id.* at 1089 (internal citations omitted). Importantly, the alleged injury was *not* that the plaintiffs had been forced to replace their tires, nor that the Plaintiffs had experienced actual tire failure, nor even that any plaintiff had "incurred an actual monetary loss as a result of . . . selling or attempting to sell" the tires. *Id.* at 1090.

The district court concluded that these alleged injuries were speculative and contingent on future events:

> Plaintiffs' assertion of financial loss is grounded in the possibility of future events that may cause them to suffer the loss associated with the products they claim are defective or diminished in value: the tires that they have unilaterally replaced or may replace in the future may suffer tread separation; they may receive on trade-in

> or resale of their Explorers (or other vehicles equipped with the Tires) less than
> they would have received absent the alleged defects.

*Id.* at 1091.

In other words, "[t]he actual failure of the Tires . . . is a contingency upon which Plaintiffs' economic damages are dependent." *Id.* at 1092. The *Bridgestone* Court provided a guiding principle for determining if a cognizable RICO injury has been asserted: an injury arises "as a result of a purchase only where the diminished value of the plaintiff's property has *actually been realized* or when the alleged infirmity in the purchased property has otherwise tangibly manifested itself." *Id.* at 1094 (emphasis added).

*In re: Gen. Motors LLC Ignition Switch Litig.* is also instructive. No. 14-MC-2543 (JMF), 2016 WL 3920353, at *16 (S.D.N.Y. July 15, 2016). That multidistrict litigation involved allegations that GM had manufactured vehicles with a defective ignition switch. *Id.* at *1. The plaintiffs advanced a RICO claim. The district court described their theory of injury as a "benefit-of-the-bargain" defect theory and summarized it as follows: "Plaintiffs who purchased defective cars were injured when they purchased for x dollars a New GM car that contained a latent defect; had they known about the defect, they would have paid fewer than x dollars for the car (or not bought the car at all), because a car with a safety defect is worth less than a car without a safety defect." *Id.* at *7. The district court held that such a theory was insufficient to create RICO standing: "'loss of value' or 'benefit of the bargain' damages 'are generally unavailable in RICO suits' and 'plainly' unavailable where (similar to the case here) a RICO claim 'sound[s] in fraud in the inducement.'" *Id.* at *16 (quoting *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 228–29 (2d Cir. 2008)).

*McLaughlin* addresses the distinction between out-of-pocket-losses (which are cognizable RICO injuries) and benefit-of-the-bargain and price impact damages theories, which are not

(because both are expectation-based). That class action case centered on the allegation that the defendant tobacco companies had fraudulently marketed "light cigarettes" as healthier than "full-flavored" cigarettes. 522 F.3d at 220. The Second Circuit explained that, to "establish the requisite injury under civil RICO," the plaintiffs must show that they "paid more for light cigarettes than they would have but for defendants' misrepresentations." *Id.* at 227. The plaintiffs attempted to meet that burden by providing a "loss of value" model which purported "to measure the difference between the price plaintiffs paid for light cigarettes as represented by defendants and the (presumably lower) price they would have paid (but for defendants' misrepresentation) had they known the truth." *Id.* at 228.

The Second Circuit held that this expectation-based theory was essentially based on a "benefit-of-the-bargain" rationale and that such damages are generally unavailable in RICO suits. *Id.* The court emphasized that "Defendants' misrepresentation could in no way have reduced the value of the cigarettes that plaintiffs actually purchased; they simply could have induced plaintiffs to buy Lights instead of full-flavored cigarettes." *Id.* at 229. Additionally, there was "no reasonable means of calculating" such damages. *Id.* Doing so would require the court to "conceptualize the impossible—a healthy cigarette—and then to imagine what a consumer might have paid for such a thing." *Id.* The plaintiffs alternatively advanced a "price impact" theory based on a "multiple regression analysis" which plaintiffs suggested showed "the amount by which defendants would have had to reduce their prices to account for the concomitant reduced demand." *Id.* The Second Circuit likewise rejected that theory, explaining that "plaintiffs have not come forward with any meaningful means of estimating how the market has changed or might change in the future in response to fluctuations in the demand for light cigarettes." *Id.* The Second Circuit did acknowledge that some plaintiffs likely suffered "out-of-pocket" damages arising out of the

misrepresentations, but held that "out-of-pocket losses cannot be shown by common evidence because they constitute an inherently individual inquiry: individual smokers would have incurred different losses depending on what they would have opted to do, but for defendants' misrepresentation." *Id.* at 228.

Several Sixth Circuit cases also provide guidance. In *Hofstetter v. Fletcher*, the RICO defendants "sold millions of dollars worth of insurance policies to scores of individual clients throughout the country by means of a fraudulent promotion whereby the defendants falsely represented that the potential investors could completely avoid payment of any future federal income taxes." 860 F.2d 1079 (6th Cir. 1988). That alleged injury—the payment for the insurance policy premised on representations that were demonstrably false at time of payment—was sufficient to establish RICO standing.

In contrast, the plaintiffs in *Fleischhauer v. Feltner* brought a RICO claim arising out of the defendants' sale of "non-theatrical rights to distribution of 23 full length feature motion pictures." 879 F.2d 1290, 1292 (6th Cir. 1989). The defendants allegedly knew that the films in question "were not marketable either because they were unauthorized copies or because unauthorized copies were readily available." *Id.* at 1294. The defendants marketed the movie rights as providing "both income and tax advantage[s]," but also "advised interested parties that there was a significant chance that the purchaser would be audited by the Internal Revenue Service." *Id.* at 1293. The defendants argued that the plaintiffs' damages should be "confined to the amount appellees paid in down payments," but the jury awarded significantly more than that amount. On appeal, the Sixth Circuit held that "plaintiffs' damages should be limited to the amounts actually invested," and not "expectancy or 'benefit of the bargain' damages" based on purported lost profits or expenses arising out of IRS audits. *Id.* at 1300. The Sixth Circuit reasoned that "[t]here was

ample warning about risks involved, particularly tax hazards, therefore expectancy damages are not recoverable under these circumstances." *Id. See also id.* (Although in some cases expectancy damages might be appropriate, clearly they are not in this case.").

**2.**

To summarize, courts have generally held that damages theories premised on the expectation of future value or profits are too speculative and contingent to establish injury for purposes of RICO. However, "courts have recognized expectation damages under RICO . . . where an agreement between the parties provided for a certain performance guarantee that the defendant had no intention of keeping." *Ignition Switch Litigation*, 2016 WL 3920353 at 17 (collecting several cases). And courts have similarly found that, when the financial injury occurred *at the time of payment*, a cognizable out of pocket loss has been sustained. *See Bridgeston*e, 155 F. Supp. 2d at 1094. For example, in *Bailey v. Atl. Auto. Corp.*, the RICO plaintiff advanced a cognizable injury because the defendants sold "former short term rental vehicles to consumers without disclosing the vehicles' history," resulting in the plaintiff being overcharged. 992 F. Supp. 2d 560, 579 (D. Md. 2014). The district court distinguished cases, like *Bridgestone*, where the alleged overpayment damages were premised on the manifestation of some defect in the future: "Bailey contends that she suffered the claimed loss *at the moment of purchase* in reliance upon the false representation that she was not buying a former short-term rental vehicle." *Id.* at 581 (emphasis added).

There are a number of analogous cases. *See In re Merrill Lynch Ltd. Partnerships Litig.*, 154 F.3d 56, 59 (2d Cir. 1998) ("[I]nvestors allege that the partnerships were fraudulent at the outset because they could never achieve the promised objectives. . . . [T]he investors sustained recoverable out-of-pocket losses when they invested; namely, the difference between the value of the security they were promised and the one they received which could not meet those

objectives."); *Ellis v. J.P. Morgan Chase & Co.*, 950 F. Supp. 2d 1062, 1086 (N.D. Cal. 2013) ("Plaintiffs allege they have paid marked-up fees and thus satisfy RICO standing. A consumer who has been overcharged can claim injury to property under RICO based on a wrongful deprivation of money, which is a form of property."); *Stitt v. Citibank*, N.A., 942 F. Supp. 2d 944, 954 (N.D. Cal. 2013) (identifying a cognizable RICO injury when the plaintiffs were "overcharged" marked-up fees related to mortgage loan servicing even if the "total fees assessed fell within market range" because the plaintiffs alleged that they "would not have paid the fees but for Defendants' deception").

