UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

IN RE DURAMAX DIESEL LITIGATION,

ANDREI FENNER, et al,

              Plaintiffs,

v.

GENERAL MOTORS, LLC,
ROBERT BOSCH GMBH, and
ROBERT BOSCH LLC,

              Defendants.

Case No. 17-cv-11661

Honorable Thomas L. Ludington

_____/

**ORDER GRANTING MOTION FOR JUDGMENT ON THE PLEADINGS IN PART**

On May 25, 2017, the original Plaintiffs (including the first-named Plaintiff Andrei Fenner) filed a complaint against Defendant General Motors LLC ("GM"), Robert Bosch GmbH, and Robert Bosch LLC ("Bosch" and, collectively, the "Defendants"). ECF No. 1. The suit was assigned to United States District Court Judge George Caram Steeh. On July 25, 2017, Judge Steeh issued a stipulated proposed order which consolidated the *Fenner* class action with another class action (*Carrie Mizell* et al. v. *General Motors LLC,* et al., Case No. 17-11984) also pending before him at the time. ECF No. 16. Pursuant to that stipulated proposed order, the "caption for the Consolidated Action" was designated as "IN RE DURAMAX DIESEL LITIGATION." *Id.* at 3. Also pursuant to that stipulated order, the Plaintiffs filed a consolidated amended complaint on August 4, 2017. ECF No. 18. On August 30, 2017, the consolidated case was reassigned because it is a companion case to *Counts* et al. *v. General Motors*, Case No. 1-16-cv-12541, which is currently in discovery. ECF No. 33.

In September 2017, GM and Bosch requested extensions of the briefing page limit for their motions to dismiss. ECF Nos. 34, 35, 39. In response, the Court suggested that "judicial efficiency might be served by resolving threshold issues in a motion to dismiss under Federal Rule of Civil Procedure 12(b)," and reserving challenges to Plaintiffs' state law claims for a motion for judgment on the pleadings. ECF No. 36 at 2. Defendants were amenable to that suggestion.

On October 13, 2017, Defendants filed motions to dismiss. ECF Nos. 44, 45. On February 20, 2019, those motions to dismiss were denied. ECF No. 61. Pursuant to the parties' stipulated schedule, ECF No. 62, Defendants subsequently filed answers to the amended complaint. ECF Nos. 64, 65. And on May 2, 2018, GM filed a motion for judgment on the pleadings. ECF No. 66.[1] For the following reasons, that motion will be granted in part.

## I.

Because a motion for judgment on the pleadings is subject to the same standard which governs a motion to dismiss, the summary of Plaintiffs' allegations articulated in the February 20, 2018, opinion and order will be reproduced in full. Feb. 20, 2018, Op. & Order, ECF No. 61.

The consolidated amended complaint names thirteen Plaintiffs residing in ten states.[2] Each Plaintiff bought a Silverado or Sierra 2500 or 3500 diesel vehicle with a model year between 2011 and 2016. Con. Am. Compl. at 1, ECF No. 18. Some Plaintiffs bought new vehicles and others bought used vehicles, but each purchased their vehicle from an authorized GM dealer. *See, e.g., id.* at 14. The vehicles which Plaintiffs identify all contain a "Duramax" diesel engine. *Id.* at 1. Plaintiffs' allegations center on the emissions reduction technology associated with that engine.

---

[1] Bosch has joined in both the motion and GM's reply brief in support of the motion. ECF Nos. 67, 74.

[2] Those states are Arizona, Arkansas, California, Louisiana, Michigan, Nevada, New Jersey, New Mexico, Oregon, and Texas.

**A.**

According to Plaintiffs, GM represented the Duramax engine as providing both low emissions and high performance. *Id.*[3] Plaintiffs (in unsourced quotations) contend that GM boasted that the Duramax engine constituted a "'remarkable reduction of diesel emissions'" compared to the engine previously used in its Silverado and Sierra vehicles. *Id.* Those representations were false. Plaintiffs allege that

> scientifically valid emissions testing has revealed that the Silverado and Sierra 2500 and 3500 models emit levels of NOx many times higher than (i) their gasoline counterparts, (ii) what a reasonable consumer would expect, (iii) what GM had advertised, (iv) the Environmental Protection Agency's maximum standards, and (v) the levels set for the vehicles to obtain a certificate of compliance that allows them to be sold in the United States.

*Id.*[4]

In other words, the Duramax engine does not actually combine high power and low emissions as GM suggested: "[T]he vehicles' promised power, fuel economy, and efficiency is obtained only by turning off or turning down emissions controls when the software in these vehicles senses they are not in an emissions testing environment." *Id.* at 1–2.

The Duramax engine allegedly achieves this feat by employing "defeat devices." *Id.* at 2. As Plaintiffs define that term, "[a] defeat device means an auxiliary emissions control device that reduces the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal vehicle operation and use." *Id.* The Duramax engine allegedly contains three such devices. Defeat Device No. 1 "reduces or derates the emissions

---

[3] This purported achievement would be particularly noteworthy because diesel engines "have an inherent trade-off between power, fuel efficiency, and emissions: the greater the power and fuel efficiency, the dirtier and more harmful the emissions." *Id.* at 46.

[4] In the consolidated amended complaint, Plaintiffs summarize, in detail, the testing they conducted on a 2013 Silverado 2500. *Id.* at 70–92.

system when temperatures are above the emissions certification test range (86°F)." *Id.* at 3. Similarly, Defeat Device No. 2 "operates to reduce emissions control when temperatures are below the emissions certification low temperature range (68°F)." *Id.* The impact of these alleged devices is significant:

> Testing reveals that at temperatures below 68°F (the lower limit of the certification test temperature), stop and go emissions are 2.1 times the emissions standard at 428 mg/mile (the standard is 200 mg/mile). At temperatures above 86°F, stop and go emissions are an average of 2.4 times the standard with some emissions as high as 5.8 times the standard.

*Id.*

The third defeat device "reduces the level of emissions controls after 200-500 seconds of steady speed operation in all temperature windows, causing emissions to increase on average of a factor of 4.5." *Id.* Plaintiffs estimate that "due to just the temperature-triggered defeat devices, the vehicles operate at 65-70% of their miles driven with emissions that are 2.1 to 5.8 times the standard." *Id.*[5]

Plaintiffs provide a technical explanation for how GM was able to leverage these devices to "obtain and market higher power and fuel efficiency from its engines while still passing the cold-start emissions certification tests." *Id.* at 4. Essentially, GM placed the "Selective Analytic Reduction (SCR) in front of the Diesel Particulate Filter (DPF)." *Id.*[6] In doing so, GM increased

---

[5] Plaintiffs analogize these alleged devices to those which Volkswagen has recently pleaded guilty to including in their diesel vehicles and which other vehicle manufacturers have been accused of utilizing. *See id.* at 2.

[6] The SCR converts oxides of nitrogen (a harmful pollutant produced by diesel engines) into nitrogen gas and water "by means of a reduction reaction." *Id.* at 50. The DPF traps and stores particulate matter (soot). *Id.* at 51. The DPF is "cleaned through a process known as regeneration." *Id.* "Passive regeneration" is a "continuously occurring process" which occurs whenever "the exhaust gas temperature is high enough to burn the particulate matter trapped by the filter." *Id.* "Active regeneration occurs only when the engine senses that the DPF needs to be cleaned as the DPF is approaching maximum capacity and generating too much exhaust backpressure." *Id.* In that scenario, "fuel is injected into the exhaust stream via the HCI to increase the exhaust gas temperature so that the particulate matter can be burned off at carbon's non-catalytic oxidation temperature." *Id.* Because fuel is being used for a purpose other than propulsion, "[a]ctive regeneration dramatically reduces fuel economy." *Id.*

the engine's power production and fuel efficiency. However, placing the SCR in front of the DPF also dramatically increased potential emissions, thus requiring the engine to "employ Active Regeneration (burning off collected soot at a high temperature) and other power- and efficiency-sapping exhaust treatment measures." *Id.* Thus, the power and fuel-efficiency gains were lost because of the increased need for emissions reduction technology. GM's solution, according to the Plaintiffs, was the three defeat devices identified above.