In other words, a distinction must be made between damages theories where the (ascertainable and reasonably quantifiable) overpayment occurred at the time of injury and speculative damages theories which are contingent on some future event, lost profit, or unanticipated future expense. Thus, a RICO plaintiff may recover for money invested on the basis of misrepresentations, but not for loss of the profits which the plaintiffs expected to receive from that investment. *See Fleischhauer*, 879 F.2d at 1300. Likewise, a RICO plaintiff may recover for overpayment when they buy a used car after being told it was new, *see Bailey*, 992 F. Supp. 2d at 579, but may not recover for overpayment simply because the tires they purchased *may* be defective, *see Bridgestone*, 155 F. Supp. 2d at 1095. A RICO plaintiff may recover money paid pursuant to insurance policies that plaintiffs chose because "the defendants falsely represented that the potential investors could completely avoid payment of any future federal income taxes," *see Hofstetter*, 860 F.2d at *6, but cannot recover for loans granted to debtors based upon misrepresentations by the debtors because the plaintiffs would suffer damages only if the debtors defaulted (and because the amount of damages was speculative until the creditor's bargained for

remedies were exhausted), *see First Nationwide Bank v. Gelt Funding Corp.*, 27 F.3d 763, 768 (2d Cir. 1994).

Plaintiffs allege both speculative and nonspeculative damages here. Some of Plaintiffs' alleged damages are clearly speculative. For example, they allege that "when and if GM recalls the Polluting Vehicles and degrades the GM Clean Diesel engine performance and fuel efficiency in order to make the Polluting Vehicles compliant with EPA standards, Plaintiffs and Class members will be required to spend additional sums on fuel and will not obtain the performance characteristics of their vehicles when purchased." Con. Am. Compl. at 117. Likewise, Plaintiffs allege that "Polluting Vehicles will necessarily be worth less in the marketplace because of their decrease in performance and efficiency and increased wear on their cars' engines." *Id.* Those damages are contingent on future, uncertain developments. Because those injuries may never occur and are thus currently unmeasurable, they cannot give rise to RICO standing. *See Gelt Funding Corp.*, 27 F.3d at 768 ("[A]s a general rule, a cause of action does not accrue under RICO until the amount of damages becomes clear and definite.").

Plaintiffs additionally allege that "[h]ad Plaintiffs and Class members known of the higher emissions at the time they purchased or leased their Polluting Vehicles, they would not have purchased or leased those vehicles, or would have paid substantially less for the vehicles than they did." Con. Am. Compl. at 117. This alleged injury straddles the line between speculative and concrete. Consumers weigh many factors in choosing a vehicle. While emissions are undoubtedly one such factor, the assertion that the unexpectedly high emissions would have been a material factor for all the Plaintiffs is questionable. Accepting all well-pleaded allegations as true, Plaintiffs have alleged that they would not have purchased the vehicles in question had they known of the true emissions level. Fair enough. But the contention that they "would have paid substantially less"

appears to be premised on some approximation of what the new market value for the vehicles would have been. Determining what that decrease in value would have been seems hopelessly speculative. *See McLaughlin*, 522 F.3d at 229 ("We are asked to conceptualize the impossible—a healthy cigarette—and then to imagine what a consumer might have paid for such a thing.").

However, Plaintiffs' first alleged injury clearly suffices to create RICO standing. Plaintiffs contend that they "paid a premium of nearly $9,000, as GM charged more for its Duramax engine than a comparable gas car." Con. Am. Compl. at 115. Plaintiffs thus identify a specific payment attributable directly to the vehicle component at issue which they opted to purchase on the basis of fraudulent conduct. This is cognizable out-of-pocket injury: "[T]he price of the [Duramax engine-equipped vehicle which Plaintiffs] bought was artificially inflated by reason of [Defendants' fraudulent] conduct." *Reiter*, 442 U.S. at 342. *See also Jackson*, 731 F.3d at 564; *Canyon Cty. v. Syngenta Seeds, Inc.*, 519 F.3d 969, 976 (9th Cir. 2008). Accepting Plaintiffs' allegations as true, the fraud (and thus overcharge) occurred *at the time the purchase was made*. *See Bailey*, 992 F. Supp. 2d at 579. Unlike in *Bridgestone* (where only some tires exhibited the defect), the alleged injury occurred every time a Duramax vehicle was purchased. The amount by which Plaintiffs overpaid is not contingent on a future occurrence or on the vagaries of the free market. It occurred and became determinable at the moment the Plaintiffs paid a premium for a vehicle component which did not work as had been represented. Plaintiffs experienced a financial property loss at that moment, which distinguishes the present case from others where the overpayment or diminution in value had not yet occurred. *Compare Bridgestone*, 155 F. Supp. 2d at 1093 & n.26; *Gelt*, 27 F.3d at 769, *with Bailey*, 992 F. Supp. 2d at 580–81. This is a cognizable RICO injury.

Admittedly, several cases appear to support the opposite conclusion. The *Ignition Switch Litigation* opinion does suggest that a plaintiff who purchases a defective car for more than they would have paid if they were aware of a defect does not state a RICO injury. 2016 WL 3920353 at *7. But the district court also recognized that "courts have recognized expectation damages under RICO . . . where an agreement between the parties provided for a certain performance guarantee that the defendant had no intention of keeping." *Id.* at *17. The district court distinguished the present claim because plaintiffs had "at best" alleged an implied promise that GM-brand vehicles would have "continuing resale value." *Id.* Resale value and brand devaluation theories are clearly speculative. But, here, GM allegedly sold Duramax vehicles, for a premium, which did not perform as a reasonable consumer would expect. In other words, Defendants had no intention of delivering the emissions performance which consumers expected.

More importantly, the *Ignition Switch Litigation* opinion relies heavily upon the Second Circuit's opinion in *McLaughlin*, but appears to overlook a crucial aspect of that opinion. In *McLaughlin*, the Second Circuit was reviewing a district court decision to certify a class action advancing a RICO claim. The court explained that "[o]nly by showing that plaintiffs paid more for light cigarettes than they would have but for defendants' misrepresentation can plaintiffs establish the requisite injury under civil RICO." *McLaughlin v. Am. Tobacco Co.*, 522 F.3d 215, 227 (2d Cir. 2008). The Second Circuit concluded that such out of pocket losses existed, but that they "cannot be shown by common evidence because they constitute an inherently individual inquiry: individual smokers would have incurred different losses depending on what they would have opted to do, but for defendants' misrepresentation." *Id.* at 228.[19] The plaintiffs' alternative damages theories (which the Second Circuit rejected, providing the basis for the decision in the *Ignition*

---

[19] Thus, even though the alleged RICO injury is sufficient to create standing, the nature of the alleged injury might prevent class certification.

*Switch Litigation*) were premised on market demand theories that, because of the confluence of factors involved, were too speculative to support a RICO claim. *See id.* at 226–28. *Tri-State Express, Inc. v. Cummins Engine Co.*, 2000 U.S. Dist. LEXIS 23564, despite its factual similarities to the present case, is distinguishable for the same reason: those plaintiffs relied upon "only the potential for harm," while the present case involves Plaintiffs who paid a premium for a vehicle component which did not provide the benefits paid for. *Id.* at *18.

To the extent the rationale in *Ignition Switch Litigation* and *Tri-State Express* cannot be squared with the conclusion that Plaintiffs have alleged a RICO injury, the Court declines to follow their reasoning. Indeed, such a reading of those two cases appears to be incompatible with the Supreme Court's conclusions in *Reiter* and the Sixth Circuit's decision in *Hofstetter*.

### B.

Bosch argues that, even if Plaintiffs' alleged injury is sufficient to confer standing to bring a RICO claim against GM, they have not alleged that their injuries were proximately caused by Bosch's conduct. The RICO proximate causation analysis is closely related to (even subsumed in) the statutory standing analysis. The Supreme Court has "held that a plaintiff's right to sue . . . required a showing that the defendant's violation not only was a 'but for' cause of his injury, but was the proximate cause as well." *Holmes*, 503 U.S. at 268. The plaintiff must show "some direct relation between the injury asserted and the injurious conduct alleged." *Id.* Importantly, the causation inquiry must focus on the alleged link between the "predicate acts" and the asserted injury. *Heinrich v. Waiting Angels Adoption Servs., Inc.*, 668 F.3d 393, 405 (6th Cir. 2012). A purported link that is "too remote," "purely contingent," or "indirect" is insufficient to confer standing. *Holmes*, 503 U.S. at 271, 274. According to the Supreme Court, "'[t]he general tendency of the law, in regard to damages at least, is not to go beyond the first step.'" *Id.* (quoting *Associated*

*Gen. Contractors of California, Inc. v. California State Council of Carpenters*, 459 U.S. 519, 534 (1983)). An attenuated causation theory creates difficulties in apportioning damages between plaintiffs and attributing damages to defendants. *See id.* at 273. A challenge to a RICO suit based on asserted lack of proximate causation, however, is often best resolved at summary judgment, not at the pleading stage. *See Trollinger v. Tyson Foods, Inc.*, 370 F.3d 602, 615 (6th Cir. 2004).