**B.**

**1.**

Plaintiffs allege that, in developing this solution, "GM did not act alone." *Id.* at 10. Rather, Robert Bosch GmbH and Robert Bosch LLC "were active and knowing participants in the scheme to evade U.S. emissions requirements" and to develop, manufacture, and test the "electronic diesel control (EDC) that allowed GM to implement the defeat device." *Id.* The EDC in question, Bosch's EDC17, "is a good enabler for manufacturers to employ 'defeat devices' as it enables the software to detect conditions when emissions controls can be derated——i.e., conditions outside of the emissions test cycle." *Id.* Importantly, "[a]lmost all of the vehicles found or alleged to have been manipulating emissions in the United States (Mercedes, FCA, Volkswagen, Audi, Porsche, Chevy Cruze) use a Bosch EDC17 device." *Id.*

According to a Bosch press release quoted by Plaintiffs, the EDC17 device controls "'the precise timing and quantity of injection, exhaust gas recirculation, and manifold pressure regulation.'" *Id.* at 93. The device also "'offers a large number of options such as the control of particulate filters or systems for reducing nitrogen oxides.'" *Id.* EDC17 is "run on complex, highly proprietary engine management software over which Bosch exerts near-total control." *Id.* at 94. Because the software "is typically locked to prevent customers, like GM, from making significant

changes on their own," vehicle manufacturers must work closely with Bosch to implement EDC17 in a vehicle. *Id.*

According to Plaintiffs, "Bosch participated not just in the development of the defeat device, but also in the scheme to prevent U.S. regulators from uncovering the device's true functionality." *Id.* at 39. Additionally, "Bosch GmbH and Bosch LLC marketed 'clean diesel' in the United States and lobbied U.S. regulators to approve 'clean diesel,' another highly unusual activity for a mere supplier." *Id.* In short, Plaintiffs believe that "Bosch was a knowing and active participant in a massive, decade-long conspiracy with Volkswagen, Audi, Mercedes, GM, and others to defraud U.S. consumers, regulators, and diesel car purchasers or lessees." *Id.* at 40.

**2.**

In their complaint, Plaintiffs repeatedly reference allegedly similar conduct by other automobile manufacturers. Plaintiffs explain that, in recent years, "almost all of the major automobile manufacturers rushed to develop 'clean diesel' and promoted new diesel vehicles as environmentally friendly and clean." *Id.* at 5. Due in part to that marketing, a significant market for "clean diesel" vehicles developed: "[O]ver a million diesel vehicles were purchased between 2007 and 2016 in the United States and over ten million in Europe." *Id.* at 6. A number of those diesel vehicle manufacturers, however, have now been accused of installing "defeat devices" in their diesel vehicles. *Id.* For example, Volkswagen has pleaded guilty to criminal charges (and has settled civil class action claims) arising out of allegations that it purposefully evaded emission standards. *Id.* Fiat Chrysler Automobiles has also been accused of similar conduct. On January 12, 2017, the EPA "issued a Notice of Violation to FCA because it had cheated on its emissions certificates with respect to its Dodge Ram and Jeep Grand Cherokee vehicles, and on May 23,

2017, the United States filed a civil suit in the Eastern District of Michigan alleging violations of the Clean Air Act." *Id.* at 6–7.

**C.**

Unlike gasoline engines, diesel engines "compress a mist of liquid fuel and air to very high temperatures and pressures, which causes the diesel to spontaneously combust." *Id.* at 46. When compared to gasoline engines, diesel engines produce greater amounts of "oxides of nitrogen (NOx), which includes a variety of nitrogen and oxygen chemical compounds that only form at high temperatures." *Id. See also id.* at 47. According to Plaintiffs,

> NOx pollution contributes to nitrogen dioxide, particulate matter in the air, and reacts with sunlight in the atmosphere to form ozone. Exposure to these pollutants has been linked with serious health dangers, including asthma attacks and other respiratory illnesses serious enough to send people to the hospital. Ozone and particulate matter exposure have been associated with premature death due to respiratory-related or cardiovascular-related effects. Children, the elderly, and people with pre-existing respiratory illness are at acute risk of health effects from these pollutants. As a ground level pollutant, NO2, a common byproduct of NOx reduction systems using an oxidation catalyst, is highly toxic in comparison to nitric oxide (NO). If overall NOx levels are not sufficiently controlled, then concentrations of NO2 levels at ground level can be quite high, where they have adverse acute health effects.

*Id.*

Plaintiffs further allege that the EPA believes that NOx contributes to increases in the amount of acid rain, water quality deterioration, toxic chemicals, smog, nitric acid vapor, and global warming. *Id.* at 113–114.

**D.**

In the consolidated amended complaint, Plaintiffs repeatedly reference the pollution standards promulgated by the EPA and other entities. They allege that GM and Bosch conspired to conceal the defeat devices in the Duramax engine from the EPA and allege that, because of the defeat devices, the vehicles in question do not comply with emission pollution standards, despite

being certified as conforming to those requirements. *See, e.g., id.* at 97–99. But Plaintiffs also allege that "[t]his case is not based on these laws but on deception aimed at consumers." *Id.* at 5. Plaintiffs contend that "a vehicle's pollution footprint is a factor in a reasonable consumer's decision to purchase a vehicle" and that GM's actions demonstrate their understanding of that fact. As Plaintiffs explain, GM crafted a marketing campaign, "intended to reach the eyes of consumers, [which] promoted the Duramax engine as delivering 'low emissions' or having 'reduced NOx emissions.' GM was acutely aware of this due to the public perception that diesels are 'dirty.'" *Id.* at 60.

In the consolidated amended complaint, Plaintiffs quote, summarize, or reproduce approximately ten pages of GM advertising, press releases, and publications related to the emissions production and fuel economy of its diesel engines. *See id.* at 61–70. These advertisements and publications repeatedly emphasize that the Duramax engine "'run[s] clean,'" delivers "'low emissions,'" and is "'friendlier to the environment.'" Notably, not one of the advertisements or publications which Plaintiffs reproduce in this section of the consolidated amended complaint references EPA standards or represents that the vehicle in question has been certified by the EPA.

Plaintiffs allege that the disparity between the way the Duramax engine was characterized as operating and the way in which its emissions reductions systems were actually configured has resulted in financial harm to them and other consumers. *See id.* at 116 ("As a result of GM's unfair, deceptive, and/or fraudulent business practices, and its failure to disclose that under normal operating conditions the Polluting Vehicles are not "clean" diesels, emit more pollutants than do gasoline-powered vehicles, and emit more pollutants than permitted under federal and state laws, owners and/or lessees of the Polluting Vehicles have suffered losses.").

First, Plaintiffs allege that they "paid a premium of nearly $9,000 [because] GM charged more for its Duramax engine than a comparable gas car." *Id.* at 115. Because the Duramax engine did not reduce emissions to the level a reasonable consumer would have expected, Plaintiffs allege that they overpaid for the vehicle at the time of purchase. *Id.* at 117. Plaintiffs also identify other damages they have suffered:

> Had Plaintiffs and Class members known of the higher emissions at the time they purchased or leased their Polluting Vehicles, they would not have purchased or leased those vehicles, or would have paid substantially less for the vehicles than they did. Moreover, when and if GM recalls the Polluting Vehicles and degrades the GM Clean Diesel engine performance and fuel efficiency in order to make the Polluting Vehicles compliant with EPA standards, Plaintiffs and Class members will be required to spend additional sums on fuel and will not obtain the performance characteristics of their vehicles when purchased. Moreover, Polluting Vehicles will necessarily be worth less in the marketplace because of their decrease in performance and efficiency and increased wear on their cars' engines.