In *Holmes*, a "Securities Investor Protection Corporation" (SIPC) brought suit against defendants who allegedly "conspired in a stock-manipulation scheme." *Id.* at 261. After the scheme was detected, stock prices plummeted and a number of broker-dealers were unable to meet their financial obligations to customers. The SIPC, accordingly, was required to advance nearly $13 million to cover the customer claims. The SIPC then brought a RICO claim against the defendants to recoup its losses. That relationship, according to the Supreme Court, was too attenuated to create standing: "the conspirators have allegedly injured these customers only insofar as the stock manipulation first injured the broker-dealers and left them without the wherewithal to pay customers' claims." *Id.* at 271. In other words, "[t]he broker-dealers simply cannot pay their bills, and only that intervening insolvency connects the conspirators' acts to the losses suffered by the nonpurchasing customers and general creditors." *Id.*

In *Hemi Grp., LLC v. City of New York, N.Y.*, the Supreme Court rejected another RICO claim because the plaintiff's causal theory was even more attenuated than in *Holmes*. The City of New York advanced the following causal theory:

> Hemi committed fraud by selling cigarettes to city residents and failing to submit the required customer information to the State. Without the reports from Hemi, the State could not pass on the information to the City, even if it had been so inclined. Some of the customers legally obligated to pay the cigarette tax to the City failed to do so. Because the City did not receive the customer information, the City could not determine which customers had failed to pay the tax. The City thus could not pursue those customers for payment. The City thereby was injured in the amount of the portion of back taxes that were never collected.

559 U.S. 1, 9 (2010).

The Supreme Court held that this relationship was too attenuated. The Court explained: "The City's theory thus requires that we extend RICO liability to situations where the defendant's fraud on the third party (the State) has made it easier for a *fourth* party (the taxpayer) to cause harm to the plaintiff (the City)." *Id.* at 11.[20] In holding that this proximate causation theory was insufficient, the Supreme Court relied in part upon the fact that "[t]he State certainly is better situated than the City to seek recovery from Hemi." *Id.* at 12. In other words, when there are other, "better situated plaintiffs [which] have an incentive to sue," the "RICO 'direct relationship' requirement" may not be met. *Id.* at 11–12.

Plaintiffs allege that the direct relationship between Bosch's predicate acts and their injury is "plain—Bosch developed the defeat devices that are at the core of this litigation while knowing that GM would sell Affected Vehicles without revealing the existence of those devices to consumers or anyone else and that consumers would buy them." Pl. Res. Bosch Mot. Dismiss at 25. Bosch argues that this theory is insufficient for several reasons.

**1.**

First, Bosch contends that "Plaintiffs' alleged harms here are premised upon the 'premium' GM charged for the Subject Vehicles, which GM determined alone." Bosch Mot. Dismiss at 26. Because Bosch was not involved in the pricing decisions, Plaintiffs' injury stems from "separate actions carried out by separate parties." *Hemi*, 559 U.S. at 11 (emphasis omitted). All of the cases Bosch relies upon in support of this argument involve RICO claims where the injuries to Plaintiffs were at least partially attributable to the decisions of third-party entities who were *not* parties to

---

[20] And Chief Justice Robert's opinion (joined by three justices) took care to reject the argument advanced by three dissenting justices that "RICO's proximate cause requirement [should] turn on foreseeability, rather than on the existence of a sufficiently 'direct relationship' between the fraud and the harm." *Id.* at 12.

the suit. *See Longmont United Hosp. v. Saint Barnabas Corp.*, 305 F. App'x 892, 895 (3d Cir. 2009) (plaintiff hospital suing defendant hospital consortium for increased medicare expenses which were partially traceable to a non-party government agency's decisions regarding reimbursement amounts); *Pillsbury, Madison & Sutro v. Lerner*, 31 F.3d 924, 930 (9th Cir. 1994) (sub-leasing tenant suing owners of the building with whom it had no contract for their fraudulent scheme to increase the rent paid by the non-party sublessee). Here, the separate party which Bosch identifies is Bosch's alleged coconspirator. Bosch has provided no authority for the proposition that a RICO defendant may avoid liability simply by identifying a separate action by its codefendant which partially contributed to the plaintiff's injury (especially when, as here, the Plaintiffs allege that the RICO Defendants worked together to cause the injury). Such an assertion is facially absurd.

Bosch does argue, correctly, that the proximate causation analysis must be conducted for each defendant in a RICO case. But, when a conspiracy is alleged, it is inevitable that not all of the RICO defendants will be directly involved in every action which injures the plaintiff.[21] The mere fact that it may be possible to differentiate between the RICO defendants in terms of culpability does not necessarily prevent a finding that all defendants proximately caused the alleged injury. *See Trollinger*, 370 F.3d at 620 ("[P]laintiffs need not show that Tyson's conduct was the sole cause of their injury in order to establish proximate cause; they need show only that the conduct was a substantial cause.") (citing *Schwartz v. Sun Co.*, 276 F.3d 900, 904 (6th Cir.2002)). This suit does not involve "derivative or passed-on harm": all entities which

---

[21] This is not the say, however, that Plaintiffs may advance a § 1962(c) RICO claim against Bosch without identifying specific predicate acts committed by Bosch. *See Kerrigan v. ViSalus, Inc.*, 112 F. Supp. 3d 580, 605 (E.D. Mich. 2015) (collecting cases and distinguishing between § 1962(d) conspiracy claims and § 1962(c) substantive claims). That subtly different analysis will be conducted below, while determining whether Plaintiffs have alleged a prima facie RICO claim. As explained in that section, Plaintiffs have adequately alleged that Bosch committed predicate acts of mail and wire fraud even though Plaintiffs have not specifically alleged that Bosch personally used the mail or wire to further the fraudulent scheme.

conceivably contributed to Plaintiffs' injuries have been joined as parties. *Id.* (citing *Mendoza v. Zirkle Fruit Co.*, 301 F.3d 1163 (9th Cir. 2002)).

**2.**

Bosch next argues that its alleged conduct was not a substantial factor in causing Plaintiffs' injuries. Specifically, Bosch contends that "Plaintiffs' alleged injury was the result of a host of factors including GM's advertising campaign; . . . the 'premiums' GM charged based on consumer demand for certain features; . . . reputation of local dealers; market forces such as competition; and promotional discounts." Bosch Mot. Dismiss at 27. Bosch further argues that Plaintiffs' injuries might be "dependent on GM's ability to provide a fix, if necessary, for the Subject Vehicles." *Id.* And, finally, Bosch opines that "to the extent Plaintiffs claim that their injury resulted from their reliance on purportedly false ads by GM, that itself breaks any causal link to the Bosch Defendants." *Id.* at 28.

That final argument is clearly inconsistent with Sixth Circuit (and Supreme Court) precedent. As the Sixth Circuit has recently held, "[a]lthough civil RICO plaintiffs must establish proximate causation, they need not necessarily show that they relied on any misrepresentations." *In re ClassicStar Mare Lease Litig.*, 727 F.3d 473, 487 (6th Cir. 2013). Rather, "Plaintiffs need only show that the defendants' wrongful conduct was 'a substantial and foreseeable cause' of the injury and the relationship between the wrongful conduct and the injury is 'logical and not speculative.'" *Id.* (quoting *Trollinger*, 370 F.3d at 615). *See also Wallace*, 714 F.3d at 420 ("[T]he appropriate inquiry in this case is not whether Wallace actually relied on the allegedly inflated appraisal, but whether the fraudulent scheme furthered by that appraisal proximately caused his financial injuries.").

In *Bridge v. Phoenix Bond & Indem. Co.*, the Supreme Court addressed, in detail, the question of whether reliance is an element of a RICO cause of action. 553 U.S. 639, 647–659 (2008). The Court explained: "Nothing on the face of the relevant statutory provisions imposes such a requirement." *Id.* at 649. Likewise, the Court dismissed the argument that "a plaintiff who brings [a RICO claim predicated on mail fraud] must show that it relied on the defendant's misrepresentations in order to establish the requisite element of causation." *Id.* at 653. In *Bridge*, the Supreme Court repeatedly distinguished between common law fraud requirements and RICO-based mail fraud claims. The Supreme Court further explained that, even under general common law fraud principles, the law "does not say that only those who rely on the misrepresentation can suffer a legally cognizable injury." *Id.* at 656. Rather, the common law "provides only that the plaintiff's loss must be a foreseeable result of *someone's* reliance on the misrepresentation." *Id.* (emphasis in original). In other words, a RICO plaintiff will typically be required to show that "*someone* relied on the defendant's misrepresentations," but does not need to prove first-party reliance. *Id.* at 658–59 (emphasis in original).