*Id.* at 117.

### E.

The consolidated amended complaint includes fifty-four counts. The first count alleges that the Defendants violated the RICO statute. The remaining fifty-three counts are state law claims predicated on the fraudulent concealment and consumer protection laws of forty-three different states. Thirty-three of the state law claims originate from states where no named Plaintiff resides.

### II.

"The standard of review for a [motion for] judgment on the pleadings [under Rule 12(c)] is the same as that for a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6)." *E.E.O.C. v. J.H. Routh Packing Co.*, 246 F.3d 850, 851 (6th Cir. 2001). "For purposes of a motion for judgment on the pleadings, all well-pleaded material allegations of the pleadings of the opposing party must be taken as true, and the motion may be granted only if the moving party is nevertheless clearly entitled to judgment." *S. Ohio Bank v. Merrill Lynch, Pierce, Fenner & Smith,*

*Inc.*, 479 F.2d 478, 480 (6th Cir. 1973). However, the court "need not accept as true legal conclusions or unwarranted factual inferences." *Mixon v. State of Ohio*, 193 F.3d 389, 400 (6th Cir. 1999). A motion for judgment on the pleadings "is granted when no material issue of fact exists and the party making the motion is entitled to judgment as a matter of law." *Paskvan v. City of Cleveland Civil Serv. Comm'n*, 946 F.2d 1233, 1235 (6th Cir. 1991). *See also JPMorgan Chase Bank, N.A. v. Winget*, 510 F.3d 577, 581 (6th Cir. 2007). Rule 9(b) requires a party alleging fraud or mistake to "state with particularity the circumstances constituting fraud or mistake." *Id.* Rule 9(b) also provides, however, that "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Id.*

<h3 style="text-align:center">III.</h3>

In its motion for judgment on the pleadings, GM challenges twenty-four counts in whole or in part, which it groups into seven categories. First, GM argues that Plaintiffs' claims under the Wisconsin Deceptive Trade Practices Act, Count 53, should be dismissed because the statute applies only to affirmative representations. Second, GM seeks dismissal of the Kentucky and Idaho Consumer Protection Act claims, found in Counts 25 and 29, because Plaintiffs have not alleged contractual privity with the Defendants. Third, GM challenges Counts 8 and 9, which advance Louisiana common law and Uniform Trade Practices Act claims, because the Louisiana Products Liability Act contains an exclusivity provisions. Fourth, GM argues that Plaintiffs' claims brought under the Iowa Consumer Fraud Act and the Mississippi Consumer Protection Act, Counts 27 and 35, are barred because Plaintiffs did not satisfy the state-attorney-general's approval or settlement process. Fifth, GM seeks dismissal of the California breach of contract claim, Count 6, because Plaintiffs do not allege the existence of a valid contract. Sixth, GM contends that Plaintiffs' claims for punitive damages in Counts 3, 10, 13, 14, 33, 34, 44, and 52 should be stricken because the

underlying state consumer protection statutes do not provide for punitive damages. Finally, GM seeks dismissal of a number of "placeholder" claims, Counts 17, 18, 22, 26, 30, 32, 52, and 54, wherein Plaintiffs merely provided notice of their intent to amend the complaint to add the claims rather than affirmatively advancing them.

In their response, Plaintiffs consent to dismissal of their Mississippi consumer protection claim, Count 35, and their California breach of contract claim, Count 6. Pl. Resp. Br. at 1 n.4, ECF No. 71. Plaintiffs further concede to the striking of the claims for punitive damages in Counts 3, 10, 13, 33, 34, and 52. *Id.* As to their "placeholder" counts, Plaintiffs admit that those counts have been included merely for purposes of providing notice, but now seek leave to amend to add the underlying substantive claims. In its reply brief, GM stipulates to permit Plaintiffs to amend their complaint for the limited purpose of amending the placeholder claims in Counts 17, 18, 22, 26, 30, 32, 52, and 54. GM. Reply Br. at v n. 1, ECF No. 73. GM also withdraws its opposition to Plaintiffs' claim under Iowa law, Count 27, and their request for punitive damages under the Nevada consumer protection statute, Count 14.

At the present time, only six counts, grouped into four categories, are contested. GM still seeks dismissal of the Wisconsin Deceptive Trade Practice Act, Count 53; the Kentucky and Idaho consumer protection act claims, Counts 25 and 29; the Louisiana common law and Uniform Trade Practices Act claims, Counts 8 and 9; and the claim for punitive damages under the Pennsylvania Unfair Trade Practices and Consumer Protection Law, Count 44.

**A.**

In Count 53, Plaintiffs advance a claim based on the Wisconsin Deceptive Trade Practices Act ("WDTPA"). "'Wisconsin courts divide a claim under Wis. Stat. § 100.18(1) into three elements: (1) the defendant made a representation to 'the public' with the intent to induce an

obligation, (2) the representation was 'untrue, deceptive or misleading,' and (3) the representation materially caused a pecuniary loss to the plaintiff.'" *Murillo v. Kohl's Corp.*, 197 F. Supp. 3d 1119, 1126 (E.D. Wis. 2016) (quoting *Spacesaver Corp. v. Marvel Grp., Inc.*, 621 F.Supp.2d 659, 662 (W.D. Wis. 2009)). GM argues that Plaintiffs' claim must be dismissed because the statute does not permit omission-based claims and Plaintiffs have already disavowed any fraud claims premised on affirmative misrepresentations. *See* Pl. Resp. GM Mot. Dismiss at 9–10 ("But Plaintiffs do not sue for common law fraud under state law for affirmative misrepresentations."); Feb. 20, 2018, Op. & Order at 21, ECF No. 61 (relying upon the disavowal). In response, Plaintiffs admit that the statute does not provide a cause of action for claims based solely on omissions or concealment. Plaintiffs contend, however, that Wisconsin courts have approved WDTPA claims based on a "mixed" theory of affirmative misrepresentation and omission.

In *Tietsworth v. Harley-Davidson, Inc.*, the Wisconsin Supreme Court held that "[a] nondisclosure is not an "assertion, representation or statement of fact" under Wis. Stat. § 100.18(1). Silence—an omission to speak—is insufficient to support a claim under Wis. Stat. § 100.18(1)." 677 N.W.2d 233, 245 (Wis. 2004). The Wisconsin Supreme Court further found that, "[t]o the extent that the amended complaint alleges any affirmative assertions, they are mere commercial "puffery" and hence legally insufficient to support a claim under the statute." *Id.*

Despite the plain language rejecting omission-based claims in *Tietsworth*, Plaintiffs believe they can advance a "mixed" cause of action, relying upon *Murillo v. Kohl's Corporation*. 197 F. Supp. 3d 1119. In *Murillo*, a district court for the Eastern District of Wisconsin considered whether the WDPTA claim should be dismissed "because the plaintiffs, in part, alleged that Kohls failed to disclose certain price-related information." *Id.* at 1127. The district court held that the claim could advance because the "gravamen of plaintiffs' amended complaint" was that "Kohls