In *Bridge*, the RICO defendants conspired to "fraudulently obtain[] a disproportionate share of [tax] liens by violating the Single, Simultaneous Bidder Rule at" Cook County tax lien auctions. *Id.* at 643. The RICO plaintiffs alleged that this scheme "deprived them and other bidders of their fair share of liens and the attendant financial benefits." *Id.* at 644. The defendants argued that "the alleged representations," their "attestations of compliance with the Single, Simultaneous Bidder Rule," were made to the county and not the plaintiffs. *Id.* at 648. The Supreme Court held that the plaintiffs had identified a "sufficiently direct relationship between the defendant's wrongful conduct and the plaintiff's injury" because "[i]t was a foreseeable and natural

consequence of petitioner's scheme to obtain more liens for themselves that no other bidders would obtain fewer liens." *Id.*

For similar reasons, Plaintiffs have plausibly alleged that Bosch's joint activities with GM were a substantial factor contributing to their injury. EDC17 is the means by which Plaintiffs were injured. According to Plaintiffs, Bosch "exerts near-total control" over the customization of EDC17, eliminating the possibility that GM programmed the functionality which enables use of defeat devices without Bosch's knowledge. *See* Con. Am. Compl. at 94–95. Plaintiffs thus plausibly allege that Bosch developed the vehicle component which has caused Plaintiffs' injury, that Bosch was aware of the deception that component would inevitably contribute to, and that Bosch was aware that consumers would pay a premium for vehicle capabilities that the component would not deliver.[22]

To repeat, Plaintiffs were financially injured when they paid a premium for a vehicle component which did not work as a reasonable consumer would have expected. GM and Bosch worked closely together to develop that component, and any injury which resulted was a "foreseeable and natural consequence" of their efforts. *Bridge*, 553 U.S. at 648. While GM's pricing decisions and market forces might have contributed to the *level* of damages which Plaintiffs sustained, they were not the *source* of the injury. Put another way, if the Duramax engine did not include the Bosch-developed EDC17, Plaintiffs would have suffered no injury, even though all the other independent factors Bosch identifies would still exist. Thus, Bosch's development of EDC17 was the but for cause of Plaintiffs' injuries.

---

[22] Bosch's arguments conflate the distinction between (1) the requirement that Plaintiffs allege a causal link between their injury and the predicate acts and (2) the elements of mail and wire fraud. As discussed below, a party can be guilty of mail fraud even if they did not personally use the mail. The fact that GM, not Bosch, is the party who used the mail and wire to make representations to regulators and consumers is thus not determinative. *See United States v. Stapleton*, 293 F.3d 1111, 1117 (9th Cir. 2002) ("Because an essential element of these offenses is a fraudulent scheme, mail and wire fraud are treated like conspiracy in several respects.") (internal citations omitted).

It was also the proximate cause. "[P]roximate cause is not . . . the same thing as a sole cause." *Cox v. Adm'r U.S. Steel & Carnegie*, 17 F.3d 1386, 1399 (11th Cir.). A plaintiff can adequately allege proximate causation by plausibly asserting that the defendant's actions "increased the likelihood of injury." *Wallace*, 724 F.3d at 422. The causation analysis in this matter is complicated due to the confluence of potentially contributing factors to Plaintiffs' injury, but there can be no reasonable dispute that the development of EDC17 is a "fundamental part of the [injury] calculus." *Id.* The alleged connection between Bosch's development of that component and Plaintiffs' alleged overpayment is sufficiently direct, foreseeable, and logical to satisfy proximate causation requirements at the pleading stage. *See id.*

**3.**

Third, Bosch argues that "the difficulty of apportioning damages between Bosch LLC and GM creates the risk of double recovery." Bosch Mot. Dismiss at 28. It is true that the Supreme Court has identified the difficulties of apportioning treble damages among multiple dissimilarly situated plaintiffs as a factor to consider in conducting the proximate causation analysis. *See Holmes*, 503 U.S. at 273. This concern was focused on the disparate damages suffered by different classes of plaintiffs (some with claims that are indirectly related to and derivative of the other class's claims). In other words, the Supreme Court's expressed concern was *not* with the difficulty of allocating the relative culpability of various RICO defendants, but with determining the proportion of the recovery which should be recoverable by directly injured plaintiffs as compared to indirectly injured plaintiffs. *See also In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, No. MDL 2672 CRB (JSC), 2017 WL 4890594, at *9 (N.D. Cal. Oct. 30, 2017) ("Difficulty apportioning damages between defendants, however, is not a factor that is considered in the proximate cause analysis."); *Koch v. Royal Wine Merchants, Ltd.*, 907 F. Supp.

2d 1332, 1343 (S.D. Fla. 2012). The proximate causation requirement operates as means to avoid that difficult determination. The Plaintiffs in this suit are all similarly situated. Accordingly, there is no difficult apportionment question and, relatedly, there is no risk of Defendants being subjected to multiple claims or multiple recoveries. Plaintiffs have plausibly alleged that Bosch's conduct proximately caused their injury.

## C.

Defendants alternatively argue that, even if Plaintiffs have standing to bring a RICO claim, they have not alleged the prima facie elements of a RICO claim. The elements of a prima facie RICO claim are: "'(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.'" *Heinrich*, 668 F.3d at 404 (quoting *Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985)).

## 1.

Defendants argue that Plaintiffs have not adequately alleged either the existence of an enterprise or the required pattern of predicate acts. Bosch additionally argues that Plaintiffs have not plausibly alleged that Bosch participated in the "conduct" of the alleged enterprise. The initial question is whether the Plaintiffs have adequately alleged the existence of an enterprise.

### i.

In order to state a RICO claim, the Plaintiffs must plausibly allege the existence of an enterprise engaged in a pattern of racketeering activity. 18 U.S.C. § 1962(c). But the definition of "enterprise" for RICO purposes is exceedingly "broad." *Boyle v. United States*, 556 U.S. 938, 944 (2009). The statute defines "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4). "On its face, the definition appears to include both legitimate and

illegitimate enterprises within its scope; it no more excludes criminal enterprises than it does legitimate ones." *United States v. Turkette*, 452 U.S. 576, 580–81 (1981). A RICO association-in-fact "must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose." *Boyle*, 556 U.S. at 946.[23]

Bosch first argues that Plaintiffs have not plausibly alleged that Bosch and GM shared a "common purpose." *Turkette*, 452 U.S. at 583. In the consolidated amended complaint, Plaintiffs allege that the Defendants "created and/or participated in the affairs of an illegal enterprise ('Clean Diesel Fraud Enterprise') whose direct purpose was to deceive the regulators and the public into believing the Polluting Vehicles were 'clean' and 'environmentally friendly.'" Con. Am. Compl. at 129. Later in the consolidated amended complaint, Plaintiffs provide further specificity:

> GM, the Bosch defendants, and other entities and individuals associated for the common purpose of designing, manufacturing, distributing, testing, and selling the Polluting Vehicles through fraudulent COCs [certificates of compliance] and EOs [Executive Orders], false emissions tests, deceptive and misleading marketing and materials, and deriving profits and revenues from those activities. Each member of the Clean Diesel Fraud Enterprise shared in the bounty generated by the enterprise—i.e., by sharing the benefit derived from increased sales revenue generated by the scheme to defraud consumers and franchise dealers alike nationwide.

*Id.* at 132–133.

Bosch contends that these allegations do not specify a common purpose. First, Bosch notes that "Plaintiffs make no allegations that Bosch LLC played any role in obtaining the COCs and EOs for GM and the Subject Vehicles." Bosch Mot. Dismiss at 30. Bosch further characterizes the complaint as framing "generalized allegations concerning unspecified communications with

---

[23] The Defendants do not attempt to argue that the relationship which Plaintiffs allege existed between them was too short to give rise to a RICO association-in-fact. And Defendants decline to make that argument for good reason: Plaintiffs allege that Defendants' enterprise spanned years.

regulators that fail to specify the who, what, when, and where of the alleged communications or any reason to believe they were truthful." *Id.* In fact, Bosch attempts to explain away all of Bosch's alleged involvement as being related only to the Volkswagen emissions scandal.