*affirmatively* represents false and misleading 'regular' prices on its merchandise and in its advertisements." *Id.* (emphasis in original). The court continued: "In a case such as this, omissions related to the goods' actual prices are not actionable, but are indeed relevant. As recognized by the Wisconsin Court of Appeals, the misrepresentation/omission interplay presents two sides of the same coin." *Id.* (citing *Christense v. TDS Metrocom LLC*, 316 Wis.2d 356 n.4 (Wisc. Ct. App. 2008). In dicta, the *Christense* court explained that while a nondisclosure is not actionable under the WDPTA, "a nondisclosure of facts, *combined with* an affirmative representation that is undermined by the non-disclosed facts, may result in liability under § 100.18(1)." *Id.* (emphasis in original). In that scenario, liability may exist because "the existence of the undisclosed facts may show that the affirmative representation is untrue, deceptive, or misleading." *Id.*

Plaintiffs contend that the same dynamic exists here: "GM owed Plaintiffs a duty to disclose the defeat devices in the Affected Vehicles in part because it made false and incomplete representations about the cleanliness and power of the vehicles, while purposefully withholding material facts from Plaintiffs that contradicted those representations." Pl. Resp. Br. at 7. But the argument that the existence of a WDPTA claim turns on whether a duty to disclose exists has been expressly rejected by Wisconsin courts. *See Tietsworth*, 677 N.W.2d at 170 ("The DTPA does not purport to impose a duty to disclose, but, rather, prohibits only affirmative assertions, representations, or statements of fact that are false, deceptive, or misleading."); *Goudy v. Yamaha Motor Corp.*, 782 N.W.2d 114, 124 (Wisc. Ct. App. 2010) (rejecting the argument that "if there is a duty to disclose a fact, then the failure to disclose is treated as equivalent to a representation," because "the standards for common law misrepresentation do not apply to claims under § 100.18.").

Accordingly, Plaintiffs cannot rely on any alleged duty to disclose in attempting to state a claim under the WDPTA. *Murillo* and *Christense* do stand for the proposition that GM's alleged fraudulent omissions are *relevant* to Plaintiff's asserted WDPTA claim, but those cases make abundantly clear that fraudulent omissions, by themselves, cannot state a claim. Rather, proof of fraudulent omissions may help a plaintiff to state a WDPTA claim because those omissions will often *identify* a fraudulent representation. For example, in *Murillo*, Kohls made a fraudulent representation when it identified a "regular" price for certain items. The plaintiffs identified a fraudulent omission—"namely, that the 'regular' prices appearing on Kohls' goods are not accurate." 197 F. Supp. 3d at 1127. The proof of that omission demonstrated that the representation was fraudulent. Because the plaintiffs identified a fraudulent representation, they had stated a claim.

Even assuming that Plaintiffs here have plausibly alleged fraudulent omissions, they have not identified any corresponding, actionable fraudulent representations. Indeed, Plaintiffs have affirmatively disclaimed any such theory. *See* Pl. Resp. GM. Mot. Dismiss. at 10–11, ECF No. 54 ("[E]vidence of affirmative statements made by GM are relevant not to prove common law fraud (which is not alleged by Plaintiffs) or claims based on affirmative misrepresentations but rather to show that Defendants' omissions were material for purposes of claims under consumer protection statutes and RICO."). Plaintiffs have not expressly retracted this characterization, which the Court and the Defendants have relied upon, and so Plaintiffs' WDPTA must be dismissed for failure to state a claim.

Regardless, Plaintiffs appear to recognize that the affirmative representations identified in the complaint constitute puffery. *See* Pl. Resp. Br. at 7–8 (arguing that the WDPTA claim should not be dismissed on the ground that the alleged misrepresentations are "mere puffery" because, in

*Murillo*, the court held that only some of Kohls' statements could be considered "puffery"). The implication of Plaintiffs' argument is that they state a WDPTA claim because GM's nonactionable representations, viewed in context of the alleged fraudulent omissions, are sufficient to constitute actionable representations. Wisconsin courts have rejected similar arguments. *See Tietsworth*, 677 N.W.2d at 245 (dismissing the WDPTA claim because any affirmative assertions alleged in the complaint were merely commercial puffery); *Murillo*, 197 F. Supp. 3d at 1128 (holding that Kohls' representation that a price was "regular" was actionable nonpuffery sufficient to state a WDPTA claim and rejecting the argument that the claim should be dismissed because other alleged representations *were* puffery). Plaintiffs have identified no Wisconsin case where individually nonactionable statements became actionable together. Simply put, nonactionable puffery does not become actionable simply through aggregation.[7] Plaintiffs' claim under the WDPTA will be dismissed.

## B.

Next, GM argues that Plaintiffs' claims under the Idaho and Kentucky Consumer Protection Statutes, found in Counts 25 and 29, must be dismissed because Plaintiffs do not allege

---

[7] And if Plaintiffs had attempted to argue that the alleged representations were individually actionable, that argument would have failed. As explained in *Tietsworth*, "[p]uffery has been defined as "'the exaggerations reasonably to be expected of a seller as to the degree of quality of his product, the truth or falsity of which cannot be precisely determined.'" 677 N.W.2d at 171 (quoting *State v. American TV*, 146 Wis.2d 292, 301–02 (1988)). Statements about an engine's "low emissions" and "great power" are inherently subjective and thus are puffery.

The only alleged statement which could arguably be "precisely determined" is found on page 68 of the amended complaint. There, Plaintiffs quote an owner's manual which boasts that the 2011 Duramax engine "uses the latest emission control technology, reducing Nitrogen Oxide (NOx) emissions by a *whopping* 63%, when compared to the 2010 model." Am. Compl. at 68. Because the emissions levels from the 2010 and 2011 models could be measured and thus the truth of the statement could presumably be precisely determined, it is not puffery. But, when viewed in context of the rest of the complaint, it is clear that this single allegation is insufficient to state a WDPTA claim. Plaintiffs never allege that the 2011 model *does not* produce a 63% reduction compared to the 2010 model. Rather, their allegations of fraud are all centered on the alleged existence of defeat devices which created the appearance of "clean diesel" and low emissions without the reality of the same. Plaintiffs' suit is thus about GM's alleged fraud regarding the true operation of its diesel engines, not whether GM's advertising regarding the iterative improvements of its vehicle models was false. Because Plaintiffs do not affirmatively allege that GM's representation regarding emissions reductions in the 2011 models over the 2010 models is false, that allegation does not constitute an actionable statement under the WDPTA.

privity between themselves and the Defendants. Plaintiffs argue that the statutes in question simply require that the plaintiffs purchase a good or service from a merchant (thus preventing claims based on merely contemplated transactions), but do not require a direct contractual relationship between the parties.

**1.**

The Idaho Consumer Protection Act ("ICPA") creates a cause of action for "[a]ny person who purchases or leases goods or services and thereby suffers any ascertainable loss of money or property, as a result of the use or employment by another person of a method, act or practice declared unlawful by this chapter." I.C. § 48-608(1). If the plaintiff is successful, they may "treat any agreement incident thereto as voidable, or, in the alternative, may bring an action to recover actual damages." *Id.* Without exception, Idaho courts have held that, "[i]n order to have standing under the Idaho Consumer Protection Act (ICPA) . . . , the aggrieved party must have been in a contractual relationship *with the party* alleged to have acted unfairly or deceptively." *Taylor v. McNichols*, 243 P.3d 642, 662 (Idaho 2010) (emphasis added). *See also Duspiva v. Fillmore*, 154 Idaho 27, 36, 293 P.3d 651, 660 (2013) (quoting *Taylor* for the same principle); *Kerr v. ReconTrust Co. N.A.*, No. 41670, 2014 WL 6674273, at *3 (Idaho Ct. App. Nov. 25, 2014) (same); *Haskin v. Glass*, 640 P.2d 1186, 1189 (Idaho Ct. App. 1982) (affirming dismissal of ICPA claim "because the renters did not enter into a contract with the owners to purchase the property").