These arguments miss the point. Plaintiffs' essential theory is that Bosch and GM[24] worked together to create an engine component which accommodated the use of defeat devices. That component and the related defeat devices caused the Duramax engine to produce emissions at a level much higher than a reasonable consumer would expect. That identified common purpose— the Defendants agreed to create a component together which would not operate as consumers would expect—is sufficient. Bosch has not proffered, and the Court cannot conceive of, a reason why Plaintiffs must identify specific communications with regulators in order to allege a common purpose. Such communications may have been made and, indeed, may have furthered the Defendants' common purpose, but they are a secondary aspect of the alleged common purpose.

### ii.

Second, Defendants argue that any alleged relationship between them is simply a routine business relationship which is insufficient to create RICO liability. "[S]imply conspiring to commit a fraud is not enough to trigger the Act if the parties are not organized in a fashion that would enable them to function as a racketeering organization for other purposes." *VanDenBroeck v. CommonPoint Mortg. Co.*, 210 F.3d 696, 699 (6th Cir. 2000), *abrogated on other grounds in Bridge*, 553 U.S. 639. The most probative question in determining whether a RICO enterprise exists is whether the enterprise has the "ability to exist apart from the pattern of wrongdoing." *Id.*

---

[24] Plaintiffs allege that Bosch and GM conspired together. The additional allegation that Bosch also conspired in similar manner with Volkswagen is largely irrelevant. It is, at the very least, consistent with Plaintiffs' theory. Bosch's apparent belief that the alleged existence of a similar but separate agreement affirmatively establishes that no such agreement existed between Bosch and GM is unexplained. The Plaintiffs' well-pleaded allegations must be construed in their favor and accepted as true at this stage.

(internal citations omitted). To state it differently, "[t]he 'enterprise' is not the 'pattern of racketeering activity'; it is an entity separate and apart from the pattern of activity in which it engages." *Turkette*, 452 U.S. at 583. The Sixth Circuit has identified two important principles for determining whether an association with a corporation constitutes a RICO enterprise:

> 1) individual defendants are always distinct from corporate enterprises because they are legally distinct entities, even when those individuals own the corporations or act only on their behalf; and 2) corporate defendants are distinct from RICO enterprises when they are functionally separate, as when they perform different roles within the enterprise or use their separate legal incorporation to facilitate racketeering activity.

*In re ClassicStar Mare Lease Litig.*, 727 F.3d at 492.

Here, GM and Bosch are clearly different corporate entities and performed different roles within the enterprise. Their association thus satisfies the fundamental requirements of a RICO enterprise.

Defendants correctly argue that courts have overwhelming held that a "routine commercial relationship" is insufficient to form the basis for a RICO enterprise. The district court in *Gomez v. Guthy-Renker, LLC* has provided both an exhaustive exposition of the law and an example of the typical fact pattern which plaintiffs allege. No. EDCV1401425JGBKKX, 2015 WL 4270042, at *5 (C.D. Cal. July 13, 2015). The *Gomez* Court summarized the typical theory:

> Some provider of services ("Provider") has a business client ("Business"). Completely unbeknownst to Provider, Business is conducting its affairs fraudulently. Someone ("Injured Party") is injured by Business's fraudulent practices and wishes to seek compensation from Business.

*Id.*

"Despite the widespread consensus among courts that such routine business relationships are insufficient to impose RICO liability, there has been very little agreement among courts as to which particular RICO requirement fails under such circumstances." *Id.* at *9. Some courts, like the Second Circuit, require that "the common purpose of an association be fraudulent in order for it to

constitute a RICO enterprise." *Id.* (citing *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 174 (2d Cir. 2004)). Other courts have rejected RICO claims premised on routine services contracts "because the entities are actually pursuing their individual economic interests, rather than any shared purpose." *Id.* And still other courts have "noted the lack of organization and structure underlying a routine contractual relationship for the provision of services." *Id.* at *10.

The *Gomez* court discusses other rationales that various courts have promulgated when confronted with this issue, but all can be summarized as demonstrating "a remarkable uniformity [among federal courts] that RICO liability must be predicated on a relationship more substantial than a routine contract between a service provider and its client." *Id.* at *11. The alleged business relationship which the Defendants entered into here, however, is far from "routine." Defendants' assertion that Bosch has supplied a number of legitimate vehicle components to GM is, simply, irrelevant. Those contractual relationships are not part of the illegal enterprise which Plaintiffs allege existed.

Plaintiffs allege that Defendants participated in an enterprise with the purpose of defrauding consumers. They "associated for the common purpose of designing, manufacturing, distributing, testing, and selling the Polluting Vehicles through fraudulent COCs and EOs, false emissions tests, and deceptive and misleading marketing and materials, and deriving profits and revenues from those activities." Con. Am. Compl. at 132. The alleged course of conduct is inherently deceptive: Bosch and GM collaborated to create an engine which performed one way when being tested for emissions and another way when in normal use. *See also In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, 2017 WL 4890594, at *15 ("Bosch's intent to defraud reasonably can be inferred from the scheme itself. . . . No one to date in this multidistrict litigation has sought to justify, or explain a lawful purpose for, software that

effectively turns a vehicle's emission systems on or off depending on whether the vehicle is undergoing emissions testing or being operated under normal driving conditions.").

In other words, Plaintiffs have plausibly alleged that both Bosch and GM were engaged in an enterprise with the manifest purpose of defrauding both regulators and consumers.[25] The Defendants may have engaged in other, "routine" business transactions, but that is irrelevant. The Defendants may even have considered the alleged enterprise whereby they collaborated to configure the EDC17 for the Duramax engine to be a similar business relationship. But when the essential purpose of a particular business relationship is fraud, the related conduct is "not ordinary or normal business activities." *Levine v. First Am. Title Ins. Co.*, 682 F. Supp. 2d 442, 461 (E.D. Pa. 2010). That fraudulent purpose is the distinction between the EDC17 collaboration and Bosch's previous transactions with GM, as well as the reason that the cases which Defendants cite are inapplicable. *See In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prod. Liab. Litig.*, 2017 WL 4890594, at *15 (finding that a RICO enterprise existed and involving indistinguishable facts); *Mitchell Tracey v. First Am. Title Ins. Co.*, 935 F. Supp. 2d 826, 844 (D. Md. 2013) ("[U]nlawful acts are not conducted in the ordinary course of business."); *Robins v. Glob. Fitness Holdings, LLC*, 838 F. Supp. 2d 631, 652 (N.D. Ohio 2012) ("The RICO claims of all Plaintiffs fail because they have failed to allege an enterprise for the common purpose of committing bank and wire fraud."). A RICO enterprise does not exist where one company unknowingly aided another company in a fraudulent endeavor. But when both companies are aware of and contribute to the fraud, they cannot argue that they have a routine commercial relationship.[26]

---

[25] The nature of the common purpose distinguishes this case from others, like *Shaw v. Nissan N. Am., Inc.*, where the alleged purpose was to continue selling vehicles that (might have) contained defects. 220 F. Supp. 3d 1046, 1054 (C.D. Cal. 2016). The common purpose here was to create, market, and sell a component and consequently an engine which was inherently deceptive.

[26] The fact that two distinct companies (Bosch and GM) associated together for a common purpose is important. That fact distinguishes the present case from several which Defendants cite. *See Ignition Switch Litig.*, 2016 WL 3920353,

Bosch alternatively argues that no RICO enterprise exists because Plaintiffs do not allege that Bosch "had any financial interest in the success of the purported enterprise other than its own compensation for performing the tasks for which it was hired." Bosch Mot. Dismiss at 32. Bosch cites *Guaranteed Rate, Inc. v. Barr* for that proposition. 912 F. Supp. 2d 671, 687 (N.D. Ill. 2012). In *Guaranteed Rate*, the district court found that no RICO enterprise existed for several reasons, including because there was not "a single factual claim asserting the RICO Defendants had any interest in the outcome of the alleged scheme beyond their individual interests." *Id.* The court went on: "[T]here is no indication in the Amended Complaint that the RICO Defendants shared in the profits of the alleged enterprise as opposed to merely taking their own respective profits from their respective actions related to the scheme." *Id.* In *Menzies v. Seyfarth Shaw LLP*, however, the district court rejected the argument that *Guaranteed Rate* stood for the proposition that "RICO requires the enterprise members to share the profits of their illegal scheme." 197 F. Supp. 3d 1076, 1095 (N.D. Ill. 2016). "There is no such requirement." *Id.*

The Court agrees. And, more importantly, Bosch's argument is factually suspect. Although GM's profits from sales of Duramax-equipped vehicles might be distinct from Bosch's profits for development and implementation of EDC17 in those vehicles, all Defendants clearly profited from the alleged scheme. EDC17 enabled GM to produce diesel vehicles with an apparent blend of high power, high fuel efficiency, and low emission levels. Because that combination was attractive to consumers, the scheme resulted in higher demand for GM's diesel vehicles, which in turn

at *12 (no enterprise because the only alleged members were GM and its agents); *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prod. Liab. Litig.*, 826 F. Supp. 2d 1180, 1185 (C.D. Cal. 2011) (no RICO enterprise because all defendants were subsidiaries of Toyota). It is axiomatic that a company cannot form a RICO enterprise with itself. But, of course, several companies can easily form a RICO enterprise. *See United States v. Huber*, 603 F.2d 387, 394 (2d Cir. 1979). *See also In re ClassicStar Mare Lease Litig.*, 727 F.3d at 493.

increased GM's demand for EDC17 devices. The scheme thus plausibly resulted both in higher sales of diesel vehicles for GM and higher sales of EDC17 for Bosch.