With one exception, federal courts applying Idaho law have interpreted the Idaho Supreme Court's analysis as predicating ICPA standing on direct privity. *See Hansen v. U.S. Bank, Nat'l Ass'n*, No. 4:15-CV-00085-BLW, 2015 WL 5190749, at *4 (D. Idaho Sept. 4, 2015) ("Here, no contractual relationship currently exists, or ever existed, between Hansen and any of the Defendants and Hansen therefore lacks standing to assert an ICPA claim."); *Moto Tech, LLC v.*

*KTM N. Am., Inc.*, No. 1:13-CV-00165-BLW, 2013 WL 6446239, at *4 (D. Idaho Dec. 9, 2013) ("As the ultimate arbiter of Idaho law, the Idaho Supreme Court has the last word on construing statutory language. And the Idaho Supreme Court has unequivocally stated that a contractual relationship must exist between the aggrieved party and the alleged aggrieving party.") (internal citation omitted); *Mortensen v. Mortg. Elec. Registration Sys., Inc.*, No. 1:10-CV-00234-EJL, 2012 WL 4482040, at *13 (D. Idaho Aug. 24, 2012) (Rep. & Rec.).

The lone outlier is the recent decision *In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, & Prod. Liab. Litig.* ("FCA"), 295 F. Supp. 3d 927, 1021 (N.D. Cal. 2018). This suit also involves allegations of emission "defeat devices" and names Fiat-Chrysler Automobiles and various subsidiaries as the defendants. In *FCA*, the district court held that the ICPA does not "necessarily require[e] a direct contract between the plaintiff and defendant (immediate privity)." *Id.* The court suggested that *Taylor v. McNochols* does not make clear "what kind of contractual relationship" the ICPA requires. *Id.* Citing to *Haskin v. Glass* and *Moto Tech*, the *FCA* court held that the ICPA requires "that a plaintiff's claim must ultimately be founded on a contract; [but] they do not necessarily require that the contract must be one entered into by the plaintiff and defendant directly." *Id.* at 1022. In particular, the court emphasized that, in *Moto Tech*, the federal district court cited *Haskin* for the proposition that "[t]he IPCA does not apply 'to a merely contemplated transaction, where there was no contract.'" 2013 WL 6446239, at *4 (quoting 640 P.2d at 1189). Because FCA had not identified any cases interpreting the ICPA's standing requirements in "the situation where a contract is with a defendant's dealer," the court did not dismiss the ICPA claim. *Id.*

Respectfully, the Court believes that the Idaho Supreme Court has unambiguously interpreted the ICPA as requiring direct contractual privity. As a federal court sitting in diversity

jurisdiction and applying Idaho law, the Court must "apply state law in accordance with the controlling decisions of the state supreme court." *Allstate Ins. Co. v. Thrifty Rent-A-Car Sys., Inc.*, 249 F.3d 450, 454 (6th Cir. 2001). In *Taylor* and *Duspiva*, the Idaho Supreme Court has specifically confirmed that, to sue under the ICPA, "the aggrieved party must have been in a contractual relationship *with the party alleged* to have acted unfairly or deceptively." *Taylor*, 243 P.3d at 662 (emphasis added). To interpret that holding as requiring a contractual relationship generally but not direct contractual privity would render the phrase "with the party alleged" superfluous. That phrase (and the rest of the holding in *Taylor*) is binding on this Court.

The only case identified by the parties (other than *FCA*) where an ICPA claim was analyzed in the context of a contractual relationship with the defendant's dealer is *Johnson v. Ford Motor Co.*, No. 3:13-6529, 2015 WL 7571841, at *10 (S.D.W. Va. Nov. 24, 2015). In *Johnson*, the district court found that ICPA standing existed because the plaintiff "allege[d] that she purchased her vehicle from an authorized Ford dealer, and because that dealer may have been an agent that bound Ford to a contract with her." *Id.* In *Am. W. Enterprises, Inc. v. CNH, LLC*, the Idaho Supreme held that "[a] manufacturer-authorized dealer relationship alone is insufficient to give rise to an agency relationship." 316 P.3d 662, 670 (Idaho 2013). Because nothing more than that kind of relationship has been alleged here, the reasoning in *Johnson* does not identify a basis for ICPA standing.

And, more importantly, both *Johnson* and *FCA* constitute mere predictions regarding how the Idaho Supreme Court would rule if confronted with the indirect privity issue presently framed. Perhaps, if confronted with the question, the Idaho Supreme Court would broaden the ICPA standing requirements. But given the language of *Taylor* and *Duspiva* which expressly permits Plaintiffs to sue only the parties with which they have a contractual relationship, Plaintiffs' lack of a contract with GM or Bosch necessitates dismissal of their ICPA claim.

**2.**

The Kentucky Consumer Protection Act ("KCPA") grants a cause of action to "[a]ny person who purchases or leases goods or services primarily for personal, family or household purposes and thereby suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment by another person of a method, act or practice declared unlawful by KRS 367.170." KRS § 367.220.

Kentucky courts have uniformly held that the KCPA authorizes only "an action by a purchaser against his immediate seller," typically described as "privity of contract." *Skilcraft Sheetmetal, Inc. v. Kentucky Mach., Inc.*, 836 S.W.2d 907, 909 (Ky. Ct. App. 1992). *See also Keaton v. G.C. Williams Funeral Home, Inc.*, 436 S.W.3d 538, 546 (Ky. Ct. App. 2013) (explaining that "[c]laims may only be brought under the KCPA by individuals who personally purchase goods or services from a merchant," and dismissing a suit against a sub-contractor for lack of privity).

Plaintiffs do not address the unambiguous holding in *Skilcraft*. They merely argue the Kentucky Supreme Court's reasoning in *Craig & Bishop, Inc. v. Piles* establishes that a plaintiff can sue anyone under the KCPA as long as they qualify as a "purchaser" under the statute. 247 S.W.3d 897, 903 (Ky. 2008). In *Piles*, a used car business argued that the consumers could not sue under the KCPA because there was no binding contract. *Id.* The Kentucky Supreme Court rejected that argument, finding that the consumers qualified as "purchasers" under the KCPA because they temporarily took possession of a Camaro after signing over title to their Nissan, and so gained "an equitable interest in the Camaro equal to the value of the Nissan." *Id.* at 902–03. The fact that the dealer was unable to secure adequate financing for the consumers to consummate the transaction was not fatal to the KCPA claim. The Kentucky Supreme Court simply held that "[e]ven though a

binding contract was at least arguably not established, we nonetheless hold that Piles and Warner qualified as purchasers to bring an action for KCPA violations." *Id.* at 903–04.

The reasoning in *Piles* is thus entirely consistent with the holding in *Skilcraft* that the KCPA authorizes only "an action by a purchaser against his immediate seller." 836 S.W.2d at 909. *Piles* demonstrates that a formal contract is not always necessary for a purchaser to sue his immediate seller for an unlawful trade practice, but *Piles* in no way contradicts the many cases which support the general proposition that a purchaser may only sue the immediate seller under the KCPA. *See Yonts v. Easton Tech. Prod., Inc.*, 676 F. App'x 413, 420 (6th Cir. 2017) (rejecting the argument that a second-hand purchaser may sue a manufacturer because "[i]f a consumer so far removed from the manufacturer could claim express-warranty or KCPA protection, . . . [the statutory] limitations would be meaningless"); *In re Chrysler-Dodge-Jeep Ecodiesel Mktg., Sales Practices, & Prod. Liab. Litig.*, 295 F. Supp. 3d 927, 1022 (N.D. Cal. 2018) (dismissing KCPA claim for lack of privity); *Estate of DeMoss by & through DeMoss v. Eli Lilly & Co.*, 234 F. Supp. 3d 873, 884 (W.D. Ky. 2017) ("[T]he KCPA requires that privity of contract exist between the parties."); *Bosch v. Bayer Healthcare Pharm., Inc.*, 13 F. Supp. 3d 730, 750 (W.D. Ky. 2014) ("Kentucky courts have held that this language "'plainly contemplates an action by a purchaser against his immediate seller.'") (quoting *Skilcraft*, 836 S.W.2d at 909); *Keaton*, 436 S.W.3d at 546; *Skilcraft*, 836 S.W.2d at 909.