## 2.

The next question is whether Plaintiffs have alleged that the Defendants both engaged in a pattern of racketeering activity. Pursuant to § 1961(d), a "'pattern of racketeering activity' requires at least two acts of racketeering activity, one of which occurred after the effective date of this chapter and the last of which occurred within ten years (excluding any period of imprisonment) after the commission of a prior act of racketeering activity." Defendants argue, correctly, that Plaintiffs must allege that *each* Defendant engaged in two predicate acts of racketeering activity. *See Kerrigan v. ViSalus, Inc.*, 112 F. Supp. 3d 580, 605 (E.D. Mich. 2015). *See also Crest Const. II, Inc. v. Doe*, 660 F.3d 346, 358 (8th Cir. 2011); *Guaranteed Rate, Inc. v. Barr*, 912 F. Supp. 2d 671, 684 (N.D. Ill. 2012).

Here, Plaintiffs allege that Defendants engaged in multiple predicate acts of mail and wire fraud. To state a claim based on mail or wire fraud, the Plaintiffs must allege the following three elements: "(1) devising or intending to devise a scheme to defraud (or to perform specified fraudulent acts); (2) involving a use of the mails; and (3) for the purpose of executing the scheme or attempting to do so. *United States v. Kennedy*, 714 F.3d 951, 958 (6th Cir. 2013) (quoting *United States v. Frost*, 125 F.3d 346, 354 (6th Cir.1997)).[27] The Plaintiffs must allege that Defendants possessed the "specific intent to deceive or defraud." *Frost*, 125 F.3d at 354. The "scheme to defraud must involve 'misrepresentations or omissions reasonably calculated to deceive persons of ordinary prudence and comprehension.'" *Bender v. Southland Corp.*, 749 F.2d 1205, 1216 (6th Cir. 1984) (quoting *United States v. Van Dyke*, 605 F.2d 220, 225 (6ht Cir. 1979)). The Plaintiffs

---

[27] The Sixth Circuit has "interpreted the mail-fraud and wire-fraud statutes as having essentially the same elements, except for the use of the mails versus the wires." *Kennedy*, 714 F.3d at 958.

need not show "actual reliance," but the Plaintiffs must demonstrate that the misrepresentations or omissions were "material." *United States v. Daniel*, 329 F.3d 480, 487 (6th Cir. 2003). Specific intent to defraud or deceive exists if "the defendant by material misrepresentations intends the victim to accept a substantial risk that otherwise would not have been taken." *Id.* at 488.

Importantly, "[a] defendant may commit mail fraud even if he personally has not used the mails." *Frost*, 125 F.3d at 354 (citing *United States v. Griffith*, 17 F.3d 865, 874 (6th Cir.1994)). "A mail fraud conviction requires only a showing that the defendant acted with knowledge that use of the mails would follow in the ordinary course of business, or that a reasonable person would have foreseen use of the mails." *Id.* In other words, there is no requirement that the defendant have actually intended that the mails (or wire) be used. *Id.* And, further, "'[t]he mailings may be innocent or even legally necessary.'" *Id.* (quoting *United States v. Oldfield*, 859 F.2d 392, 400 (6th Cir. 1988)). The use of the mails "'need only be closely related to the scheme and reasonably foreseeable as a result of the defendant's actions.'" *Id.* (quoting *Oldfield*, 859 F.2d at 400).

"When pleading predicate acts of mail or wire fraud, in order to satisfy the heightened pleading requirements of Rule 9(b), a plaintiff must '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.'" *Heinrich*, 668 F.3d at 404 (quoting *Frank v. Dana Corp.*, 547 F.3d 564, 570 (6th Cir. 2008)).

### i.

GM argues, first, that Plaintiffs' allegations regarding GM's advertising campaign are insufficient to establish affirmative misrepresentations because all claims made in that campaign are nonactionable puffery. Plaintiffs contend that their "RICO claim does not require any proof of affirmative misrepresentations because the omission of material facts suffices to prove the

predicate acts of mail or wire fraud." Pl. Resp. GM Mot. Dismiss at 10. That is correct. *See Bender*, 749 F.2d at 1216.

The more pertinent question, then, is whether Plaintiffs have adequately alleged fraudulent omissions. Defendants contend that Plaintiffs do not allege any fraudulent omissions "with the factual specificity mandated by Rule 9(b)." GM Mot. Dismiss at 40. But, as discussed earlier, allegations of omissions—as opposed to affirmative misrepresentations—will inevitably be less specific. Misrepresentations occur at a definite point in time, but omissions occur over periods of time. And, because misrepresentations involve action while omissions involve inaction, plaintiffs are less likely to uncover discrete evidence of omissions. *See Beck*, 2017 WL 3448016, at *9 (collecting cases). It must be remembered that the essential purpose of Rule 9(b) is to provide the defendants with adequate notice of the allegations so that they can defend against the claims.

When considered from that perspective, Plaintiffs' allegations of fraudulent conduct are clearly sufficient to apprise Defendants of the alleged fraudulent scheme. Defendants argue that Plaintiffs have not plausibly alleged that both GM and Bosch had specific intent to defraud consumers. But, as explained above, that intent can be inferred from the nature of the alleged conduct. The way in which EDC17 interacted with the Duramax engine is inherently deceptive. The alleged purpose of the device is to provide the perception of reduced emissions while avoiding the reality of reduced emissions. Defendants cannot reasonably argue that the deceptive nature of EDC17 was unanticipated or unintended, and even if they do, that argument could be resolved only by a jury. Plaintiffs have plausibly alleged that the purpose of EDC17 was deception, and so Defendants' protestations that it has an innocent and lawful purpose are noncognizable at the pleading stage.

Defendants also appear to argue that Plaintiffs have not plausibly alleged or specifically identified specific uses of the mail or wire which were fraudulent. But the Sixth Circuit has clearly held that a RICO claim can exist even if the mailings were "innocent" or "legally necessary." *Frost*, 125 F.3d at 354 (internal citations omitted). Additionally, the Supreme Court has held that "[m]ailings occurring after receipt of the goods obtained by fraud are within the statute if they 'were designed to lull the victims into a false sense of security, postpone their ultimate complaint to the authorities, and therefore make the apprehension of the defendants less likely than if no mailings had taken place.'" *United States v. Lane*, 474 U.S. 438, 451–52 (1986) (quoting *United States v. Maze*, 414 U.S. 395, 403 (1974)). *See also United States v. Daniel*, 329 F.3d 480, 489 (6th Cir. 2003). In other words, Plaintiffs do not bear the burden of pleading uses of the mail or wire that were fraudulent. They need only identify uses of the mail or wire which furthered the fraudulent scheme. Allegations that mailings by the Defendants aided in the concealment of the fraud are sufficient.

In making the argument that Plaintiffs must specifically allege fraudulent uses of the mail and wires, Defendants conflate several legal requirements. As described above, Plaintiffs bear the burden of alleging that each Defendant committed two predicate acts of racketeering activity. Plaintiffs allege that Defendants engaged in wire and mail fraud. Wire and mail fraud require a scheme to defraud through fraudulent representation or omission *and* a use of the mail or wire to further that scheme. But a defendant can commit wire or mail fraud without actually having used the wire or mail to defraud. Rather, and as explained above, a defendant can be found culpable simply by entering into the scheme to defraud if a co-defendant's use of the mail or wire was reasonably foreseeable and closely related to the scheme. Thus, Bosch's repeated argument that Plaintiffs must specifically allege that *Bosch* used the mail or wire to defraud is, simply, wrong.