One exception to this general rule exists under Kentucky law. Specifically, "[c]ourts have recognized that an exception to the privity requirement exists when express representations are alleged." *Estate of DeMoss*, 234 F. Supp. 3d at 884 (citing *Naiser v. Unilever U.S., Inc.*, 975 F. Supp. 2d 727, 743 (W.D. Ky. 2013)). In *Naiser*, the court held that plaintiffs could maintain a KCPA claim against the defendant, "despite the absence of a direct buyer-seller relationship,"

because the plaintiffs "sufficiently alleged that Unilever made valid express warranties for Plaintiffs' benefit." 975 F. Supp. 2d at 743. *See also Skilman*, 836 S.W.2d at 909 ("[W]e conclude a subsequent purchaser may not maintain an action against a seller with whom he did not deal *or who made no warranty for the benefit of the subsequent purchaser*.") (emphasis added).

Plaintiffs do not expressly argue that the Defendants have made express warranties to the Plaintiffs, much less identify what those express warranties might be. Under Kentucky law, express warranties are created by "[a]ny affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise" or "[a]ny description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description." KRS § 355.2-313(1). Plaintiffs have disclaimed any claims premised on proof of affirmative misrepresentation. And, regardless, the representations Plaintiffs identify in the amended complaint are nonactionable as the suit is presently framed (discussed in footnote seven). *See Moore v. Mack Trucks, Inc.*, 40 S.W.3d 888, 891 (Ky. Ct. App. 2001) (explaining that "statement[s] of opinion," or "puffing," do not create express warranties). Count 29 of the amended complaint will be dismissed.

## C.

In Counts Eight and Nine, Plaintiffs advance claims under Louisiana law. In Count 8, Plaintiffs advance a claim for violation of the Louisiana Unfair Trade Practices and Consumer Protection Act ("LUPTA"), La. Rev. Stat. § 51:1401, *et seq*. In Count 9, Plaintiffs advance a "fraudulent concealment" claim based on uncited "Louisiana law."[8] Defendants argue that both of

---

[8] Plaintiffs' failure to cite the authority on which they rely is particularly unhelpful because of Louisiana's heritage of following the Napoleanic Code, instead of the English common law.

these claims are barred by the exclusivity provision of the Louisiana Products Liability Act ("LPLA"), La. Rev. Stat. § 2800.52, *et seq*.

The LUPTA makes unlawful "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." La. Rev. Stat. § 51:1405(A). However, the LPLA specifies that the Act "establishes the exclusive theories of liability for manufacturers for damage caused by their products. A claimant may not recover from a manufacturer for damage caused by a product on the basis of any theory of liability that is not set forth in this Chapter." La. Rev. Stat. § 2800.52. The LPLA further defines "damages" as including "damage to the product itself and economic loss arising from a deficiency in or loss of use of the product only to the extent that Chapter 9 of Title VII of Book III of the Civil Code, entitled 'Redhibition,' does not allow recovery for such damage or economic loss." *Id.* at § 2800.53(5).

The scope of the LPLA's exclusivity provision has been given much more attention by federal district courts than Louisiana state courts.[9] According to the Louisiana Court of Appeal, "the [LPLA] is the exclusive form of recovery against a manufacturer only for damages as defined by the Act." *Draten v. Winn Dixie of Louisiana, Inc.*, 94-0767 (La. App. 1 Cir. 3/3/95), 652 So. 2d 675, 678 (1995). As explained above, the LPLA's definition of "damages" includes an exception for "redhibition" claims. Thus, "[t]he LPLA does not preclude recovery from a manufacturer for

---

[9] Because Louisiana state law has incorporated the Napoleanic Code, and not the English common law, the *Erie* doctrine has unique application to a federal court sitting in diversity jurisdiction. As explained by the Fifth Circuit, "[u]nder Louisiana's Civil Code, the only authoritative 'sources of law are legislation and custom.'" *Am. Int'l Specialty Lines Ins. Co. v. Canal Indem. Co.*, 352 F.3d 254, 260 (5th Cir. 2003) (quoting La. Civ. Code. Ann. art. 1 (2003)). "Thus, in Louisiana, courts must look first and foremost to the state's 'primary sources of law: the State's Constitution, codes, and statutes.'" *Id.* (quoting *Prytania Park Hotel, Ltd. v. General Star Indem.*, 179 F.3d 169, 175 (5th Cir.1999)). In other words, "[j]urisprudence, even when so cohesive and entrenched as 'to rise to the level of *jurisprudence constante*,' is merely 'a secondary law source.'" *Id.* (quoting *Transcon. Gas Pipe Line Corp. v. Transp. Ins. Co.*., 953 F.2d 985, 988 (5th Cir.1992)). "'[S]tare decisis is foreign to the Civil Law, including Louisiana.'" *Id.* (quoting *Transcon. Gas Pipe Line Corp.*, 953 F.2d at 988). In short, while federals courts "will not disregard Louisiana appellate court decisions unless we are convinced 'by other persuasive data that the highest court of the state would decide otherwise,' 'particularly [if] numerous decisions are in accord on a given issue—the so-called *jurisprudence constante*—[ ] we are not strictly bound by them.'" *Id.* (quoting *Transcon. Gas Pipe Line Corp.*, 953 F.2d at 988).

damages for economic loss due in a redhibition claim." *Draten*, 652 So. 2d at 678. *See also United Fire Grp. v. Caterpillar, Inc.*, 2013-2115 (La. App. 1 Cir. 8/18/14) (2014) (same); *Monk v. Scott Truck & Tractor*, 619 So. 2d 890, 893 (La. Ct. App. 1993) (same).

Federal districts courts applying the LPLA have repeatedly concluded that the LPLA provides the exclusive means for suits against a manufacturer for damages caused by a product, with several specifically codified exceptions. For example, in *Bladen v. C.B. Fleet Holding Co.*, the district court held that "[t]he plain language and the unique legislative history of the LPLA demonstrate the legislature's intent to make the LPLA the sole vehicle for a suit against a 'manufacturer.'" 487 F. Supp. 2d 759, 767 (W.D. La. 2007). *See also id.* at n.4 (discussing the legislative history of the LPTA); *Johnson v. Ford Motor Co*., No. 3:13-6529, 2015 WL 7571841, at *11 (S.D.W. Va. Nov. 24, 2015) (holding that "the LPLA bars claims against manufacturers for fraudulent omission and unjust enrichment that arise from one of the manufacturer's products," but does not bar claims for redhibition against manufacturers); *Grenier v. Med. Eng'g Corp.*, 99 F. Supp. 2d 759, 763 (W.D. La. 2000), aff'd, 243 F.3d 200 (5th Cir. 2001) (holding that "[t]he LPLA provides the only avenue by which Plaintiffs may assert liability on behalf of a manufacturer" and dismissing fraudulent representation and concealment claims); *Pitre v. Yamaha Motor Co.*, 51 F. Supp. 3d 644, 661 (E.D. La. 2014) ("The LPLA does not provide causes of action for negligence, fraudulent concealment, or unjust enrichment. Thus, Plaintiffs may not individually maintain actions under Louisiana law based on any of these theories.").