Plaintiffs have adequately alleged a number of uses of the mail and wire which furthered the fraudulent scheme. GM submitted applications to government regulators which affirmed that the vehicles complied with emission standards. Without those mailings and electronic communications, GM would have been unable to sell the vehicles. The applications and resulting certificates also increased the likelihood that consumers would perceive the Duramax vehicles as emitting pollution at a low level. And although Bosch may not have directly used the mail or wire to further the fraudulent scheme, GM's uses of the mail and wire were inevitable and thus reasonably foreseeable. Plaintiffs have not specifically alleged the date of the applications or the specific identity of the employee who prepared them, but Plaintiffs have alleged enough detail to put Defendants on notice of the alleged predicate acts.

Additionally, Plaintiffs have identified a number of advertisements made by GM which characterized the Duramax vehicles as having low emissions and as being friendly to the environment. *See* Con. Am. Compl. at 61–70. If Plaintiffs were relying on these advertisements as the basis for its claim of fraud, then Defendants' arguments regarding puffery and duty to disclose would become relevant. However, these representations do not constitute the fraudulent scheme; they merely further it. The level of emissions produced by a diesel engine was a material consideration for consumers purchasing a vehicle. GM's extensive advertising which emphasized the low emissions and environmentally-friendly nature of its "clean diesel" engine underscores its understanding of that fact. Thus, regardless of whether these advertisements would be actionable on their own, they were material to the scheme. The advertisements urged consumers to buy Duramax vehicles *because* they were environmentally friendly even though the Defendants had purposefully worked together to obfuscate the true level of emissions.

Plaintiffs have specifically identified a number of communications that were "reasonably calculated to deceive persons of ordinary prudence and comprehension." *Bender*, 749 F.2d at 1216. The communications themselves may not have been demonstrably fraudulent, but they were intended to increase the likelihood that consumers would purchase Duramax vehicles because they produced emissions at a low level, when in fact the true level of emissions was much higher. The nondisclosure of the true operation of the Duramax engine was material precisely because GM worked so hard to convince consumers that it was a "clean diesel" engine. The fact that the uses of the mail and wire which Plaintiffs identify may have been innocent or legally required is irrelevant. *See Frost*, 125 F.3d at 354. *See also Schmuck*, 489 U.S. at 712 ("[A]lthough the registration-form mailings may not have contributed directly to the duping of either the retail dealers or the customers, they were necessary to the passage of title, which in turn was essential to the perpetuation of Schmuck's scheme."). Plaintiffs have identified a number of predicate acts of mail or wire fraud with sufficient specificity to avoid dismissal.[28]

### ii.

Bosch alternatively argues that Plaintiffs cannot rely on alleged omissions unless they can demonstrate that Bosch had an independent duty to disclose. Some noncontrolling cases do appear to support this proposition. *See United States v. Skeddle*, 940 F. Supp. 1146, 1149 (N.D. Ohio 1996) ("Because the "scheme to defraud of property or money" counts are based on what was not said (i.e., omissions), the defendants are culpable under this branch of the mail fraud statute only if the government proves the defendants had a duty to disclose their interest in the transactions."); *Gould, Inc. v. Mitsui Min. & Smelting Co.*, 750 F. Supp. 838, 843 (N.D. Ohio 1990) ("[T]here has

---

[28] As the *Kerrigan* Court explained, when the RICO claim is premised on a concealment theory of fraud, the plaintiffs do not need to meet the Rule 9(b) heightened pleading standard when identifying the mailings. Rather, Plaintiffs need only "provide a detailed description of the fraudulent scheme and a clear explanation of each Defendant's alleged role in it." 112 F. Supp. 3d at 607. Plaintiffs have done so here.

been no attempt to delineate what facts were omitted or what duty defendants had to disclose information to Gould, which is necessary when one alleges a material omission."). *See also United States v. Benny*, 786 F.2d 1410, 1418 (9th Cir. 1986) ("[A] non-disclosure can only serve as a basis for a fraudulent scheme when there exists an independent duty that has been breached by the person so charged."); *United States v. Rabbitt*, 583 F.2d 1014, 1026 (8th Cir. 1978).

But other courts have squarely rejected this rationale. *United States v. Colton*, 231 F.3d 890, 901 (4th Cir. 2000) ("Concealment often is accompanied by an affirmative misrepresentation or a violation of an independent statutory or fiduciary disclosure duty, but neither is "essential" for actionable fraud."); *United States v. Keplinger*, 776 F.2d 678, 697 (7th Cir. 1985) ("It requires no extended discussion of authority to demonstrate that omissions or concealment of material information can constitute . . . fraud cognizable under the mail fraud statute, without proof of a duty to disclose the information pursuant to a specific statute or regulation."); *United States v. Allen*, 554 F.2d 398, 410 (10th Cir. 1977) (same).

Neither Plaintiffs nor Defendants have identified Sixth Circuit authority which expressly addresses this question. The Sixth Circuit has, however, repeatedly confirmed that concealment of material facts can constitute a fraudulent scheme sufficient to establish RICO liability. *See, e.g., Daniel,* 329 F.3d at 487; *Dana Corp. v. Blue Cross & Blue Shield Mut. of N. Ohio*, 900 F.2d 882, 885 (6th Cir. 1990); *Am. Eagle Credit Corp. v. Gaskins*, 920 F.2d 352, 354 (6th Cir. 1990); *Bender*, 749 F.2d at 1216. *See also United States v. Chew*, 497 F. App'x 555, 563 (6th Cir. 2012) ("[I]n relation both to mail fraud and wire fraud, there is no technical or precise definition of an unlawful 'scheme to defraud.' The standard is a reflection of moral uprightness, of fundamental honesty, fair play and right dealing in the general and business life of members of society.") (internal citations omitted); *In re ClassicStar Mare Lease Litig.*, 823 F. Supp. 2d 599, 627 (E.D. Ky. 2011)

("A fraudulent scheme may be demonstrated by proof that it was reasonably calculated to deceive persons of ordinary prudence and comprehension, and communications of half-truths and concealment of material facts are both actionable."). Because, to the Court's knowledge, the Sixth Circuit has never articulated a duty to disclose requirement, the Court declines to manufacture that requirement. The more recent and better reasoned cases from other circuits do not require a duty to disclose in order for fraudulent omissions to constitute a scheme to defraud.

And, importantly, "[a] false or fraudulent representation, within the meaning of 18 U.S.C. § 2314, may be made by statements of half truths or the concealment of material facts, as well as by affirmative statements or acts." *United States v. O'Boyle*, 680 F.2d 34, 36 (6th Cir. 1982). *See also United States v. Kurlemann*, 736 F.3d 439, 446 (6th Cir. 2013); *United States v. Allen*, 554 F.2d 398, 410 (10th Cir. 1977). Even if the representations made during the advertising campaign are nonactionable puffery, those representations also seem fundamentally inconsistent with Plaintiffs' allegation that the Duramax vehicles polluted at levels several multiples more than the legal limit. Con. Am. Compl. at 3. In other words, to the extent Defendants may have had no duty to disclose the operation of the Duramax engine's emissions technology in the abstract, a duty arose when they created the appearance that it was a "clean diesel" engine. *See e.g.*, *Muncy v. InterCloud Sys., Inc.*, 92 F. Supp. 3d 621, 642 (E.D. Ky. 2015) (summarizing situations where a duty to disclose arises in the tort context).

### 3.

Finally, Bosch argues that Plaintiffs have not plausibly alleged that Bosch participated in the conduct of the RICO enterprise by directing the enterprise's affairs. Bosch similarly argues that Plaintiffs cannot join Bosch as a RICO Defendant by alleging that Bosch aided and abetted GM in violating the wire and mail fraud statutes. Finally, Bosch and GM both argue that Plaintiffs

cannot maintain a RICO conspiracy claim if they do not allege a cognizable substantive RICO claim.

i.

In *Reves v. Ernst & Young*, the Supreme Court addressed the requirement that a RICO defendant "conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs." 507 U.S. 170, 179 (1993) (quoting § 1962(c)). The Court explained:

> Once we understand the word "conduct" to require some degree of direction and the word "participate" to require some part in that direction, the meaning of § 1962(c) comes into focus. In order to "participate, directly or indirectly, in the conduct of such enterprise's affairs," one must have some part in directing those affairs. Of course, the word "participate" makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase "directly or indirectly" makes clear that RICO liability is not limited to those with a formal position in the enterprise, but some part in directing the enterprise's affairs is required.

*Id.*

"[L]iability [under § 1962(c)] depends on showing that the defendants conducted or participated in the conduct of the "*enterprise's* affairs," not just their *own* affairs." *Id.* at 185. "Although *Reves* does not explain what it means to have some part in directing the enterprise's affairs, subsequent decisions from our sister circuits have persuasively explained that it can be accomplished either by making decisions on behalf of the enterprise or by knowingly carrying them out." *United States v. Fowler*, 535 F.3d 408, 418 (6th Cir. 2008).