Nevertheless, because Louisiana is not a common law jurisdiction, the statutes in question, not jurisprudential interpretations of those statutes, are the controlling authority. As explained above, the LPLA provides the "exclusive" means of recovery of "damage caused by [a manufacturer's] products." La. Rev. Stat. § 2800.52. The dispositive question, then, is whether

Plaintiffs' alleged injuries were "caused" by the Duramax-engine produced by GM. Plaintiffs argue that "the plain language of the LPLA does not preclude claims based on overpayment caused by deceptive conduct as they cannot be reasonably construed to be claims for damages 'caused by . . . products.'" Pl. Resp. Br. at 14. Plaintiffs emphasize that "there is no allegation here that the concealed defeat devices were product *defects*; to the contrary, they worked exactly as Defendants intended." *Id.* (emphasis in original).

Plaintiffs' argument carries some force: they allege that GM purposefully designed the engine to operate in a deceptive way, thus depriving consumers of certain functionality which they believed they were paying for. The alleged "defeat devices" are not a defect in the engine because they were designed and purposefully included. It is thus counterintuitive to find that Plaintiffs can sue only under a products liability statute. Such claims typically involve unintentional imperfections in a product, not engineering successes.

And yet there is reason to believe that Plaintiffs cannot advance an LUPTA claim on this theory. The LPLA applies to suits against manufacturers for damage caused by their products. The language of the act does not limit its scope to damage arising from unintentional defects. The Act defines "damage" as including "damage to the product itself and economic loss arising from a deficiency in or loss of use of the product only to the extent that Chapter 9 of Title VII of Book III of the Civil Code, entitled "Redhibition," does not allow recovery for such damage or economic loss. Attorneys' fees are not recoverable under this Chapter." La. Rev. Stat. § 2800.53(5). Plaintiffs clearly allege a "deficiency in . . . the product" which they bought: the Duramax engines do not limit emissions as a reasonable consumer would expect.

The single case which Plaintiffs rely upon to support their interpretation of the LPLA actually helps clarify the relevant distinction. In *NAZ, LLC v. Philips Healthcare, a Div. of Philips*

*Elecs. N. Am. Corp.*, the district court held that "when the source of damage is not the product itself but, for instance, a fraudulent misrepresentation made by the manufacturer, or a failure to provide services in breach of a contract separate and apart from the contract of sale, a plaintiff may bring this distinct claim alongside or independently from an LPLA claim." No. CV 17-2882, 2018 WL 1202570, at *8 (E.D. La. Mar. 8, 2018). In so holding, the court relied upon the following provision from *Hollybrook Cottonseed Processing, LLC v. Carver, Inc.*: "While the exclusivity provision of the LPLA leaves no doubt breach of contract claims against manufacturers for damages caused by their products are subsumed by the LPLA, in cases where a specific part of the injury is caused *only* by the breach of contract, and not by the product itself, a buyer might be able to bring both types of claims against a manufacturer." No. CIV.A 09-0750, 2010 WL 892869, at *7 (W.D. La. Mar. 11, 2010) (emphasis in original).

At best, *Naz* and *Hollybrook* stand for the proposition that the LPLA might not be the exclusive avenue for relief when the plaintiff's damage is *solely* attributable to a breach of contract. Here, no contract has ever been alleged. And, even if this rationale was applied to a non-contractual fraudulent concealment claim, Plaintiffs would be required to show that their damages stem *solely* from the fraudulent concealment, and not from the product itself. The allegations in the amended complaint cannot meet that requirement.

To be sure, Plaintiffs' claim is premised on an alleged fraudulent scheme, but the focus of the scheme was on the *product* being produced. Plaintiffs were not injured when Defendants allegedly designed an engine with "defeat devices," they were injured at the moment they purchased the product containing those devices. If Defendants had designed the Duramax engine in an intentionally deceptive way and concealed that fact from the public, but never sold vehicles containing the engine, no damage to any consumer would have ever occurred. Plaintiffs' damages

were caused by a deficiency in the product they bought. Accordingly, the LPLA's exclusivity provision applies.

Plaintiffs argue that it would be absurd to interpret the LPLA as applying to their theory of relief:

> It defies belief to suppose that the Louisiana legislature intended to provide effective immunity for manufacturers who make false statements about their products by precluding consumers from bringing LUPTA and common-law fraud claims *without* providing them with a cause of action under the LPLA. GM's position effectively guts the LUPTA with respect to manufacturers; had the Louisiana legislature intended such a radical result—the undoing of the LUPTA, which it had previously enacted——would surely have said so.

Pl. Resp. Br. at 14 (emphasis in original).

This hyperbolic argument overlooks two facts. First, the exclusivity provision of the LPLA represents the legislature's affirmative intention to supersede past remedies it had created. Second, the LPLA appears to contemplate a cause of action which Plaintiffs could conceivably avail themselves of.

As indicated above, the LPLA's definition of "damage" exempts claims advanced pursuant to "Chapter 9 of Title VII of Book III of the Civil Code, entitled 'Redhibition,'" from the LPLA's coverage. La. Rev. Stat. § 2800.53(5). Chapter 9, Art. 2545 reads:

> A seller who *knows that the thing he sells has a defect but omits to declare it*, or a seller who declares that the thing has a quality that he knows it does not have, is liable to the buyer for the return of the price with interest from the time it was paid, for the reimbursement of the reasonable expenses occasioned by the sale and those incurred for the preservation of the thing, and also for damages and reasonable attorney fees. If the use made of the thing, or the fruits it might have yielded, were of some value to the buyer, such a seller may be allowed credit for such use or fruits.

La. Rev. Stat. Art. 2545 (emphasis added).

The Revision Comments to that provision indicate that "[w]hen the thing sold contains a redhibitory defect, the manufacturer and the seller are solidarily liable to the buyer for a return of

the purchase price." *Id.* Revision Comments at (c) (citing *Womack and Adcock v. 3M Business Products Sales, Inc*., 316 So.2d 795 (La.App. 1st Cir.1975); *Media Production Consultants, Inc. v. Mercedes-Benz of North America, Inc*., 262 La. 80, 262 So.2d 377 (La. 1972)). *See also Pitre v. Yamaha Motor Co.*, 51 F. Supp. 3d 644, 661 (E.D. La. 2014) ("[T]o the extent that Plaintiffs allege that Yamaha knew that the F–Series motor was defective, but sold it anyway, their claims sound in redhibition.").

Plaintiffs do not cite the redhibition statute in the amended complaint, nor do they consider that potential theory of relief in their briefing. Accordingly, the cognizability of that particular claim is not framed and not ripe. There may be procedural and substantive bars to a redhibitory claim premised on the facts alleged in the amended complaint. But Plaintiffs are, of course, free to seek leave to amend their complaint to add the claim if they wish. Regardless of whether a hypothetical redhibition claim would be cognizable, Plaintiffs' LUPTA and common-law fraudulent concealment claims are barred by the LPLA's exclusivity provision. They will be dismissed.

### D.

The final issue is whether punitive damages are available under the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 P.S. § 201-1, *et seq.* Section 201-9.2 of the UTPCPL provides that "[t]he court may, in its discretion, award up to three times the actual damages sustained, but not less than one hundred dollars ($100), and may provide such additional relief as it deems necessary or proper. The court may award to the plaintiff, in addition to other relief provided in this section, costs and reasonable attorney fees."