Bosch argues that Plaintiffs' allegations establish simply that Bosch "worked together with GM to design and implement software and that Bosch LLC participated in promoting clean diesel technology generally." Bosch Mot. Dismiss at 35. According to Bosch, that is insufficient because "a RICO violation requires more than that a defendant had a business relationship with a putative

RICO enterprise or . . . performed services for that enterprise." *Id.* (quoting *Kerrigan*, 112 F. Supp 3d at 603 (internal citations omitted)).

This argument is simply a repackaging of Bosch's previous argument that no RICO enterprise has been alleged because the relationship between the Defendants was merely a routine business relationship. That argument was rejected above and carries no additional persuasive weight here. Plaintiffs allege that Bosch was an integral part of the operation of the enterprise because Bosch "locked out" EDC17 so that its customers could not make significant changes to the component. Rather, Bosch worked closely with its customers to customize EDC17. Plaintiffs' allegations characterize EDC17 as performing an inherently deceptive function. Thus, the operation of EDC17 is the apparent heart of the fraudulent enterprise and, because Bosch bears primary responsibility for programming EDC17, it "knowingly carried . . . out" core aspects of the alleged enterprise. *Fowler*, 535 F.3d at 418. *See also Ouwinga v. Benistar 419 Plan Servs., Inc.*, 694 F.3d 783, 793 (6th Cir. 2012) ("*Fowler* makes clear that knowingly carrying out the orders of the enterprise satisfies the "operation or management" test."). *See also id.* ("We recognize that although this analysis applies to all Defendants, the various Defendants acted in different capacities and those differences may ultimately impact the determination of whether a particular Defendant only participated in his own affairs. But that is a matter to be fleshed out in discovery and to be resolved through motion practice or by the jury.").[29]

---

[29] Bosch also argues that Plaintiffs cannot satisfy the predicate act requirement by alleging that Bosch "aided and abetted" GM in violating the mail and wire fraud statutes. As explained above, this argument conflates several legal requirements. Plaintiffs must allege that Bosch engaged in two predicate acts under the RICO statute. The alleged predicate acts, mail and wire fraud, can be committed without actually using the mail or wire. A charge of mail or wire fraud, then, bears a certain resemblance to conspiracy law. As explained above, Plaintiffs have plausibly alleged that Bosch committed predicate acts of mail and wire fraud. Thus, Plaintiffs' RICO theory does not rely upon "aiding or abetting" liability.

**ii.**

Thus, Plaintiffs have adequately alleged the elements of a § 1962(c) substantive RICO claim against both GM and Bosch. Both Defendants argue that, to the extent Plaintiffs have not alleged a cognizable substantive RICO claim, they cannot maintain a § 1962(d) RICO conspiracy claim against the Defendants. The premise of that argument has been rejected, and so the RICO conspiracy claim will not be dismissed.

**D.**

Finally, GM argues that Plaintiffs' RICO claim must be dismissed because it is essentially an attempt to enforce the Clean Air Act via a civil suit. In support of that argument, GM cites three cases (none involving suits to enforce the CAA) where courts concluded that extensive regulatory schemes provided the exclusive remedies for violations of regulatory statutes and preventing the plaintiffs from invoking RICO to obtain treble damages. *See Ayres v. Gen. Motors Corp.*, 234 F.3d 514, 525 (11th Cir. 2000) (dismissing a RICO claim premised on non-compliance with the notification requirement of Section 210 of the Energy Reorganization Act because the regulatory statute provided the exclusive remedy for violations); *Norman v. Niagara Mohawk Power Corp.*, 873 F.2d 634, 637 (2d Cir. 1989) (also dismissing a RICO claim premised on violation of Section 210 of the Energy Reorganization Act because that section provides an exclusive remedy for violations and because the RICO claim did not involve "a collateral matter that is only peripherally related to the safety concerns implicit in section 210"); *Gifford v. Meda*, No. 09-CV-13486, 2010 WL 1875096, at *12 (E.D. Mich. May 10, 2010) (dismissing a RICO claim premised on "the misclassification of Plaintiffs as independent contractors for purposes of federal income and employment tax reporting" because that conduct was "unlawful only by virtue of the federal income tax laws").

This argument is largely coterminous with Defendants' argument, rejected above, that Plaintiffs' state law claims are preempted by the CAA. Plaintiffs' allegations are not dependent upon proof of violation of federal emission regulations. That said, Plaintiffs' allegations are confusing because they repeatedly allege that Defendants purposefully deceived government regulators about the true emission levels of the Duramax engine. Plaintiffs allege, however, that their suit is "not based on these laws but on deception aimed at consumers." Con. Am. Compl. at 5.

For largely the same reasons articulated while rejecting Defendants' argument that Plaintiffs' state law claims are preempted, Plaintiffs' RICO claim is not primarily premised on proof of violation of EPA regulations and thus is cognizable. The alleged common purpose at the heart of the RICO scheme is the deception of consumers. The alleged injury is overpayment by consumers. The identified predicate acts of mail and wire fraud involve communications to consumers. Admittedly, Plaintiffs also allege that the RICO Defendants intended to deceive regulators and made fraudulent mail and wire communications to regulators. But neither of those allegations are essential to Plaintiffs' RICO claim. Accordingly, they are best construed as "collateral matter[s]" that are "only peripherally related to the" regulatory concerns advanced by EPA regulations. *Norman*, 873 F.2d at 637. Plaintiffs' RICO claim is not an attempt to obtain a remedy which is exclusively within the purview of the EPA.

## VI.

The final question is whether Plaintiffs should be permitted to proceed to discovery on state law claims advanced on behalf of unnamed, putative class members. Defendants argue that these claims should be dismissed because Plaintiffs do not have standing to advance claims on behalf of

unnamed Plaintiffs prior to class certification. Plaintiffs argue that this analysis is best reserved until class certification because that determination will resolve the standing issue.

"Threshold individual standing is a prerequisite for all actions, including class actions." *Fallick v. Nationwide Mut. Ins. Co.*, 162 F.3d 410, 423 (6th Cir. 1998). "A potential class representative must demonstrate individual standing vis-as-vis the defendant; he cannot acquire such standing merely by virtue of bringing a class action." *Id.* The growing consensus, however, is that "class certification issues are . . . 'logically antecedent' to Article III concerns," at least when the named plaintiffs possess Article III standing. *See Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 831 (1999); *Kaatz v. Hyland's Inc.*, No. 16 CV 237 (VB), 2016 WL 3676697, at *4 (S.D.N.Y. July 6, 2016); *Storey v. Attends Healthcare Prod., Inc.*, No. 15-CV-13577, 2016 WL 3125210, at *3 (E.D. Mich. June 3, 2016); *In re Auto. Parts Antitrust Litig.*, 29 F. Supp. 3d 982, 1000 (E.D. Mich. 2014). In other words, "where 'class certification is the source of the potential standing problems,' class certification should precede the standing inquiry." *In re Digital Music Antitrust Litig.*, 812 F. Supp. 2d 390, 406 (S.D.N.Y. 2011) (quoting *In re Grand Theft Auto Video Game Litig.*, No. 06 MD 1739, 2006 WL 3039993, at *2 (S.D.N.Y. Oct. 25, 2006)).

GM attempts to argue that the standing question would exist regardless of whether Plaintiffs filed their claims alone or as part of a putative class action. But GM does not explain why that is the case, and the Court cannot conceive of a reason. The named Plaintiffs have Article III standing and, if the class is certified, then those Plaintiffs will be able to advance state law claims on behalf of unnamed Plaintiffs. The question of whether the state law claims may be advanced on behalf of unnamed Plaintiffs, then, is indistinguishable from the Federal Rule of Civil Procedure 23 analysis. *See Kaatz*, 2016 WL 3676697, at *4 ("That standing inquiry is more appropriately addressed at the class certification stage when courts consider the commonality and

typicality prerequisites of class actions."). The claims predicated on the law of states where no named Plaintiff lives will not be dismissed for lack of standing.

### VII.

Accordingly, it is **ORDERED** that Defendants' motions to dismiss, ECF No. 44, 45, are **DENIED.**

It is further **ORDERED** that Plaintiffs' motion for leave to file a surreply, ECF No. 58, is **DENIED as moot.**

It is further **ORDERED** that Defendant GM's motion to file a surresponse, ECF No. 60, is **DENIED as moot.**

Dated: February 20, 2018                    s/Thomas L. Ludington
                                            THOMAS L. LUDINGTON
                                            United States District Judge

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on February 20, 2018.

                        s/Kelly Winslow
                        KELLY WINSLOW, Case Manager