Plaintiffs argue that the "additional relief" which courts are empowered to award includes punitive damages. In support of that argument, Plaintiffs identify a limited number of cases. *See*

*Werwinski v. Ford Motor Co.*, No. CIV.A. 00-943, 2000 WL 375260, at *4 (E.D. Pa. Apr. 11, 2000) ("The UTPCPL allows a court discretionary authority to award punitive damages in addition to actual and treble damages in cases where the court finds such additional relief to be 'necessary or proper.'"); *Aronson v. Creditrust Corp.*, 7 F. Supp. 2d 589, 594 (W.D. Pa. 1998) ("Based upon the plain language of the statute and absent any authority from the Defendants to the contrary, I find that the UTPCPL allows a court discretionary authority to award punitive damages in addition to actual and treble damages in cases where the court finds such additional relief to be "necessary or proper."); *Hammer v. Nikol*, 659 A.2d 617, 620 (Pa. Commw. Ct. 1995) ("[The UTPCPL] provides that in private actions under the CPL, the court may, in its discretion, award treble damages and "such additional relief as it deems necessary or proper." In this case, the trial court awarded damages in the amount of $1,700—twice Hammer's actual damages of $850—and attorney's fees and costs. This award was within the court's discretion and will not now be disturbed."); *Adams v. Gen. Motors Corp.*, No. CIV. A. 89-7653, 1990 WL 18850, at *2 (E.D. Pa. Feb. 26, 1990) ("Although there is little caselaw on the availability of punitive damages under the UTPCPL, what law there is suggests that punitive damages are appropriate where violations are repeated or extreme.").

In recent years, however, Pennsylvania state courts (and federal district courts) have firmly held that punitive damages are not available under the UTPCPL. *See Richards v. Ameriprise Fin., Inc.*, 152 A.3d 1027, 1039–40 (Pa. Sup. Ct. 2016) ("The trial court had the discretion to award to treble damages, but the trial court was prohibited from imposing punitive damages under the statute."); *McCauslin v. Reliance Fin. Co.*, 751 A.2d 683, 685 (Pa. Sup. Ct. 2000) ("The Act does not specifically confer the right to recover damages for infliction of emotional distress, nor are there reported decisions recognizing such a recovery. Further, although the Act does allow the

Court to impose up to treble damages for actual damage sustained, it does not otherwise confer a right to punitive damages."); *Samuel-Bassett v. KIA Motors Am., Inc.*, 357 F.3d 392, 401 (3d Cir. 2004) ("We also point out that under the Consumer Protection Law no punitive damages other than the discretionary authority to treble is permitted."); *Lindsley v. Am. Honda Motor Co., Inc.*, No. CV 16-941, 2017 WL 2930962, at *10 (E.D. Pa. July 7, 2017) (collecting cases, and hold that "[w]e are satisfied that Plaintiff may recover treble damages on her UTPCPL claim, but is not entitled to recover punitive damages on that claim."); *Perry v. Capital One*, No. 2:11-CV-27, 2012 WL 645938, at *3 (E.D. Pa. Feb. 29, 2012) ("The damages provision of the UTPCPL, which the FCEUA incorporates, provides that 'no punitive damages other than the discretionary authority to treble is permitted.'") (quoting *Samuel-Bassett*, 357 F.3d at 401); *Smith v. Bristol-Myers Squibb Co.*, No. CIVA 306-CV-6053 FLW, 2009 WL 5216982, at *7 n.11 (D.N.J. Dec. 30, 2009) ("In light of this Court's dismissal of Plaintiff's UTPCPL claim, this Court need not address the issue, however, the Court notes, and Plaintiff does not contest, that punitive damages are unavailable under the UTPCPL."); *Hockenberry v. Diversified Ventures, Inc.*, No. 4:04CV1062, 2005 WL 1458768, at *5 (M.D. Pa. June 20, 2005) ("The UTPCPL, the basis for the only remaining claim, permits recovery of treble damages in some circumstances, but such damages are not the equivalent of punitive damages.") (internal citations omitted); *Shorb v. State Farm Mut. Auto. Ins. Co.*, No. CIV.1CV-05-0296, 2005 WL 1137881, at *5 (M.D. Pa. Apr. 25, 2005) ("The CPL does not provide for punitive damages.").

Thus, the precedent from the last eighteen years reflects a consensus that punitive damages are not available under the UTPCPL. This general reluctance to impute the availability of punitive damages from the ambiguous language of the UTPCPL is perhaps attributable to that fact that, "[u]nder Pennsylvania law, punitive damages are an 'extreme remedy available in only the most

exceptional matters.'" *Lindsley*, 2017 WL 2930962 at *10 (quoting *Kee v. Zimmer, Inc.*, 871 F. Supp. 2d 405, 413 (E.D. Pa. 2012)). More importantly, a federal court adjudicating claims premised on state law must "apply state law in accordance with the controlling decisions of the state supreme court." *Allstate Ins. Co. v. Thrifty Rent-A-Car Sys., Inc.*, 249 F.3d 450, 454 (6th Cir. 2001). "If the state supreme court has not yet addressed the issue presented, we must predict how the court would rule by looking to all the available data." *Id.* The decisions of state appellate courts should not "'be disregarded unless [the court is] presented with persuasive data that the [State] Supreme Court would decide otherwise.'" *Id.* (quoting *Kingsley Assoc. v. Moll PlastiCrafters, Inc.*, 65 F.3d 498, 507 (6th Cir.1995)).

The Pennsylvania Supreme Court has not resolved this issue. But Defendants have identified two Pennsylvania Superior Court opinions which unambiguously reject the availability of punitive damages under the UTPCPL. *See Richards*, 152 A.3d at 1039–40; *McCauslin*, 751 A.2d at 685 (Pa. Sup. Ct. 2000). The only state court authority which Plaintiffs rely upon is *Hammer v. Nikol*, 659 A.2d 617, 620 (Pa. Commw. Ct. 1995). *Hammer* predates *Richards* and *McCauslin*, and thus does not represent the most accurate statement of the present nature of Pennsylvania law. Regardless, the court in *Hammer* merely affirmed the trial court's award of damages in twice the amount of the plaintiff's actual damages. *See id.* Section 201-9.2(a) clearly authorizes trial courts to "award up to three times the actual damages sustained," which no party presently disputes. Thus, *Hammer* appears to stand for the unremarkable proposition that actual damages may be trebled by the trial court, not that punitive damages may be awarded.

The most recent and most on-point state appellate court precedent clearly precludes punitive damages for UTPCPL claims. The weight of the federal authority, including all of the

most recent authority, supports the same conclusion. Plaintiffs' claim for punitive damages under the UTPCPL will be stricken.

## IV.

Although Defendants prevail on all of the arguments advanced in their reply brief, Defendants have withdrawn some of the arguments made in their original motion for judgment on the pleadings. For that reason, the motion for judgment on the pleadings will be granted in part. Pursuant to the agreements reached between the parties, some claims will be dismissed without prejudice[10] and certain claims for punitive damages will be stricken. Plaintiffs have further indicated a desire to amend their complaint. If Defendants have no present objection to any of the claims to be added, Plaintiffs should obtain a formal stipulation and then amend. If Plaintiffs wish to add some claims over objection, then, of course, a motion will be required.

Accordingly, it is **ORDERED** that Defendant GM's motion for judgment on the pleadings, ECF No. 66, is **GRANTED in part.**

It is further **ORDERED** that Counts 8, 9, 25, 29, and 53 of the amended complaint, ECF No. 18, are **DISMISSED with prejudice.**

It is further **ORDERED** that Counts 6 and 35 of the amended complaint, ECF No. 18, are **DISMISSED without prejudice.**

It is further **ORDERED** that the requests for punitive damages in Counts 3, 10, 13, 33, 34, 44, and 52 are **STRICKEN.**


Dated: August 1, 2018                              s/Thomas L. Ludington
                                                   THOMAS L. LUDINGTON
                                                   United States District Judge

---

[10] The informal agreements reached by the parties did not specify whether the claims should be dismissed with or without prejudice. In an abundance of caution, the claims will be dismissed without prejudice.

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on August 1, 2018.

s/Kelly Winslow
KELLY WINSLOW, Case Manager